1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4                ---oOo---

**CERTIFIED ORIGINAL**

J|G  Jane GROSSMAN
R|S  REPORTING Services

5   AT&T CORPORATION,              )
                                   )
6            Plaintiff,            )
                                   )
7   vs.                           )    No. C07-02440-EDL
                                   )
8   DATAWAY INC. and dba DATAWAY  )
    DESIGNS,                       )
9                                  )
             Defendants.           )
10  _____)
                                   )
11  DATAWAY, INC.,                 )
                                   )
12           Counterclaimant,      )
                                   )
13  vs.                            )
                                   )
14  AT&T CORPORATION,              )
                                   )
15           Counterdefendant.    )
16  _____)

17        DEPOSITION OF FRANCISCO J. MOLIERI

18               April 15, 2008

19          VOLUME I - Pages 1 through 64

20

21

22     Taken before JANE GROSSMAN, CSR No. 5225

23        JANE GROSSMAN REPORTING SERVICES
            Certified Shorthand Reporters
24        1939 Harrison Street, Suite 460
            Oakland, California 94612
25               (510) 444-4500

EXHIBIT D

```
1                          I N D E X

2   DEPOSITION OF FRANCISCO J. MOLIERI

3   TUESDAY, APRIL 15, 2008

4   VOLUME I

5                                                      PAGE

6   EXAMINATION BY:    MR. AIRES                          4

7

8                      E X H I B I T S

9   DEPOSITION EXHIBIT NUMBER                          PAGE

10  1    Multipage document entitled "RESPONSE TO       36
         PLAINTIFF'S AND COUNTERDEFENDANT'S FIRST
11       SET OF SPECIAL INTERROGATORIES PROPOUNDED
         TO DEFENDANT AND COUNTERCLAIMANT DATAWAY
12       (No Bates numbers)

13                      ---oOo---

14             QUESTION NOT ANSWERED

15            PER INSTRUCTION OF COUNSEL

16               PAGE     LINE

17                27       10

18                      ---oOo---

19     Proceedings Scheduled:  11:00 a.m.

20     Proceedings Commenced:  12:02 p.m.

21                  RECESSES

22       12:45 p.m. until 12:49 p.m.

23     Proceedings Adjourned:  1:25 p.m.

24                      ---oOo---

25
```

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

EXHIBIT D

```
 1              DEPOSITION OF FRANCISCO J. MOLIERI

 2                         VOLUME I

 3           BE IT REMEMBERED that, pursuant to Notice of

 4   Taking Deposition and on Tuesday, April 15, 2008,

 5   commencing at the hour of 12:02 p.m., at the Law Offices

 6   of KORNFIELD, PAUL, NYBERG & KUHNER, Lake Merritt Plaza,

 7   1999 Harrison Street, Suite 2675, Oakland, California

 8   94612, before me, JANE GROSSMAN, a Certified Shorthand

 9   Reporter of the State of California, personally appeared

10   FRANCISCO J. MOLIERI, produced as a witness in said

11   action, and being by me first duly sworn, was thereupon

12   examined as a witness in said cause.

13                        ---oOo---

14                    A P P E A R A N C E S

15           TIMOTHY CARL AIRES, Attorney at Law, of the

16   AIRES LAW FIRM, 180 Newport Center Drive, Suite 260,

17   Newport Beach, California 92660, was present on behalf

18   of Plaintiff and Counterdefendant AT&T Corporation.

19

20           ANNE-LEITH MATLOCK, Attorney at Law, of the

21   MATLOCK LAW GROUP, PC, 1485 Treat Boulevard, Suite 200,

22   Walnut Creek, California 94597, was present on behalf of

23   Defendant and Counterclaimant Dataway, Inc. and dba

24   Dataway Designs.

25                        ---oOo---
```

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

EXHIBIT D

```
 1   TUESDAY, APRIL 15, 2008                    12:02 P.M.

 2                    FRANCISCO J. MOLIERI,

 3              having been sworn as a witness by the

 4                 Certified Shorthand Reporter,

 5                     testified as follows.

 6                          ---oOo---

 7              EXAMINATION BY MR. AIRES

 8        MR. AIRES:  Q.  Could you please state and

 9   spell your name for the record?

10        A.    Francisco, F-r-a-n-c-i-s-c-o, middle initial

11   J., Molieri, M-o-l-i-e-r-i.

12        Q.    Are you currently employed?

13        A.    Yes.

14        Q.    By whom?

15        A.    Dataway, Incorporated.

16        Q.    How long have you been so employed?

17        A.    Since September 2000.

18        Q.    All right.  And what position do you currently

19   hold?

20        A.    Controller.

21        Q.    And how long have you held that position?

22        A.    Since September 2000.

23        Q.    All right.  What are your duties and

24   responsibilities as the controller?

25        A.    Oversee the day-to-day operations and the
```

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

EXHIBIT D

1  early morning, and the following weekend.

