1  Matlock Law Group, PC
2  Anne Leith Matlock, SBN 244351
   1485 Treat Blvd., Suite 200
3  Walnut Creek, CA 94597
   Office: 925-944-7131
4  Fax: 925-944-7138
   E-mail: anne-leith@matlocklawgroup.com
5
   Attorneys for Defendant,
6  Dataway, Inc.

7

8                    **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10                    **SAN FRANCISCO DIVISION**

11

12  AT&T Corp.                          | **CASE NO. C07-02440 EDL**

13                    PLAINTIFF,

14              v.                        | **DECLARATION OF ANNE-LEITH
                                            MATLOCK  IN SUPPORT OF
15                                          DATAWAY'S MOTION TO STRIKE
                                            AT&T'S UNTIMELY REPLY TO
16  Dataway, Inc.                          DATAWAY'S COUNTERCLAIMS**

17                    DEFENDANT.           | **Date: August 26, 2008
                                            Time: 9:00 a.m.
18                                          Courtroom: E**

19  Dataway, Inc.

20                    COUNTERCLAIMANT

21              v.

22  AT&T Corp.

23                    COUNTERDEFENDANT

24

25

26

27

28              I, ANNE-LEITH MATLOCK, declare:

1.  I am an attorney at law licensed to practice before all Courts of the State of California and before the Courts of the Eastern and Northern District of California. I am a partner of the law firm Matlock Law Group, P.C., attorneys of record for Defendant and Counter-Claimant Dataway, Inc. (hereinafter "Dataway").

2.  On October 17, 2007 I filed and served Dataway's Answer and Counterclaim to AT&T's Complaint for Damages. My pleadings remained unresponded until July 16, 2008, the day after I served Dataway's Opposition to AT&T's Motion for Summary Judgment on July 15, 2008. This is 170 days after AT&T's response was due on January 28, 2008.

3.  In Dataway's Opposition to AT&T's Motion for Summary Judgment Dataway asserts that pursuant to Fed. R. Civ. P. 8(b)(6) all allegations and defenses stated in Dataway's Answer and Counterclaim, are admitted due to AT&T's failure to answer/reply.

4.  The resulting admissions and waived defenses by AT&T are now and remain available to Dataway in order to establish Dataway's Counterclaims and to demonstrate that AT&T's so-called undisputed "facts" are contrary to the record.

5.  The answer and counterclaim basically recites the facts Simon Lewis and Francisco Molieri, both officers of Dataway, stated in their depositions. Support for these facts are found in the Transcript of the Deposition of Simon Lewis on pages:

  a. 5 (l. 18-20) and 45 (l.13-25): calls were epidemic;

  b. 6 (l.3-5 and 18-19) and 27 (l.5-17): AT&T employees knew that Dataway did not execute calls and that charges should be waived;

  c. 10 (6-11), 43 (p.21 – p.44 l. 14): calls were fraudulent, executed by hackers, used and created unauthorized Legacy T account;

  d. 11 (l.9-13): calls were executed from remote location in Kansas,

  e. 11 (l.16 – p.12 l.3): does not know how calls were executed, which tariff was used and did not authorize them;

  f. 16 (l.16-20) and 25 (14-18): Dataway did not become indebted to AT&T, did not receive services and was not reasonable value;

2

DECLARATION OF ANNE-LEITH MATLOCK IN SUPPORT
OF DATAWAY'S MOTION TO STRIKE AT&T'S REPLY

Case No. C07-02440 – EDL

g.  29 (l.23- p.30 l.15) and 38 (l.2-9): Despite AT&T's promise, AT&T sent Notice of Disconnect;

h.  30 (l.16-21) and 46 (l.4-12): Dataway denies charges;

i.  32 (l.10-p.33 l.4), 34 (l.8-22) and 40 (l.9-19): consolidated its long-distance telecommunication with SBC, Legacy S;

j.  36: Dataway maintained security means;

k.  42 (l.9-22): AT&T breached its oral contract;

l.  45 (l. 13-25): was hacking typical call and not a regular connection, and

m.  20 (damages).

6.  The allegations are also repeated in the Transcript of the Deposition of Francisco Molieri on pages:

a.  7 (l.18-22): calls were fraudulent, executed by hackers, used and created unauthorized Legacy T account;

b.  8 (l.2-7): hackers compromised voicemail and executed calls to the Philippines using Legacy T);

c.  13 (l.1-7): AT&T promised to waive charges once Dataway formally disputed them;

d.  17 (l.7-9): don't know how calls were executed and which tariff was used;

e.  18 (l. 12-23) and 59 (l.18 et.seq.): hacker compromised voicemail system, executed calls from a remote location, but no knowledge of used service;

f.  58 (l. 19 – p.59. l.2: calls were epidemic;

g.  59 (l. 3-5): AT&T breached oral promise and sent Notice of Disconnect;

7.  Due to the large number of transcript pages, only the pertinent pages are attached as Exhibits. However, Dataway is prepared to submit a full copy of the deposition transcripts at the Court's request.