2      Q.   Do you know what long-distance provider was

3  used?

4      A.   It was done through the same way as the calls

5  from January 24th, except the calls that followed showed

6  up on our regular contracted accounts with SBC/AT&T.

7      Q.   And they were billed for other long-distance

8  carriers?

9      A.   Yes.  They were MCI, Sprint, and there were

10  some -- a few other ones with small charges.  I do not

11  recall their names, but...

12      Q.   But they were long-distance service providers?

13      A.   Yes.  I believe they are the kind that does

14  the 10-10-something to dial.  I believe that's the kind

15  of service they provide.

16          I know one of them was located in Miami.

17      Q.   All right.  So, there were charges that showed

18  up on an AT&T invoice; is that right?

19      A.   Yes.

20      Q.   And those were in the sum of $11,534.67?

21      A.   Yes.

22      Q.   All right.  So, that came as one invoice from

23  AT&T; right?

24      A.   Yes.

25      Q.   And then you received a different invoice from

EXHIBIT D

1    your local telephone service provider?

2         A.    From AT&T as well.

3         Q.    Or SBC?

4         A.    We have two system accounts.

5              One is a contracted long-distance account,

6    where we have a reduced rate for long-distance calls.

7              The other one is what is called our "Summary

8    Billing Account."  That comprises our contracts with

9    AT&T local, toll, and long distance.

10             The $11,000 you mentioned came on an account

11   that we had never set up.

12             The other charges, the MCI and Sprint charges,

13   came on the summary billing.

14             And there were several smaller charges on the

15   long distance.

16        Q.    On the summary -- on the bill that you would

17   have normally expected to see?

18        A.    Yes.

19        Q.    Okay.  And you concluded somehow that at least

20   some of these charges were the result of caller --

21   calling code access?

22             Do you know what that term means?

23        A.    I'm not sure if I understand it exactly.

24        Q.    All right.  You made reference to 10-10-280.

25        A.    Uh-huh.

EXHIBIT D

1    Q.    Have you ever seen any of those ads where they

2    sold -- they sold access to phone users by dialing a

3    10-10 code?

4    A.    Yes.

5    Q.    So, do you remember that -- I think it was

6    either Sprint or MCI had 10-10-280?

7    A.    I know I've seen the ads.  I don't remember

8    which one had what.

9    Q.    Do you remember the ad from AT&T which was

10   10-10-ATandT?

11   A.    No.

12   Q.    Do you know how is $11,534.67 charges were

13   generated?

14   A.    Not exactly.  I don't know which method they

15   used.  I did some research and found that the call had

16   been originated not in California, but in Kansas, and,

17   you know, it had gone to a number in the Philippines.

18   But I don't know which mechanism.

19   Q.    So, you're not aware that it was accessed

20   through using the calling access code 10-10-288?

21   A.    I don't have firsthand knowledge.

22   Q.    Did anybody ever tell you that?

23   A.    Not that I recall.

24   Q.    How did you learn that the other charges

25   from the other long-distance service providers were the

EXHIBIT D

1    result of calling access codes?

2        A.    At some point in the discussions with the

3    local AT&T managers that was revealed to me.

4        Q.    So, somebody at AT&T told you that the

5    charges from Sprint and MCI were the result of calls

6    made through the use of calling-code-access numbers?

7        A.    I believe so.

8        Q.    Did they ever -- did those -- did that person

9    at AT&T ever indicate to you that the AT&T charges that

10    amounted to $11,534.67 were the result of calls made

11    using a calling-code-access number?

12        A.    No.

13        Q.    Back in 2006, did you conclude that the

14    methodology of the making of the calls relative to the

15    AT&T charges totaling about $11,000 was different from

16    the MCI and the Sprint charges?

17        A.    In all honesty, I cannot tell the difference

18    when I looked at the bills.

19            When I received the bill for the $11,000, I

20    knew it was not one of our accounts.