8.  A copy of the pertinent pages of the Transcript of the Deposition of Simon Lewis is attached hereto as Exhibit A.

1      9.  A copy of the pertinent pages of the Transcript of the Deposition of Francisco

2   Molieri is attached as Exhibit B.

3      10. A copy of news articles (Bate-Stamps DW 011-DW013) is attached as Exhibit C.

4      11. AT&T's extremely tardy response constitutes a failure to demonstrate good faith

5   and to attempt to avoid the consequences of Fed. R. Civ. P. 8(b)(6) with the most scandalous

6   means. Therefore, I respectfully request that this Court strikes Docket No. 115 for this reason.

7

8      I declare under penalty of perjury under the laws of the United States that the foregoing

9   is true and correct.  I could and would competently testify thereto, if called upon as a witness.

10

11      This Declaration is executed this twenty-first day of July, 2008, at Walnut Creek,

12   California.

13

14

15

16                                    Anne-Leith Matlock, Esq.
                                      Attorney for Dataway, Inc.
17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ANNE-LEITH MATLOCK IN SUPPORT
OF DATAWAY'S MOTION TO STRIKE AT&T'S REPLY                    Case No. C07-02440 – EDL

# EXHIBIT A

1    years until I started branding myself as "CEO" a few

2    years ago.

3         Q.    All right.  Have your duties and

4    responsibilities at Dataway been the same since you

5    formed the company?

6         A.    Essentially.

7         Q.    What are those duties and responsibilities?

8         A.    I'm the principal business manager in the

9    company, so I'm effectively the CFO -- I'm essentially

10   the business manager, and I'm effectively the CFO and

11   CEO.  I make most of the management decisions.

12            I'm a principal engineer in the company.  So,

13   I maintain a number of clients.

14            I'm probably responsible for 50 percent or

15   more of the revenue that comes into the company.

16        Q.    What's the principal business activity of

17   Dataway?

18        A.    We are a network security consultancy.  We

19   provide managed services to clients and consulting

20   services in the computer-network and network-security

21   area.

22        Q.    Has that been the business of Dataway since

23   its inception?

24        A.    Yes.

25        Q.    In July of 2006, did you come to learn that

DEPOSITION OF SIMON LEWIS

1   there had been some toll calls placed through the

2   Dataway phone system to the Philippines?

3       A.    Specifically the Philippines or whatever, yes,

4   I learned through a phone call from AT&T, I believe,

5   that was left on my voice mail.

6       Q.    Did the person on the telephone identify

7   themself by name?

8       A.    I don't remember.

9       Q.    Do you know if --

10      A.    I was given a phone number to call, and I

11  called and spoke to a woman in New Jersey.

12      Q.    Did the message left on the machine indicate

13  the job title of the person who left the telephone call

14  -- the telephone message?

15      A.    I don't recall.

16      Q.    Can you recall anything regarding the specific

17  substance of that message?

18      A.    Something about "unauthorized calls on your

19  account; please call this number."

20      Q.    And the number you later determined rang in

21  New Jersey?

22      A.    I know it was New Jersey because I spoke to

23  the person and she told me she was in New Jersey.

24      Q.    Okay.  Can you recall whether or not it was an

25  800 number or a toll-free number or an area code in

DEPOSITION OF SIMON LEWIS

1      Q.    Did she -- it was a PBX system?

2      A.    It is a PBX, yeah.  A key system is PBX.  A

3  key system is a small PBX, basically.

4      Q.    Did she make any recommendations or

5  suggestions regarding the system?

6      A.    If I recall, we discussed how it could be that

7  somebody could make a call.

8          And she suggested that the way -- the only way

9  she knew was through the voice-mail system; in other

10  words, somebody dialing in remotely, like an employee

11  would dial in remotely to access their voice mail.

12      Q.    Did you --

13      A.    That is --

14      Q.    Go ahead.

15      A.    That is what she suggested was likely the

16  reason because, being in the, you know, Fraud

17  Department, or whatever department she was in, she sees

18  this stuff all day long.

19          And to paraphrase exactly what she said, these

20  calls stand out like a sore thumb.  She can see them

21  instantly in the system.  And alarms are going off all

22  day long.

23      Q.    And so, she indicated that it was -- it

24  appeared to her that it was accessed through the

25  voice-mail system?

DEPOSITION OF SIMON LEWIS

1    A.    She suggested that that was the likely place

2   where it would be accessed through because it's,

3   basically, a very simple phone system.

4    Q.    Did Dataway undertake its own independent

5   investigation to determine how it happened?

6    A.    We don't know exactly how it happened, nor can

7   we say definitively how it happened.

8         We do know, because we suspect that it was

9   through the voice-mail system -- and one interesting

10  piece of information we gathered was a telephone number

11  that we believe was in Kansas by the area code -- our

12  caller ID picked it up, and it showed up on one of the

13  phones in the office.

14        We gave this to AT&T as the -- as potentially a

15  source of one of these calls that came in.