21            And following the instructions we had been

22    given to dispute these charges, when I called to dispute

23    it, I called the AT&T Billing Office to place the

24    billing dispute.

25            I asked at the time -- because it wasn't in my

EXHIBIT D

1   radar, I asked at the time who had set up the account.

2   I wanted to know if either one of the two owners of the

3   company had set up this other account with AT&T.  And I

4   was never given an answer.

5          I repeatedly asked several people if I could

6   have a copy of the contract we had signed for my

7   records, so I would have some verification that this

8   bill, in fact, belonged to us, and it was not due to

9   some error.  I was never given any answer.

10      Q.   Okay.  Did you ever communicate with anybody

11  at Sprint regarding the toll charges that they assessed?

12      A.   No.

13      Q.   How about MCI?

14      A.   No.

15          What the local AT&T manager told me to do was

16  to send letters to each one of those carriers asking them

17  to reverse the charges because they were calls by --

18  fraudulent calls.

19          I researched each one of the companies listed

20  on the bills, found their addresses, sent letters.

21          I sent copies of all of those letters to the

22  local AT&T manager.

23          And some of them called me back -- not MCI or

24  Sprint, who were the two largest ones, but the other

25  ones.  That's how I know one of them was from Miami.  And

EXHIBIT D

1    apologize for it -- is I might speak when you are

2    speaking.  I don't mean to do that.  I apologize.

3          At any point in time was your local telephone

4    service terminated?

5          A.    No.

6          Q.    All right.  At any point in time was any

7    telephone service -- strike that.

8          At any point in time was any long-distance

9    telephone service provided by AT&T terminated as the

10   result of your failure to pay a bill?

11         A.    No.

12         Q.    Who is your local provider now?

13         A.    AT&T.

14         Q.    All right.  And do they provide both local

15   telephone service as well as your long-distance

16   telephone service?

17         A.    Yes, they do.

18         Q.    So, is it fair to state that as a result of

19   this dispute involving toll charges that you have not

20   suffered any telephone interruption?

21         A.    No, we have not.

22         Q.    Now, as I understand it, this dispute has been

23   kind of time-consuming for you folks; is that correct?

24         A.    That's right.

25         Q.    And you've allocated a certain amount of your

EXHIBIT D

1   time to try to resolve this?

2        A.   Yes.

3        Q.   And I believe there's a suggestion that you've

4   allocated 144 hours to this process.

5        A.   Yes, that's correct.

6        Q.   Do you keep time sheets?

7        A.   No, I don't.

8        Q.   How did you -- how did you sum the 144 --

9   strike that.

10            Upon what information did you rely upon in

11  coming to the conclusion that you had allocated 144 hours

12  to the process of trying to resolve this dispute with

13  AT&T?

14       A.   I came to that conclusion based on --

15            MS. MATLOCK:  Actually, objection.

16            As you know from your documents that you're

17  looking at, we have actually produced a privilege log

18  that work product and attorney-client privilege pertains

19  here, which is the one item -- that and privacy -- that

20  I can tell my client not to respond.

21            These things were prepared and looked at and

22  figured into in preparation for litigation.

23            So, my client does not need to answer.

24            MR. AIRES:  Okay.  So, the objection is

25  attorney work product, attorney-client privilege, and

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

27

**EXHIBIT D**

1  privacy?

2          MS. MATLOCK:  Uh-huh.

3          MR. AIRES:  And you're instructing him not to

4  answer?

5          MS. MATLOCK:  I am.

6          MR. AIRES:  All right.  So, if I ask him any

7  questions about how he determined that it was 144 hours,

8  you are going to give him that instruction?

9          MS. MATLOCK:  It depends on how you verb --

10  verbiage the question.

11          MR. AIRES:  Q.  Do you keep a diary, a daily

12  journal?

13      A.   For work?

14      Q.   Yes, for work.

15      A.   No.

16      Q.   Do you have a desktop calendar or anything?

17      A.   Yes, I do, but I don't -- I don't use it as

18  much.

19      Q.   Okay.  So, it's not like you make little

20  notations on your desktop calendar indicating what you

21  did from eight o'clock in the morning until 8:30 in the

22  morning, assuming that you were at work at eight o'clock

23  in the morning until 8:30 in the morning?

24      A.   No.

25      Q.   And you are not required to maintain records

EXHIBIT D

1    of how you spend your time at work, are you?

2        A.    No, I'm not required.

3        Q.    So, you don't do it voluntarily, and you are

4    not mandated to do it; is that right?