16   Q.    Did you ever learn that it was -- that the

17  method used in making the access was through a 10-10-288

18  calling-code access number?

19   A.    I don't know what you mean by that.

20   Q.    So, the answer is that nobody ever told you

21  that?

22   A.    I know what 10-10-288 is.  That's an outbound

23  access code.

24   Q.    Okay.

25   A.    You asked me about how the call came in.

DEPOSITION OF SIMON LEWIS

11

1    paid a bill for toll charges that were believed to be

2    fraudulent in the sum of $1,238.75?

3        A.    No.  And I'm very surprised to hear that.

4        Q.    All right.

5        A.    Did we?  We should not have.

6        Q.    And did Mr. Molieri ever indicate to you that

7    a decision was made to pay certain toll charges because

8    they were billed at a contract rate, versus the Legacy T

9    rate?

10       A.    No.

11       Q.    Okay.

12       A.    Although, if -- okay.  So, our contracted rate

13   -- we have one long-distance carrier, which is AT&T.

14            We now know that there are more than one

15   flavor of AT&T.

16            But there was one AT&T for all intents and

17   purposes as far as we were concerned.  And we had a

18   contract with them.  And we had long-distance rates

19   internationally, you know, of 10, 12, 14 cents a minute,

20   whatever -- very, very inexpensive.

21            So, for the amount of hassle required to deal

22   with phone companies and getting them to, you know,

23   spend months and months or a year or, in this case, two

24   years almost dealing with it, I don't think anybody

25   would have noticed, you know, a few hundred dollars here

DEPOSITION OF SIMON LEWIS

1    AT&T would be one long-distance provider, which is what

2    we had a contract for:  one long-distance provider.

3         The MCI, as far as I know, and Sprint all show

4    up on the one bill and are dealt with by our phone

5    company, AT&T, because they are able to push back on the

6    other third parties and say, "This is fraud.  Therefore,

7    this is not going to be covered."  Everything is fine.

8    The problem goes away.

9         But they don't do that for their own AT&T.

10        And, in fact, that AT&T bill shows up as a

11   different bill two months later.  How this happens is a

12   mystery to me.

13   Q.   Okay.  Did you ever --

14   A.   In fact, I would go further to say, if, in

15   fact, that was the case, why AT&T, the Legacy T AT&T,

16   who are not our long-distance carrier, who we have no

17   relationship with -- why they didn't cut off the calls

18   themselves is beyond me.

19   Q.   Okay.  Did you ever speak with a woman by the

20   name of Cardswell?

21   A.   Yes.

22   Q.   How many times?

23   A.   I don't know.  A couple of times, two or three

24   times maybe.

25   Q.   Can you recall the substance of any of your

DEPOSITION OF SIMON LEWIS

1      Q.   Okay.  Did she say anything else in any of

2   these conversations other than what you've been able to

3   tell me so far?

4      A.   I don't recall.

5      Q.   Okay.  Did you speak with a woman by the name

6   of Jessica Yee at any point in time?

7      A.   She is our -- she is one of our local people.

8   So, in other words, she is a representative of AT&T, who

9   is the company that we believe we actually had an

10   account with.

11      Q.   She's --

12      A.   It turns out she's not the same AT&T.

13      Q.   Okay.  And what, if anything, did she tell you

14   in any conversations relative to these toll fraud

15   charges?

16      A.   "It's ridiculous.  We'll do whatever we can to

17   help you."

18      Q.   But you understood that she didn't -- she

19   wasn't part of that division or that particular arm of

20   AT&T?

21      A.   Not exactly.  We found that out later.

22      Q.   Okay.

23      A.   We found out that there were Chinese walls

24   (sic), or whatever, between different departments within

25   AT&T.

DEPOSITION OF SIMON LEWIS

1    the process with somebody like Jessica -- at the

2    beginning -- that she was, in fact, dealing with another

3    company.

4             She represented in every way that this was

5    AT&T and that, "Absolutely, we'll take care of this."

6             Because we were also, at the same time,

7    negotiating with Jessica about modifications to our

8    existing service.  She was already engaged with the

9    company.

10        Q.   With the existing account?

11        A.   With the -- the account.  We don't

12    differentiate.  The account was AT&T.  We had an account

13    with AT&T.  We had had an account with the same company

14    for over ten years.

15        Q.   Wasn't your local phone provider SBC?

16        A.   SBC -- it was Pac Bell; then it was SBC; then

17    it was AT&T.

18             Our phone numbers never changed.  Our lines

19    have never changed.  The PRI is the same.  The numbers

20    on the PRI are the same.

21             It's the same thing.  They maybe changed the

22    name, but it's the same company.

23        Q.   So, is it correct for me to understand that

24    Ms. Cardswell ultimately told you that AT&T wasn't going

25    to do anything about the toll charges?

DEPOSITION OF SIMON LEWIS

1    A.    Correct.

2    Q.    Do you remember when that happened?

3    A.    Several months later, as far as I know.

4          I mean, this whole thing -- these things take

5    months.