5        A.    That's correct.

6        Q.    Is anybody at your company required -- strike

7    that.

8              Was the same true for back in 2006?

9        A.    Yes.

10       Q.    How about in 2007?

11       A.    Yes.

12       Q.    All right.

13             MS. MATLOCK:    Ambiguous.

14             Are you asking for him -- for his time in 2006

15   and in 2007?

16             MR. AIRES:    Q.    Is that the way you understood

17   my question?

18       A.    I understood you were asking me personally if

19   I --

20       Q.    Yes.    And that's how I intended it.

21             To your knowledge -- strike that.

22             To your knowledge, back in 2006, was anybody at

23   Dataway required to account for their time spent on

24   projects?

25       A.    Yes.    The engineers.

EXHIBIT D

1      Q.   All right.  Did the engineers spend any time

2   back in 2006 trying to resolve this dispute with AT&T?

3      A.   No.

4      Q.   Other than yourself, who in 2006 spent any

5   time trying to resolve this dispute with AT&T?

6      A.   Simon Lewis.

7      Q.   Anybody else?

8      A.   No.

9      Q.   To your knowledge, was Mr. Lewis keeping track

10  of his time in written form?

11     A.   To my knowledge, no.

12     Q.   All right.  So, you've not seen a daily log

13  that he has prepared or a time sheet or anything on a

14  day-to-day basis saying what he did on any particular

15  day and between any particular hours?

16     A.   No.

17     Q.   Has anybody ever told you that such a

18  contemporaneous written document exists?

19     A.   (No response.)

20     Q.   Withdrawn.

21          Has anybody ever told you that Mr. Lewis kept a

22  log?

23     A.   No.

24     Q.   What's Mr. -- strike that.

25          In 2006, what was Mr. Lewis's job title?

EXHIBIT D

```
1          A.   President and CEO of the company.
2          Q.   Do you have an understanding as to what his
3     duties and responsibilities were?
4          A.   Yes.
5          Q.   Back in '06?
6          A.   Yes.
7          Q.   What were they, as you understood it?
8          A.   He manages the financial and business side of
9     the operation.
10         Q.   In 2007 were his duties the same?
11         A.   Yes.
12         Q.   How about right up until today, in 2008?  Is
13    it the same thing?
14         A.   Yes.
15         Q.   Do you ever perform any services for -- strike
16    that.
17              In your capacity at Dataway, do you ever
18    perform services for any outside clients?
19         A.   (No response.)
20         Q.   If you don't understand my question, I'll
21    rephrase it.
22         A.   Yes, please.
23         Q.   Sure.
24              Lawyers have clients, and they work for
25    clients.
```

EXHIBIT D

1       A.    Uh-huh.

2       Q.    And some people in the office, though, don't

3   do anything for those outside clients.  Some of them

4   answer the phone.

5       A.    Uh-huh.

6       Q.    Do you understand what I'm saying?

7       A.    Yes.

8       Q.    Do you ever perform any services for outside

9   clients?

10      A.    No.

11      Q.    All right.  So, everything -- strike that.

12            Is that true from the period of July 24th of

13  2006 all the way through until today?

14      A.    Yes.

15      Q.    Back in '06, what was the nature of the

16  business activity of Dataway?  What did it do?

17      A.    Dataway is a company that provides managed

18  support and security for Internet and network (sic).

19      Q.    Does that include telephone systems?

20      A.    No.

21      Q.    Just Internet?

22      A.    Internet and network connections.

23      Q.    How long -- is that its primary business

24  today?

25      A.    Yes.

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

EXHIBIT D

1          Q.    How long has it been doing that?

2          A.    Since its inception in 1996.

3          Q.    Back in 2006, when Mr. Lewis was absent from

4    the company's headquarters, who was in charge?

5          A.    The company is owned by two partners.

6                Usually if one is away, the other one is in

7    the office.

8                Simon takes care more of the financial and

9    business side of the operation, while the other partner,

10   Eoghan, is more involved in the technical/engineering

11   aspect.

12         Q.    What is Eoghan's last name?

13         A.    O'Neill, O-apostrophe-N-e-i-l-l.

14               And Eoghan is E-o-g-h-a-n.  That's his first

15   name.

16         Q.    I have never seen that spelling before.  It's

17   very unusual.