6    Q.    Was there ever any discussion about

7    discounting the claim or reducing the charges, to your

8    recollection?

9    A.    Yeah.  She came back, I believe, with an offer

10   for 30 percent off of a beyond-extortionary rate.  We're

11   talking about $6 a minute versus maybe 12 cents a

12   minute.  So, 30 percent off at, what, $4 a minute,

13   versus 12 cents a minute, that's not a deal that I would

14   be prepared to take, particularly for calls that were

15   fraudulent.

16         If they were legitimate calls, I would have a

17   problem at not having an honored contracted rate through

18   our existing long distance, the way it should have been.

19         And we believe the total bill for all of the

20   fraud associated with this was somewhere in the nature

21   of -- somewhere on the order of $400.

22         After however many months of hassle, we made

23   it clear to Ms. Cardswell that we would be prepared to

24   pay the 400-and-something dollars and go away and not

25   worry about the fraud.

DEPOSITION OF SIMON LEWIS

1    A.    -- against us?

2    Q.    Yes, sir.

3    A.    I believe so.

4    Q.    I don't have anything further.

5          Thank you for your time.  I appreciate it.

6          MS. MATLOCK:  Well, I believe I have the

7    opportunity to ask questions now.

8          MR. AIRES:  Oh, you can.  Sure.

9                EXAMINATION BY MS. MATLOCK

10         MS. MATLOCK:  Q.  Mr. Lewis, a few minutes ago

11   you made the comment that AT&T -- that you had been with

12   AT&T for ten years.

13   A.    Correct, or more.

14   Q.    When you moved from your Townsend location to

15   your Redwood location --

16   A.    Correct.

17   Q.    -- and you had the hundred lines, was that

18   AT&T?

19         MR. AIRES:  Objection.  Leading.

20         THE WITNESS:  When you say "the hundred lines"

21   -- okay.  So, we had a block of a hundred numbers.  I

22   assume that was SBC at the time.  That's what their name

23   was.

24         Essentially, it's the same company that we

25   have today.  For all intents and purposes, it's the same

DEPOSITION OF SIMON LEWIS

32

1  -- that service we had is the same service that we have

2  today.  It hasn't changed.  It hasn't changed with the

3  exception of the addition -- some additional lines that

4  we've added to it.  It's the same accounts.

5       MS. MATLOCK:  Q.  In July -- actually, you

6  said several months after July is when you became aware

7  of this additional bill from AT&T Legacy T.  It was

8  several months after.

9       At that point, was that the first time that you

10  had had disputes with AT&T, and it had taken a length of

11  time to resolve them?

12      A.  No, it is not.

13      We had, I believe -- I don't know the exact

14  dates, but I believe that when we originally switched to

15  this long-distance plan, they inadvertently didn't put

16  in the correct paperwork and put us on an incorrect

17  long-distance carrier.  And over a period of a billing

18  cycle, we accumulated, if I remember correctly, $4500 in

19  long distance that should have been, you know, a

20  thousand dollars, or whatever it was.

21      So, we paid it because we had to.  We were

22  forced to pay it.  Otherwise, they would cut us off.

23      But we eventually, somewhere around two years

24  later -- or more -- got it all credited back.  Because

25  what should have happened -- and they recognized their

DEPOSITION OF SIMON LEWIS

1    mistake right from the outset -- was that when we made

2    whatever the modification to our service was, they

3    should have followed through correctly and put us on

4    their long-distance network, which was an exclusive

5    long-distance arrangement with that organization.

6        Q.    So, are you referring to when you said that

7    you hooked -- or started the long distance -- switched

8    to this long-distance plan with AT&T -- SBC/AT&T?  Is

9    that the same plan you had the exclusive signed contract

10   from 2003?

11       A.    It is the same plan we still have today.  It

12   is the same plan.  We have not changed our long distance

13   in any way for five or more years, however many years it

14   is.  It's five or six years.  It's maybe more.  It's

15   maybe when we moved into our building in 2000/2001.  I

16   don't actually remember.  It's been a long time.

17       Q.    Okay.

18       A.    So, we've got the 10-to-12-cents,

19   14-cents-a-minute variable, depending where you are

20   calling.  We've had that long-distance plan in place for

21   six or seven years, seven or eight years -- whatever, a

22   long time.

23       Q.    You mentioned that when you had the

24   conversation sometime in July with the technical person

25   that they said to you it was a "kit"?

DEPOSITION OF SIMON LEWIS

1        We have -- I have one of only two or three
2    Medeco locks.  They're this type of a key (indicating).
3    It's a very sophisticated key.  You can't get it cut
4    anywhere.  You can't go get that cut anywhere.  I have
5    access, and the landlord has access.
6            We have cards -- card readers as well.
7            So, we are a net security company.  We have a
8    very secure network facility.  We security-manage
9    network communications around the world.  So, physical
10   security to our building is extremely important.
11           (Clarification requested by the reporter.)
12           THE WITNESS:  This is very well known.  It's
13   called Medeco, M-e-d-e-c-o.  The only people that have
14   Medeco locks are people that have very strong physical
15   security.
16           MS. MATLOCK:  Q.  How many employees were
17   working for you in July 2006?
18       A.  I can't recall exactly.  I think it was
19   probably 12, 13, 14 maybe.
20       Q.  Did all of those employees have access by key
21   code?
22       A.  Every -- every employee has a biometric
23   fingerprint to get in the door.  And they have a card
24   that opens the doors as well.  It's a combination of
25   both fingerprint and card.