18               MS. MATLOCK:  It's nice to hear that answer.

19   I had the same response.

20               MR. AIRES:  Q.  All right.  Did Mr. O'Neill

21   participate in any way in any of this AT&T toll-fraud-

22   resolution stuff?

23         A.    No.

24         Q.    All right.  Now, it's been suggested in

25   responses to interrogatories that your time -- don't

EXHIBIT D

1     take this the wrong way -- is worth $50 an hour.

2         A.    Yes.

3         Q.    Do you know how that sum was determined?

4         A.    Yes.

5         Q.    How?

6         A.    I took my salary, my annual salary, and

7     divided it by 2,088.

8         Q.    And that's the average amount of hours in a

9     year?

10        A.    Yes.

11        Q.    Is that based on a 40-hour week?

12        A.    Yes.

13        Q.    Did you take into account any vacation you

14    might have taken?

15        A.    No.

16        Q.    All right.  So, it's 52 weeks multiplied by

17    40, and then you took your salary and divided it?

18        A.    Uh-huh.

19        Q.    That's a "yes"?

20        A.    Yes, which is the standard way of calculating

21    hourly rates.

22        Q.    Sure.  Did you do the same thing with respect

23    to Mr. Lewis?

24        A.    Yes.

25        Q.    You took his salary and divided it by 2,088?

EXHIBIT D

```
1         A.   No.  I am sorry.  I stand corrected.

2         Q.   How did you figure out the 250 bucks an hour?

3         A.   That's the rate we charge clients for

4    Mr. Lewis' consulting.

5         Q.   And has that been consistently $250 an hour

6    since July 24th of 2006?

7         A.   Yes.

8         Q.   He hasn't adjusted it upward for inflation or

9    anything?

10        A.   Not yet.  We are in the process of revising

11   those rates.

12        Q.   Okay.  Now, in the responses to

13   interrogatories, you've identified a category of damages

14   which is -- which -- withdrawn.

15             In the responses to interrogatories, you've

16   identified $40,000 business interruption as an item of

17   damages.

18             Did you investigate whether or not there had

19   been any business interruption as a result of this

20   situation?

21        A.   No.  It was an assumption.

22        Q.   And do you have a recollection of verifying,

23   under penalty of perjury, the responses to

24   interrogatories?

25        A.   Say that again, please.
```

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

EXHIBIT D

1    Q.   All right.  Anybody else?

2    A.   We had a conference -- telephone conference

3    call with some gentleman with Crystal, Jessica.  It was

4    a gentleman, but I don't recall his name or what

5    department within AT&T he was from.

6    Q.   All right.  In any of those communications,

7    did anybody at AT&T tell you that they were going to

8    waive the $11,534.67?

9    A.   Crystal and Jessica never said that because

10   they explicitly told me they couldn't be involved in the

11   dispute of that amount, given that that account, dealing

12   for (sic) -- within their system, whatever that meant,

13   and that we had to deal directly with the -- with AT&T

14   Corporate in -- and the Fraud Resolution Group regarding

15   this.

16         Daniela never said she would waive the charges.

17         She just asked us to fill out a form.  And she

18   said it would go into investigation, and a resolution

19   would be made.

20   Q.   Did Mr. Lewis ever tell you that he was told

21   by anybody at AT&T that AT&T would waive the $11,534.67?

22   A.   He was told by the lady technician from the

23   AT&T Technical Team in New Jersey that he talked to.

24   Q.   He was told what by who?

25   A.   That this was a common occurrence, and that

EXHIBIT D

1    the process was to dispute the charges, and they will be

2    waived.

3         Q.   Did they ever get waived?

4         A.   Not the 11,000.  They are still an open

5    balance.

6         Q.   Okay.  Did he ever indicate to you who he

7    spoke with?

8         A.   He doesn't have a name for the person.  All

9    he recalls -- he told me it was a woman from the AT&T

10   Technical Team in New Jersey.

11        Q.   Did he ever tell you that he received within

12   ten days of that conversation any written evidence that

13   the charges in the amount of $11,534.67 would be waived?

14        A.   No.

15        Q.   Okay.  Did you ever figure out how your system

16   was compromised?

17        A.   No.  Me personally, no.

18        Q.   Do you know if anybody at Dataway determined

19   how the Dataway system had been compromised?

20        A.   Not to my knowledge.

21        Q.   And the system that was in place in July of

22   2006, that was a system that was owned and operated by

23   Dataway?

24        A.   Yes.

25        Q.   I mean, you didn't lease your telephone system

EXHIBIT D