1   of Oahu at a partner conference for Cisco.

2           And I received a frantic telephone

3   conversation from Francisco saying that he has received

4   another one of these letters from AT&T saying that all

5   of our phone service, which will essentially put us out

6   of business -- all of our phone service would be

7   disconnected the following Sunday, I believe, or

8   Saturday.  Saturday -- it was Saturday, the 12th, which

9   happens to be my son's birthday.  So, it was Saturday.

10          In terms of, you know, just that call itself, I

11  had to waste an hour or two of time, when I was already

12  at a business conference, you know, many miles away from

13  here.  It is just absolutely ridiculous.  I had to jump

14  in and make sure that I'm remotely managing everything.

15          I'm potentially making travel plans to fly back

16  to the Bay Area immediately, so that I'm on site to deal

17  with the, you know, enormous disruption that a loss of

18  phone service would be.

19          To explain how critical that would be to our

20  business, we were on 24-by-7 managed services.  We rely

21  on our phone service very heavily because our customers

22  use it as a lifeline to communicate with us if there's an

23  emergency.

24          Our phone system is designed in such a way that

25  it will track users down and find people, if necessary.

DEPOSITION OF SIMON LEWIS

1          So, we had four days of limbo, not knowing if
2    we were going to lose our phone system and be put out of
3    business; okay?
4          Q.   Thank you.
5               As the CEO, as I believe you described
6    yourself, and the primary business operations manager
7    for Dataway, do you sign personally contracts?
8          A.   Yes.
9          Q.   Did you sign the Letter of Agency with
10   SBC/AT&T that they would be your exclusive local and
11   long-distance provider?
12         A.   Yes, I did.
13         Q.   And did you also then sign the --
14         A.   I also negotiated that contract, so...
15         Q.   So, you are fully familiar that the promises
16   were made?
17         A.   Absolutely.
18         Q.   Okay.  Was that approximately in 2003?
19         A.   That sounds correct, yeah.
20         Q.   In conjunction with that Letter of Agency, was
21   there also -- strike that.
22              Mr. Aires was asking you previously about
23   offers to settle.
24         A.   Okay.
25         Q.   And you stated that you did not make them.

DEPOSITION OF SIMON LEWIS

1    frankly.

2          But the FCC would not get involved on our

3    behalf after AT&T had made some attempt, albeit

4    unacceptable.

5       Q.   Did you -- were you aware of this regulation

6    or purported FCC regulation prior to?

7       A.   Prior to what?

8       Q.   Prior to the offers.

9       A.   No.  I assumed the FCC was there to protect

10   the consumer.  I assumed the FCC worked with the

11   consumer.

12         Obviously not.

13         Frankly, this whole process, from start to

14   finish, has been an abuse.  And I feel quite abused by

15   even being here right now, when I should be doing

16   business.

17      Q.   You mentioned in your phone conversation with

18   the person that you called from Fraud or Technical or --

19      A.   Right.

20      Q.   -- et cetera, that this was rampant.

21      A.   Yes.  We -- she was very nice.  She was very

22   pleasant.  We had a conversation for, I'm sure, 30

23   minutes, 45 minutes.

24         She said, basically, it happens all the time,

25   and they can spot it a mile away.  They can tell, you

DEPOSITION OF SIMON LEWIS

43

1    know, right away by the nature of what they call a

2    "nailed-up call," in other words, fixed up.

3         Q.    It's nail like n-a-i-l?

4         A.    Nailed-up, that was probably her terminology.

5    It's a nailed-up -- a communication channel, if you

6    will, that was made from our switch to somewhere in the

7    Philippines or somewhere in India, or wherever else,

8    that lasts for hours and hours.

9              They see it all the time.  And they are

10   disconnecting them all the time.

11             And they -- you know, she said, basically, you

12   know, "Don't worry about it.  This happens all the time.

13   You know, just -- I have it noted in the record.  It's

14   fraud.  They'll take care of it."

15             MR. AIRES:  Okay.  Move to strike everything

16   after "yes" as nonresponsive.

17             THE WITNESS:  Actually, I'll say it again.

18             MS. MATLOCK:  Actually, you know, you can't

19   strike it, as you know, in the ways I was not able to

20   strike it before.  You can say, "Move to strike."

21             THE WITNESS:  I'll say it again.

22             We had a very amicable conversation about it.

23             She said she sees this stuff all the time.

24   She said not to worry about it, that she had it noted in

25   the record, and that it will be taken off our bill,

1  dealt with by their Fraud Department or whatever else.

2           MR. AIRES:  Objection.  Move to strike.

3           Nonresponsive; no question pending.

4           THE WITNESS:  (Addressing Ms. Matlock) Would

5  you like to ask me a question?

6           MS. MATLOCK:  Q.  In July of 2006, you had a

7  conversation.  How long did it last, and what did it

8  pertain to?

9           MR. AIRES:  Objection.  Compound.

10          MS. MATLOCK:  Q.  Please answer.

11     A.   It was a lengthy conversation.  It was very

12  amicable.

13          She told me that she sees this type of fraud

14  call all the time.  She described calls that -- I'm

15  paraphrasing her words -- "nailed-up" connections

16  between a phone system and something in India or

17  somewhere in the Philippines or somewhere else.

18          They can recognize them, I'm sure she said, "a

19  mile away," or something to that effect.  She said she

20  sees it all day long.

21          She said not to worry about it.  It would be

22  -- she would put it down in the record as such, and it

23  would be taken off or dealt with by her Fraud

24  Department.  They take -- they deal with this all the

25  time.

DEPOSITION OF SIMON LEWIS

1          And I'm sure that if we were not a small

2     company in San Francisco, but a large institution, this

3     would have been dealt with, no questions asked.

4          But for some reason, completely -- I'm

5     completely baffled by it -- AT&T decided to persist in

6     trying to extort $6 a minute for phone calls that I have

7     a contracted long-distance rate of maybe 12 cents.

8          And then when I made it very clear to AT&T

9     that I would not pay for bills that are extortionary,

10    they decide to hand it across (sic) to the gentleman

11    across the table, who thought it was a good idea to get

12    involved.

13          Hopefully, he'll find out it's not.

14     Q.    Thank you.  Those are all of my questions.

15          Mr. Aires?

16               FURTHER EXAMINATION BY MR. AIRES

17          MR. AIRES:  Q.  In 2006 -- in July of 2006, is

18    it correct for me to understand that you had a block of

19    a hundred numbers?

20     A.    We have, essentially, always had a block of a

21    hundred numbers.

22          We, as part of our block -- it had been

23    chopped up amongst different customers, unbeknownst to

24    us.  They were unused.

25          So, we were going through a process of

DEPOSITION OF SIMON LEWIS

# EXHIBIT B

1    A.    To Dataway.

2    Q.    All right.  So, do you differentiate at all,

3    when you think back about the calendar year 2006, as

4    there being any difference between SBC and AT&T?

5    A.    I believe that's the year the company merged.

6          And it may have started as SBC early in the

7    year.  But by the end of the year, it certainly was

8    AT&T.

9    Q.    All right.  How about on July 24th, 2006?  Do

10   you have some understanding as to the status of the

11   merger?

12   A.    Not exactly.

13   Q.    All right.  Now, on July 24th, 2006, I

14   understand there were some calls placed through a

15   telephone system belonging to Dataway; is that right?

16   A.    Yes.

17   Q.    What do you understand happened?

18   A.    Our voice-mail system was compromised from the

19   outside.  And several calls were made to the Philippines

20   and to other places -- India.  And those calls reflected

21   in our contracts that we had at the time, our existing

22   contracts, local and long distance.

23         Also, a new account appeared.

24   Q.    When did you first learn that these

25   unauthorized -- that these calls had been made on

1    your local telephone service provider?

2        A.    From AT&T as well.

3        Q.    Or SBC?

4        A.    We have two system accounts.

5              One is a contracted long-distance account,

6    where we have a reduced rate for long-distance calls.

7              The other one is what is called our "Summary

8    Billing Account."  That comprises our contracts with

9    AT&T local, toll, and long distance.

10             The $11,000 you mentioned came on an account

11   that we had never set up.

12             The other charges, the MCI and Sprint charges,

13   came on the summary billing.

14             And there were several smaller charges on the

15   long distance.

16       Q.    On the summary -- on the bill that you would

17   have normally expected to see?

18       A.    Yes.

19       Q.    Okay.  And you concluded somehow that at least

20   some of these charges were the result of caller --

21   calling code access?

22             Do you know what that term means?

23       A.    I'm not sure if I understand it exactly.

24       Q.    All right.  You made reference to 10-10-280.

25       A.    Uh-huh.

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

1      Q.   Have you ever seen any of those ads where they

2  sold -- they sold access to phone users by dialing a

3  10-10 code?

4      A.   Yes.

5      Q.   So, do you remember that -- I think it was

6  either Sprint or MCI had 10-10-280?

7      A.   I know I've seen the ads.  I don't remember

8  which one had what.

9      Q.   Do you remember the ad from AT&T which was

10  10-10-ATandT?

11      A.   No.

12      Q.   Do you know how is $11,534.67 charges were

13  generated?

14      A.   Not exactly.  I don't know which method they

15  used.  I did some research and found that the call had

16  been originated not in California, but in Kansas, and,

17  you know, it had gone to a number in the Philippines.

18  But I don't know which mechanism.

19      Q.   So, you're not aware that it was accessed

20  through using the calling access code 10-10-288?

21      A.   I don't have firsthand knowledge.

22      Q.   Did anybody ever tell you that?

23      A.   Not that I recall.

24      Q.   How did you learn that the other charges

25  from the other long-distance service providers were the

1    Q.    All right.   Anybody else?

2    A.    We had a conference -- telephone conference

3    call with some gentleman with Crystal, Jessica.   It was

4    a gentleman, but I don't recall his name or what

5    department within AT&T he was from.

6    Q.    All right.   In any of those communications,

7    did anybody at AT&T tell you that they were going to

8    waive the $11,534.67?

9    A.    Crystal and Jessica never said that because

10   they explicitly told me they couldn't be involved in the

11   dispute of that amount, given that that account, dealing

12   for (sic) -- within their system, whatever that meant,

13   and that we had to deal directly with the -- with AT&T

14   Corporate in -- and the Fraud Resolution Group regarding

15   this.

16          Daniela never said she would waive the charges.

17          She just asked us to fill out a form.   And she

18   said it would go into investigation, and a resolution

19   would be made.

20   Q.    Did Mr. Lewis ever tell you that he was told

21   by anybody at AT&T that AT&T would waive the $11,534.67?

22   A.    He was told by the lady technician from the

23   AT&T Technical Team in New Jersey that he talked to.

24   Q.    He was told what by who?

25   A.    That this was a common occurrence, and that

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

1    the process was to dispute the charges, and they will be

2    waived.

3        Q.    Did they ever get waived?

4        A.    Not the 11,000.  They are still an open

5    balance.

6        Q.    Okay.  Did he ever indicate to you who he

7    spoke with?

8        A.    He doesn't have a name for the person.  All

9    he recalls -- he told me it was a woman from the AT&T

10   Technical Team in New Jersey.

11       Q.    Did he ever tell you that he received within

12   ten days of that conversation any written evidence that

13   the charges in the amount of $11,534.67 would be waived?

14       A.    No.

15       Q.    Okay.  Did you ever figure out how your system

16   was compromised?

17       A.    No.  Me personally, no.

18       Q.    Do you know if anybody at Dataway determined

19   how the Dataway system had been compromised?

20       A.    Not to my knowledge.

21       Q.    And the system that was in place in July of

22   2006, that was a system that was owned and operated by

23   Dataway?

24       A.    Yes.

25       Q.    I mean, you didn't lease your telephone system

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

# EXHIBIT C

# [ISN] Voicemail Hacking Leaves Ears Ringing

**From:** InfoSec News (*isn@c4i.org*)
**e:** Thu Apr 17 2003 - 02:39:31 CDT

Next message: InfoSec News: "[ISN] Commit a crime, no network time?"
Previous message: InfoSec News: "[ISN] Swipe Card Hack Prompts Complaint"
Messages sorted by: [ date ] [ thread ] [ subject ] [ author ] [ attachment ]

http://www.latimes.com/technology/la-fi-phonehack16apr16,1,6980247.story?coll=la%2Dheadlines%2Dtechnology%20.html

By Kathy M. Kristof
Times Staff Writer
April 16, 2003

Voicemail can cost you. Just ask K.C. Hatcher, a San Francisco-based
graphic artist.

AT&T wants her to pay $12,000 in long-distance charges rung up by a
hacker who apparently changed Hatcher's voicemail message to accept
third-party billed calls to Saudi Arabia and the Philippines.

"I am totally obsessing about this," said Hatcher, whose normal
long-distance bill runs $35 a month. "I'm getting married in June. I
want to buy a house, and I'm worried that this fraud is going to ruin
my credit."

Such voicemail hacking is on the rise -- and phone customers are
wrongly being held liable for it, according to San Francisco-based
Consumer Action.

AT&T acknowledges that the scamming has become all too common and that
people rarely know they have been had until company fraud
investigators alert them to unusual activity on their phones. But
AT&T, like some other long-distance providers, insists that consumers
foot most of the bill.

"It is the responsibility of the customer to secure their voicemail
system," said Gordon Diamond, a spokesman for AT&T in San Francisco.

Maureen Claridge, a San Francisco travel agent, doesn't see it that
way but has been unable to persuade AT&T to let her off the hook. The
company has sent her $8,000 long-distance bill -- generated by a
voicemail hacker -- to a collection agent, Claridge said.

Linda Sherry of Consumer Action maintains that telephone companies are
largely to blame.

Hackers take advantage of the voicemail offered by local phone
companies -- including SBC Communications Inc., which provides the
stem Hatcher and Claridge use -- and long-distance companies'
voice-activated operator services.

What a hacker does is break into a person's voicemail and record a
message so that it will respond affirmatively to an automated operator

DW 011

long-distance call.

...ted that at AT&T, the automated system always asks the same ...s and waits a set interval for a response, making it fairly ...r a hacker to synchronize his fraudulent voicemail message.

...t AT&T would permit third-party phone charges based only on the ...nority of a recorded message is beyond belief," Sherry said. ...Third-party billing should be allowed only when a real person answers ...the phone and is able to verify that they approve the charges."

AT&T's Diamond countered that the company's automated system is "fairly sophisticated," adding: "If it was a live operator, I don't know that it would turn out any differently."

AT&T suggests that consumers change their pass codes regularly; avoid pass codes that are intuitive, such as birth dates and addresses; and check their announcements to make sure they haven't been changed.

Diamond said AT&T works on a case-by-case basis with customers who believe they have been defrauded but doesn't necessarily write off fraudulent charges.

MCI Communications also offers automated operator assistance and has a similar policy, spokeswoman Audrey Waters said. Sprint Corp. handles calls billed to a third party manually, which Sprint says has stymied this particular fraud.

Meanwhile, SBC said it recently changed its voicemail system so that ...ult pass codes aren't so easy to guess. The company says it has a ...cy of reversing charges when a consumer is willing to file a police report claiming fraud.

ISN is currently hosted by Attrition.org

To unsubscribe email majordomo@attrition.org with 'unsubscribe isn' in the BODY of the mail.

---

Next message: InfoSec News: "[ISN] Commit a crime, no network time?"
Previous message: InfoSec News: "[ISN] Swipe Card Hack Prompts Complaint"
Messages sorted by: [ date ] [ thread ] [ subject ] [ author ] [ attachment ]

*This archive was generated by hypermail 2.1.7*

DW 012

DW 013

# Voicemail Hackers Phone It In

Michelle Delio ✉ 04-17-03 | 2:00 AM

*Reader's advisory: Wired News has been unable to confirm some sources for a number of stories written by this author. If you have any information about sources cited in this article, please send an e-mail to sourceinfo@ATTwired.com.*

Voicemail passwords are being transformed into all-access backstage passes that allow malicious hackers to exploit voicemail systems, racking up huge charges on their unlucky victims' phone bills.

Hackers are exploiting a combination of automated operator services from AT&T, voicemail services from SBC Communications and consumers who haven't changed their default voicemail passwords.

Victims say the AT&T and SBC know about the scam and are taking no concrete action to protect consumers from it.

But AT&T spokesman Gordon Diamond said that AT&T has been instrumental in stopping the scam. "We are taking the appropriate technology to detect and deter phone scams and protect our customers," Diamond said. "We detect the scams, and we stopped them. But technological deterrents can't do the job alone, and consumers and businesses are responsible for ensuring the security of their phone lines."

Here's how the scam works: The default passwords that SBC issues to new users of their voicemail services are in a specific format and are easily guessed.

If the default password is not changed after the system is set up, it's ripe for exploitation by malicious hackers, who have been breaking into SBC voicemail systems and replacing the owners' recorded greetings with recordings of a voice saying "yes" at appropriate intervals.

The hackers then place a collect call, typically from the Philippines or Saudi Arabia, to the hacked system at an odd hour, assuming that the voicemail system will pick up.

AT&T uses an automated voice-recognition system when processing collect calls. The recording asks whether the party who is being called will accept the charges. When the hacked system responds "yes," the call is connected.

Once connected, the hackers have been leaving the line open for hours — and in some cases for days — resulting in enormous bills for the victim.

According to several security experts, there are a few reasons why the malicious hackers might leave the line open.

"They might be bored, rich with someone just because they can," said Sweeney. "But I also know that hackers will set up conference calls this way to discuss various 'business deals' at no cost to themselves. They might have set up the line open when they were done — it's the victims' dime, so why bother stopping it?"

K.C. Hatcher, a San Francisco graphic artist and one of the scam's casualties, has been billed $12,000 dollars for calls that both she and AT&T agree she didn't make. But she's expected to pay for those calls anyway, as are the other victims.

In Hatcher's case, the scam was carried out on her business line on New Year's Eve. Hatcher said when she returned to the office after the holiday, she received a call from Bill Allen of AT&T Fraud Detection, who told her he thought she was the victim of telephone fraud.

"I checked my outgoing message and discovered it had been altered, exactly as Mr. Allen said it would be," Hatcher said. "In a man's voice with a foreign accent the new message stated something like, 'Yes, yes, I will accept the charges, yes, yes, yes...'"

Hatcher said Allen then issued her a case number to dispute the charges once she received her next phone bill. "He said that I probably would not have to pay the charges, as this type of incident happened quite often, and that AT&T often waived the charges."

Later Hatcher was told that AT&T would take 35 percent of her bill, but she'd have to pay $3,000.

Hatcher was not happy.

🔖 💬 👍 👎

Add this to:
Digg
Delicio.us
Sphere
📄 Full Page

Page:
1
2
next>

| | Top Stories |

See Also:
File-Trading Hoax Scares Victims
Help Wanted: Steal This Database
Lax Security, ID Theft Made Easy
You Know IT/IS Important
Search Wired

💬 Comments (0)
Want to start a new thread or reply to a post?

Related Topics:
Entertainment, Tech Biz, Politics, Music, IT, Security