1  Matlock Law Group, PC
2  Anne Leith Matlock, SBN 244351
   1485 Treat Blvd., Suite 200
3  Walnut Creek, CA 94597
   Office: 925-944-7131
4  Fax: 925-944-7138
   E-mail: anne-leith@matlocklawgroup.com
5
   Attorneys for Defendant,
6  Dataway, Inc.

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10               **SAN FRANCISCO DIVISION**

11

12  AT&T Corp.                          **CASE NO. C07-02440 EDL**

13              PLAINTIFF,
                                        **SUPPLEMENTAL DECLARATION OF**
14        v.                            **ANNE-LEITH MATLOCK  IN**
                                        **SUPPORT OF DATAWAY'S**
15                                      **OPPOSITION TO AT&T'S MOTION**
    Dataway, Inc.                       **FOR SUMMARY JUDGMENT**
16

17              DEFENDANT.              **Date: August 5, 2008**
                                        **Time: 9:00 a.m.**
18                                      **Courtroom: E**

19  Dataway, Inc.

20              COUNTERCLAIMANT

21        v.

22  AT&T Corp.

23              COUNTERDEFENDANT

24

25

26

27  //

28  //

I, ANNE-LEITH MATLOCK, declare:

1. I am an attorney at law licensed to practice before all Courts of the State of California and before the Courts of the Eastern and Northern District of California. I am a partner of the law firm Matlock Law Group, P.C., attorneys of record for Defendant and Counter-Claimant Dataway, Inc. (hereinafter "Dataway").

2. On July 1, 2008 AT&T filed its Motion for Summary Judgment. On July 15, 2008 Dataway filed its Opposition to AT&T's motion requesting that AT&T's motion shall be denied but that Summary Judgment in favor of Dataway is proper.

3. Both parties refer to the Depositions of Simon Lewis and Francisco Molieri, officers of Dataway, which constitute evidence satisfying the standard of F.R.C.P. 56.

4. In particular Dataway's references are to the Deposition of Simon Lewis, pages:

    a. 5 (l. 18-20) and 45 (l.13-25): calls were epidemic;

    b. 6 (l.3-5 and 18-19) and 27 (l.5-17): AT&T employees knew that Dataway did not execute calls and that charges should be waived;

    c. 10 (6-11), 43 (p.21 – p.44 l. 14): calls were fraudulent, executed by hackers, used and created unauthorized Legacy T account;

    d. 11 (l.9-13): calls were executed from remote location in Kansas,

    e. 11 (l.16 – p.12 l.3): does not know how calls were executed, which tariff was used and did not authorize them;

    f. 16 (l.16-20) and 25 (14-18): Dataway did not become indebted to AT&T, did not receive services and was not reasonable value;

    g. 29 (l.23- p.30 l.15) and 38 (l.2-9): Despite AT&T's promise, AT&T sent Notice of Disconnect;

    h. 30 (l.16-21) and 46 (l.4-12): Dataway denies charges;

    i. 32 (l.10-p.33 l.4), 34 (l.8-22) and 40 (l.9-19): consolidated its long-distance telecommunication with SBC, Legacy S;

    j. 36: Dataway maintained security means;

    k. 42 (l.9-22): AT&T breached its oral contract;

1            l.  45 (l. 13-25): was hacking typical call and not a regular connection, and

2            m.  20 (damages).

3        5. Moreover, the Dataway's Opposition to AT&T's Motion for Summary Judgment

4 refers to the Transcript of the Deposition of Francisco Molieri, pages:

5            a.  7 (l.18-22): calls were fraudulent, executed by hackers, used and created

6              unauthorized Legacy T account;

7            b.  8 (l.2-7): hackers compromised voicemail and executed calls to the

8              Philippines using Legacy T);

9            c.  12 (l.15 to p.15 l. 22): Dataway's security means

10            d.  13 (l.1-7): AT&T promised to waive charges once Dataway formally

11              disputed them;

12            e.  17 (l.7-9): don't know how calls were executed and which tariff was used;

13            f.  18 (l. 12-23) and 59 (l.18 et.seq.): hacker compromised voicemail system,

14              executed calls from a remote location, but no knowledge of used service;

15            g.  58 (l. 19 – p.59. l.2: calls were epidemic;

16            h.  59 (l. 3-5): AT&T breached oral promise and sent Notice of Disconnect;

17        6.  Due to the large number of transcript pages, only the pertinent pages are attached as

18 Exhibits. However, Dataway is prepared to submit a full copy of the deposition transcripts at

19 the Court's request.

20        7.  A copy of the pertinent pages of the Transcript of the Deposition of Simon Lewis is

21 attached hereto as Exhibit A.

22        8.  A copy of the pertinent pages of the Transcript of the Deposition of Francisco

23 Molieri is attached as Exhibit B.

24        9.  A copy of the pertinent Bate Stamped documents is attached as Exhibit C.

25

26

27 //

28 //

DECLARATION OF ANNE-LEITH MATLOCK IN SUPPORT
OF DATAWAY'S MOTION TO STRIKE AT&T'S REPLY       Case No. C07-2440 – EDL

1    9.  Dataway hereby also notifies AT&T of the filing of the pertinent parts of the two

2    depositions pursuant to F.R.C.P. 31(c)(2).

3

4    I declare under penalty of perjury under the laws of the United States that the foregoing

5    is true and correct.  I could and would competently testify thereto, if called upon as a witness.

6

7    This Declaration is executed this twenty-first day of July, 2008, at Walnut Creek,

8    California.

9

10

11

12    Anne-Leith Matlock, Esq.
      Attorney for Dataway, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1    years until I started branding myself as "CEO" a few

2    years ago.

3        Q.    All right.  Have your duties and

4    responsibilities at Dataway been the same since you

5    formed the company?

6        A.    Essentially.

7        Q.    What are those duties and responsibilities?

8        A.    I'm the principal business manager in the

9    company, so I'm effectively the CFO -- I'm essentially

10    the business manager, and I'm effectively the CFO and

11    CEO.  I make most of the management decisions.

12            I'm a principal engineer in the company.  So,

13    I maintain a number of clients.

14            I'm probably responsible for 50 percent or

15    more of the revenue that comes into the company.

16        Q.    What's the principal business activity of

17    Dataway?

18        A.    We are a network security consultancy.  We

19    provide managed services to clients and consulting

20    services in the computer-network and network-security

21    area.

22        Q.    Has that been the business of Dataway since

23    its inception?

24        A.    Yes.

25        Q.    In July of 2006, did you come to learn that

DEPOSITION OF SIMON LEWIS

1    there had been some toll calls placed through the

2    Dataway phone system to the Philippines?

3        A.    Specifically the Philippines or whatever, yes,

4    I learned through a phone call from AT&T, I believe,

5    that was left on my voice mail.

6        Q.    Did the person on the telephone identify

7    themself by name?

8        A.    I don't remember.

9        Q.    Do you know if --

10       A.    I was given a phone number to call, and I

11   called and spoke to a woman in New Jersey.

12       Q.    Did the message left on the machine indicate

13   the job title of the person who left the telephone call

14   -- the telephone message?

15       A.    I don't recall.

16       Q.    Can you recall anything regarding the specific

17   substance of that message?

18       A.    Something about "unauthorized calls on your

19   account; please call this number."

20       Q.    And the number you later determined rang in

21   New Jersey?

22       A.    I know it was New Jersey because I spoke to

23   the person and she told me she was in New Jersey.

24       Q.    Okay.  Can you recall whether or not it was an

25   800 number or a toll-free number or an area code in

DEPOSITION OF SIMON LEWIS

1       Q.   Did she -- it was a PBX system?

2       A.   It is a PBX, yeah.  A key system is PBX.  A

3  key system is a small PBX, basically.

4       Q.   Did she make any recommendations or

5  suggestions regarding the system?

6       A.   If I recall, we discussed how it could be that

7  somebody could make a call.

8            And she suggested that the way -- the only way

9  she knew was through the voice-mail system; in other

10  words, somebody dialing in remotely, like an employee

11  would dial in remotely to access their voice mail.

12       Q.   Did you --

13       A.   That is --

14       Q.   Go ahead.

15       A.   That is what she suggested was likely the

16  reason because, being in the, you know, Fraud

17  Department, or whatever department she was in, she sees

18  this stuff all day long.

19            And to paraphrase exactly what she said, these

20  calls stand out like a sore thumb.  She can see them

21  instantly in the system.  And alarms are going off all

22  day long.

23       Q.   And so, she indicated that it was -- it

24  appeared to her that it was accessed through the

25  voice-mail system?

1      A.    She suggested that that was the likely place

2  where it would be accessed through because it's,

3  basically, a very simple phone system.

4      Q.    Did Dataway undertake its own independent

5  investigation to determine how it happened?

6      A.    We don't know exactly how it happened, nor can

7  we say definitively how it happened.

8            We do know, because we suspect that it was

9  through the voice-mail system -- and one interesting

10 piece of information we gathered was a telephone number

11 that we believe was in Kansas by the area code -- our

12 caller ID picked it up, and it showed up on one of the

13 phones in the office.

14           We gave this to AT&T as the -- as potentially a

15 source of one of these calls that came in.

16     Q.    Did you ever learn that it was -- that the

17 method used in making the access was through a 10-10-288

18 calling-code access number?

19     A.    I don't know what you mean by that.

20     Q.    So, the answer is that nobody ever told you

21 that?

22     A.    I know what 10-10-288 is.  That's an outbound

23 access code.

24     Q.    Okay.

25     A.    You asked me about how the call came in.

DEPOSITION OF SIMON LEWIS

1          I have no idea how the call coming in could

2    have anything to do with that --

3          Q.    All right.

4          A.    -- to answer your question.

5          Q.    Do you have any special knowledge or education

6    in the operation of telephone systems?

7          A.    Not those types of systems, no.

8          Q.    How come -- strike that.

9          What is the basis of your familiarity with

10   10-10-288, that it's an outbound system?

11         A.    It's a long-distance access code.  It was

12   described to me on the phone by that same engineer as a

13   "kick code," k-i-c-k.

14         Q.    Have you -- have you heard the term "kick

15   code" in --

16         A.    I had never heard the term "kick code" before

17   she mentioned it, no.

18         Q.    Have you heard it since?

19         A.    Frankly, I haven't looked it up.  No, I

20   haven't.

21         But that's what she referred to it as.

22         Q.    And she specifically referenced 10-10-288 --

23         A.    No, that never came up.

24         She said a kick code was used to access long

25   distance.

DEPOSITION OF SIMON LEWIS

1    paid a bill for toll charges that were believed to be

2    fraudulent in the sum of $1,238.75?

3        A.    No.    And I'm very surprised to hear that.

4        Q.    All right.

5        A.    Did we?    We should not have.

6        Q.    And did Mr. Molieri ever indicate to you that

7    a decision was made to pay certain toll charges because

8    they were billed at a contract rate, versus the Legacy T

9    rate?

10       A.    No.

11       Q.    Okay.

12       A.    Although, if -- okay.    So, our contracted rate

13   -- we have one long-distance carrier, which is AT&T.

14            We now know that there are more than one

15   flavor of AT&T.

16            But there was one AT&T for all intents and

17   purposes as far as we were concerned.    And we had a

18   contract with them.    And we had long-distance rates

19   internationally, you know, of 10, 12, 14 cents a minute,

20   whatever -- very, very inexpensive.

21            So, for the amount of hassle required to deal

22   with phone companies and getting them to, you know,

23   spend months and months or a year or, in this case, two

24   years almost dealing with it, I don't think anybody

25   would have noticed, you know, a few hundred dollars here

DEPOSITION OF SIMON LEWIS

1   AT&T would be one long-distance provider, which is what

2   we had a contract for:  one long-distance provider.

3          The MCI, as far as I know, and Sprint all show

4   up on the one bill and are dealt with by our phone

5   company, AT&T, because they are able to push back on the

6   other third parties and say, "This is fraud.  Therefore,

7   this is not going to be covered."  Everything is fine.

8   The problem goes away.

9          But they don't do that for their own AT&T.

10          And, in fact, that AT&T bill shows up as a

11   different bill two months later.  How this happens is a

12   mystery to me.

13     Q.    Okay.  Did you ever --

14     A.    In fact, I would go further to say, if, in

15   fact, that was the case, why AT&T, the Legacy T AT&T,

16   who are not our long-distance carrier, who we have no

17   relationship with -- why they didn't cut off the calls

18   themselves is beyond me.

19     Q.    Okay.  Did you ever speak with a woman by the

20   name of Cardswell?

21     A.    Yes.

22     Q.    How many times?

23     A.    I don't know.  A couple of times, two or three

24   times maybe.

25     Q.    Can you recall the substance of any of your

DEPOSITION OF SIMON LEWIS

1    Q.    Okay.  Did she say anything else in any of

2    these conversations other than what you've been able to

3    tell me so far?

4    A.    I don't recall.

5    Q.    Okay.  Did you speak with a woman by the name

6    of Jessica Yee at any point in time?

7    A.    She is our -- she is one of our local people.

8    So, in other words, she is a representative of AT&T, who

9    is the company that we believe we actually had an

10   account with.

11   Q.    She's --

12   A.    It turns out she's not the same AT&T.

13   Q.    Okay.  And what, if anything, did she tell you

14   in any conversations relative to these toll fraud

15   charges?

16   A.    "It's ridiculous.  We'll do whatever we can to

17   help you."

18   Q.    But you understood that she didn't -- she

19   wasn't part of that division or that particular arm of

20   AT&T?

21   A.    Not exactly.  We found that out later.

22   Q.    Okay.

23   A.    We found out that there were Chinese walls

24   (sic), or whatever, between different departments within

25   AT&T.

DEPOSITION OF SIMON LEWIS

1    the process with somebody like Jessica -- at the

2    beginning -- that she was, in fact, dealing with another

3    company.

4           She represented in every way that this was

5    AT&T and that, "Absolutely, we'll take care of this."

6           Because we were also, at the same time,

7    negotiating with Jessica about modifications to our

8    existing service.  She was already engaged with the

9    company.

10        Q.   With the existing account?

11        A.   With the -- the account.  We don't

12   differentiate.  The account was AT&T.  We had an account

13   with AT&T.  We had had an account with the same company

14   for over ten years.

15        Q.   Wasn't your local phone provider SBC?

16        A.   SBC -- it was Pac Bell; then it was SBC; then

17   it was AT&T.

18          Our phone numbers never changed.  Our lines

19   have never changed.  The PRI is the same.  The numbers

20   on the PRI are the same.

21          It's the same thing.  They maybe changed the

22   name, but it's the same company.

23        Q.   So, is it correct for me to understand that

24   Ms. Cardswell ultimately told you that AT&T wasn't going

25   to do anything about the toll charges?

DEPOSITION OF SIMON LEWIS

1    A.    Correct.

2    Q.    Do you remember when that happened?

3    A.    Several months later, as far as I know.

4          I mean, this whole thing -- these things take

5    months.

6    Q.    Was there ever any discussion about

7    discounting the claim or reducing the charges, to your

8    recollection?

9    A.    Yeah.  She came back, I believe, with an offer

10   for 30 percent off of a beyond-extortionary rate.  We're

11   talking about $6 a minute versus maybe 12 cents a

12   minute.  So, 30 percent off at, what, $4 a minute,

13   versus 12 cents a minute, that's not a deal that I would

14   be prepared to take, particularly for calls that were

15   fraudulent.

16         If they were legitimate calls, I would have a

17   problem at not having an honored contracted rate through

18   our existing long distance, the way it should have been.

19         And we believe the total bill for all of the

20   fraud associated with this was somewhere in the nature

21   of -- somewhere on the order of $400.

22         After however many months of hassle, we made

23   it clear to Ms. Cardswell that we would be prepared to

24   pay the 400-and-something dollars and go away and not

25   worry about the fraud.

DEPOSITION OF SIMON LEWIS

1       A.    -- against us?

2       Q.    Yes, sir.

3       A.    I believe so.

4       Q.    I don't have anything further.

5             Thank you for your time.  I appreciate it.

6             MS. MATLOCK:  Well, I believe I have the

7   opportunity to ask questions now.

8             MR. AIRES:  Oh, you can.  Sure.

9                  EXAMINATION BY MS. MATLOCK

10            MS. MATLOCK:  Q.  Mr. Lewis, a few minutes ago

11  you made the comment that AT&T -- that you had been with

12  AT&T for ten years.

13      A.    Correct, or more.

14      Q.    When you moved from your Townsend location to

15  your Redwood location --

16      A.    Correct.

17      Q.    -- and you had the hundred lines, was that

18  AT&T?

19            MR. AIRES:  Objection.  Leading.

20            THE WITNESS:  When you say "the hundred lines"

21  -- okay.  So, we had a block of a hundred numbers.  I

22  assume that was SBC at the time.  That's what their name

23  was.

24            Essentially, it's the same company that we

25  have today.  For all intents and purposes, it's the same

DEPOSITION OF SIMON LEWIS

1    -- that service we had is the same service that we have

2    today.  It hasn't changed.  It hasn't changed with the

3    exception of the addition -- some additional lines that

4    we've added to it.  It's the same accounts.

5         MS. MATLOCK:  Q.  In July -- actually, you

6    said several months after July is when you became aware

7    of this additional bill from AT&T Legacy T.  It was

8    several months after.

9         At that point, was that the first time that you

10   had had disputes with AT&T, and it had taken a length of

11   time to resolve them?

12       A.    No, it is not.

13       We had, I believe -- I don't know the exact

14   dates, but I believe that when we originally switched to

15   this long-distance plan, they inadvertently didn't put

16   in the correct paperwork and put us on an incorrect

17   long-distance carrier.  And over a period of a billing

18   cycle, we accumulated, if I remember correctly, $4500 in

19   long distance that should have been, you know, a

20   thousand dollars, or whatever it was.

21       So, we paid it because we had to.  We were

22   forced to pay it.  Otherwise, they would cut us off.

23       But we eventually, somewhere around two years

24   later -- or more -- got it all credited back.  Because

25   what should have happened -- and they recognized their

DEPOSITION OF SIMON LEWIS

33

1    mistake right from the outset -- was that when we made

2    whatever the modification to our service was, they

3    should have followed through correctly and put us on

4    their long-distance network, which was an exclusive

5    long-distance arrangement with that organization.

6        Q.   So, are you referring to when you said that

7    you hooked -- or started the long distance -- switched

8    to this long-distance plan with AT&T -- SBC/AT&T?   Is

9    that the same plan you had the exclusive signed contract

10   from 2003?

11       A.   It is the same plan we still have today.   It

12   is the same plan.   We have not changed our long distance

13   in any way for five or more years, however many years it

14   is.   It's five or six years.   It's maybe more.   It's

15   maybe when we moved into our building in 2000/2001.   I

16   don't actually remember.   It's been a long time.

17       Q.   Okay.

18       A.   So, we've got the 10-to-12-cents,

19   14-cents-a-minute variable, depending where you are

20   calling.   We've had that long-distance plan in place for

21   six or seven years, seven or eight years -- whatever, a

22   long time.

23       Q.   You mentioned that when you had the

24   conversation sometime in July with the technical person

25   that they said to you it was a "kit"?

DEPOSITION OF SIMON LEWIS

1    A.    A "kick."

2    Q.    A "kick"?

3    A.    A "kick code."

4    Q.    Which means it's outgoing?

5         MR. AIRES:  Objection.  Leading; assumes facts

6    not in evidence.

7         THE WITNESS:  She mentioned that -- she

8    mentioned that there were kick codes involved, I guess.

9    I don't recall specifically what she said.

10        She was from AT&T.

11        MS. MATLOCK:  Q.  Outgoing?

12   A.    Yes, outgoing --

13        MR. AIRES:  Objection.  Leading.

14        THE WITNESS:  -- long distance.

15        MS. MATLOCK:  Q.  And you previously stated

16   that when you were answering the questions of Mr. Aires.

17   A.    Yes.

18        MR. AIRES:  Objection.  The record speaks for

19   itself.

20        MS. MATLOCK:  Q.  What are, for physical

21   entrance -- if those are outgoing calls, for physical

22   entrance into Dataway's facility, what security measures

23   do you physically have for getting into the building?

24   A.    We have biometric fingerprint readers on the

25   front doors.

DEPOSITION OF SIMON LEWIS

1           We have -- I have one of only two or three
2    Medeco locks.  They're this type of a key (indicating).
3    It's a very sophisticated key.  You can't get it cut
4    anywhere.  You can't go get that cut anywhere.  I have
5    access, and the landlord has access.
6           We have cards -- card readers as well.
7           So, we are a net security company.  We have a
8    very secure network facility.  We security-manage
9    network communications around the world.  So, physical
10   security to our building is extremely important.
11          (Clarification requested by the reporter.)
12          THE WITNESS:  This is very well known.  It's
13   called Medeco, M-e-d-e-c-o.  The only people that have
14   Medeco locks are people that have very strong physical
15   security.
16          MS. MATLOCK:  Q.  How many employees were
17   working for you in July 2006?
18      A.   I can't recall exactly.  I think it was
19   probably 12, 13, 14 maybe.
20      Q.   Did all of those employees have access by key
21   code?
22      A.   Every -- every employee has a biometric
23   fingerprint to get in the door.  And they have a card
24   that opens the doors as well.  It's a combination of
25   both fingerprint and card.

DEPOSITION OF SIMON LEWIS

1    of Oahu at a partner conference for Cisco.

2            And I received a frantic telephone

3    conversation from Francisco saying that he has received

4    another one of these letters from AT&T saying that all

5    of our phone service, which will essentially put us out

6    of business -- all of our phone service would be

7    disconnected the following Sunday, I believe, or

8    Saturday.  Saturday -- it was Saturday, the 12th, which

9    happens to be my son's birthday.  So, it was Saturday.

10           In terms of, you know, just that call itself, I

11   had to waste an hour or two of time, when I was already

12   at a business conference, you know, many miles away from

13   here.  It is just absolutely ridiculous.  I had to jump

14   in and make sure that I'm remotely managing everything.

15           I'm potentially making travel plans to fly back

16   to the Bay Area immediately, so that I'm on site to deal

17   with the, you know, enormous disruption that a loss of

18   phone service would be.

19           To explain how critical that would be to our

20   business, we were on 24-by-7 managed services.  We rely

21   on our phone service very heavily because our customers

22   use it as a lifeline to communicate with us if there's an

23   emergency.

24           Our phone system is designed in such a way that

25   it will track users down and find people, if necessary.

DEPOSITION OF SIMON LEWIS

1          So, we had four days of limbo, not knowing if

2  we were going to lose our phone system and be put out of

3  business; okay?

4      Q.    Thank you.

5          As the CEO, as I believe you described

6  yourself, and the primary business operations manager

7  for Dataway, do you sign personally contracts?

8      A.    Yes.

9      Q.    Did you sign the Letter of Agency with

10 SBC/AT&T that they would be your exclusive local and

11 long-distance provider?

12     A.    Yes, I did.

13     Q.    And did you also then sign the --

14     A.    I also negotiated that contract, so...

15     Q.    So, you are fully familiar that the promises

16 were made?

17     A.    Absolutely.

18     Q.    Okay.  Was that approximately in 2003?

19     A.    That sounds correct, yeah.

20     Q.    In conjunction with that Letter of Agency, was

21 there also -- strike that.

22          Mr. Aires was asking you previously about

23 offers to settle.

24     A.    Okay.

25     Q.    And you stated that you did not make them.

DEPOSITION OF SIMON LEWIS

1    frankly.

2          But the FCC would not get involved on our

3    behalf after AT&T had made some attempt, albeit

4    unacceptable.

5          Q.    Did you -- were you aware of this regulation

6    or purported FCC regulation prior to?

7          A.    Prior to what?

8          Q.    Prior to the offers.

9          A.    No.  I assumed the FCC was there to protect

10   the consumer.  I assumed the FCC worked with the

11   consumer.

12         Obviously not.

13         Frankly, this whole process, from start to

14   finish, has been an abuse.  And I feel quite abused by

15   even being here right now, when I should be doing

16   business.

17         Q.    You mentioned in your phone conversation with

18   the person that you called from Fraud or Technical or --

19         A.    Right.

20         Q.    -- et cetera, that this was rampant.

21         A.    Yes.  We -- she was very nice.  She was very

22   pleasant.  We had a conversation for, I'm sure, 30

23   minutes, 45 minutes.

24         She said, basically, it happens all the time,

25   and they can spot it a mile away.  They can tell, you

DEPOSITION OF SIMON LEWIS

1    know, right away by the nature of what they call a

2    "nailed-up call," in other words, fixed up.

3        Q.    It's nail like n-a-i-l?

4        A.    Nailed-up, that was probably her terminology.

5    It's a nailed-up -- a communication channel, if you

6    will, that was made from our switch to somewhere in the

7    Philippines or somewhere in India, or wherever else,

8    that lasts for hours and hours.

9            They see it all the time.  And they are

10    disconnecting them all the time.

11            And they -- you know, she said, basically, you

12    know, "Don't worry about it.  This happens all the time.

13    You know, just -- I have it noted in the record.  It's

14    fraud.  They'll take care of it."

15            MR. AIRES:  Okay.  Move to strike everything

16    after "yes" as nonresponsive.

17            THE WITNESS:  Actually, I'll say it again.

18            MS. MATLOCK:  Actually, you know, you can't

19    strike it, as you know, in the ways I was not able to

20    strike it before.  You can say, "Move to strike."

21            THE WITNESS:  I'll say it again.

22            We had a very amicable conversation about it.

23            She said she sees this stuff all the time.

24    She said not to worry about it, that she had it noted in

25    the record, and that it will be taken off our bill,

DEPOSITION OF SIMON LEWIS

1    dealt with by their Fraud Department or whatever else.

2             MR. AIRES:  Objection.  Move to strike.

3             Nonresponsive; no question pending.

4             THE WITNESS:  (Addressing Ms. Matlock) Would

5    you like to ask me a question?

6             MS. MATLOCK:  Q.  In July of 2006, you had a

7    conversation.  How long did it last, and what did it

8    pertain to?

9             MR. AIRES:  Objection.  Compound.

10            MS. MATLOCK:  Q.  Please answer.

11        A.  It was a lengthy conversation.  It was very

12    amicable.

13            She told me that she sees this type of fraud

14    call all the time.  She described calls that -- I'm

15    paraphrasing her words -- "nailed-up" connections

16    between a phone system and something in India or

17    somewhere in the Philippines or somewhere else.

18            They can recognize them, I'm sure she said, "a

19    mile away," or something to that effect.  She said she

20    sees it all day long.

21            She said not to worry about it.  It would be

22    -- she would put it down in the record as such, and it

23    would be taken off or dealt with by her Fraud

24    Department.  They take -- they deal with this all the

25    time.

1          And I'm sure that if we were not a small

2    company in San Francisco, but a large institution, this

3    would have been dealt with, no questions asked.

4          But for some reason, completely -- I'm

5    completely baffled by it -- AT&T decided to persist in

6    trying to extort $6 a minute for phone calls that I have

7    a contracted long-distance rate of maybe 12 cents.

8          And then when I made it very clear to AT&T

9    that I would not pay for bills that are extortionary,

10   they decide to hand it across (sic) to the gentleman

11   across the table, who thought it was a good idea to get

12   involved.

13         Hopefully, he'll find out it's not.

14    Q.    Thank you.  Those are all of my questions.

15         Mr. Aires?

16             FURTHER EXAMINATION BY MR. AIRES

17         MR. AIRES:  Q.  In 2006 -- in July of 2006, is

18   it correct for me to understand that you had a block of

19   a hundred numbers?

20    A.    We have, essentially, always had a block of a

21   hundred numbers.

22         We, as part of our block -- it had been

23   chopped up amongst different customers, unbeknownst to

24   us.  They were unused.

25         So, we were going through a process of

DEPOSITION OF SIMON LEWIS

# EXHIBIT B

1        A.    To Dataway.

2        Q.    All right.  So, do you differentiate at all,

3    when you think back about the calendar year 2006, as

4    there being any difference between SBC and AT&T?

5        A.    I believe that's the year the company merged.

6              And it may have started as SBC early in the

7    year.  But by the end of the year, it certainly was

8    AT&T.

9        Q.    All right.  How about on July 24th, 2006?  Do

10   you have some understanding as to the status of the

11   merger?

12       A.    Not exactly.

13       Q.    All right.  Now, on July 24th, 2006, I

14   understand there were some calls placed through a

15   telephone system belonging to Dataway; is that right?

16       A.    Yes.

17       Q.    What do you understand happened?

18       A.    Our voice-mail system was compromised from the

19   outside.  And several calls were made to the Philippines

20   and to other places -- India.  And those calls reflected

21   in our contracts that we had at the time, our existing

22   contracts, local and long distance.

23             Also, a new account appeared.

24       Q.    When did you first learn that these

25   unauthorized -- that these calls had been made on

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

1    July 24th of 2006?

2         A.    The Monday before July 24th, I was informed

3    that a message had been left by the AT&T Technical Team

4    saying that our phone system had been compromised, that

5    there was suspicious activity, and that we should

6    immediately change our password system to an eight-digit

7    password.

8         Q.    And who left that message?

9         A.    I cannot tell you because I didn't receive it

10   directly.

11        Q.    Who told you that a message -- that such a

12   message had been received?

13        A.    My boss.

14        Q.    Who was that person?

15        A.    Simon Lewis.

16        Q.    Did he tell you if he received the call

17   directly or that somebody else at Dataway had received

18   the call?

19        A.    He didn't specify.

20             MS. MATLOCK:  Objection as hearsay.

21             Mr. Lewis is going to be here this afternoon.

22   So, he would be the person most knowledgeable to ask the

23   direct questions.

24             (Addressing the witness) But go ahead and

25   answer.

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

1    participate in that decision.

2        Q.   Okay.  I'm not sure I really am -- if I have

3    my hands around this yet.

4            Did -- to your knowledge, did the contact from

5    AT&T Technical Services happen after the calls were

6    placed that appeared on the billing statement for the

7    time of July 24th, 2006?

8            MS. MATLOCK:  Objection.  Vague-and-ambiguous

9    question.

10           Which bill?

11           MR. AIRES:  Q.  The first time the charges

12   showed up for July 24.

13       A.   To my knowledge, the AT&T Technical Services

14   called when they detected the suspicious activity.

15       Q.   Okay.  And they suggested that you change your

16   passwords; right?

17       A.   Yes.

18       Q.   And you were given that information by

19   Mr. Lewis; correct?

20       A.   I was informed, yes.

21       Q.   And what, if anything, did you do in response

22   to the information given to you by Mr. Lewis?

23       A.   I asked him, "What will we need to do in order

24   to resolve when the charges showed (sic) up on the bills

25   -- on the statements?"

1    He told me that it had been explained to him by

2    the AT&T technician, a woman -- he didn't get the name;

3    all he got was it was from the AT&T Technical Team in

4    New Jersey -- that this was a common occurrence; that it

5    was very much like credit-card fraud; that when the

6    charges showed up on our bills, what we needed to do was

7    to place them in dispute and that they would be waived.

8         Q.    That's what Mr. Lewis told you?

9         A.    Yes.

10        Q.    Okay.  Did you engage in any effort to change

11   the passwords?

12        A.    The passwords were changed immediately that

13   morning.

14        Q.    Wasn't that the suggestion made by AT&T

15   Technical Services, that you needed to change the

16   passwords?

17        A.    Yes.

18        Q.    Then you, in fact -- you or someone else at

19   Dataway changed the passwords?

20        A.    Yes, someone else changed the passwords on the

21   phones.

22        Q.    Who did that?

23        A.    I believe it's one of our engineers.

24        Q.    Do you know which one?

25        A.    Either Tedman Eng -- it's T-e-d-m-a-n, and the

1   last name is Eng, E-n-g -- or Brad Thompson,

2   T-h-o-m-p-s-o-n.

3       Q.   Are they both men?

4       A.   Yes.

5       Q.   Did those two fellows have the same job title

6   in 2006?

7       A.   No.   One is an engineer in Research and

8   Development; the other one is a Support engineer.

9       Q.   Which one is which?

10      A.   Tedman is an engineer in Research and

11  Development, and Brad is a Support engineer.

12      Q.   And how do you know it was only one of those

13  two fellows?

14      A.   Because they both came to my desk.   They were

15  both involved in, you know, changing the passwords.

16      Q.   So, you were told that something needed to

17  happen relative to the passwords by Mr. Lewis; right?

18      A.   (Witness nods head.)

19      Q.   That's a "yes"?

20      A.   Yes.

21      Q.   And then you contacted Brad and Tedman, and

22  they came to your desk?

23           MS. MATLOCK:   That's a fact not in evidence.

24           MR. AIRES:   I'm trying to figure out how it

25  happened.

1        THE WITNESS:  No, I didn't contact them.

2            They were also informed of what had happened to

3    the telephone system.  And they were asked to go ahead

4    and change the passwords on every phone.

5        MR. AIRES:  Q.  All right.  Would it be

6    correct for me to conclude that they were present with

7    you at the time that Mr. Lewis communicated to you that

8    he'd heard from Technical Services?

9        A.  No, they were not present.

10        Q.  Do you know how they were told about this

11    situation?

12        A.  I wasn't present when they were informed.

13        Q.  But you have some reason to believe that

14    either one of them -- strike that.

15            You have some reason to believe that one of

16    them was responsible for changing the passwords.

17            Why do you believe it was one of those two?

18        A.  Because they were the ones that gave me my new

19    password.  I do not remember exactly which one, but I

20    know it was one of them.

21            We had to change the password twice because,

22    despite the first attempt, the calls continued.

23        Q.  Interesting.

24            When did that happen?

25        A.  In the following days, mostly evenings or

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

1    your local telephone service provider?

2         A.    From AT&T as well.

3         Q.    Or SBC?

4         A.    We have two system accounts.

5               One is a contracted long-distance account,

6    where we have a reduced rate for long-distance calls.

7               The other one is what is called our "Summary

8    Billing Account."  That comprises our contracts with

9    AT&T local, toll, and long distance.

10              The $11,000 you mentioned came on an account

11   that we had never set up.

12              The other charges, the MCI and Sprint charges,

13   came on the summary billing.

14              And there were several smaller charges on the

15   long distance.

16        Q.    On the summary -- on the bill that you would

17   have normally expected to see?

18        A.    Yes.

19        Q.    Okay.  And you concluded somehow that at least

20   some of these charges were the result of caller --

21   calling code access?

22              Do you know what that term means?

23        A.    I'm not sure if I understand it exactly.

24        Q.    All right.  You made reference to 10-10-280.

25        A.    Uh-huh.

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

1      Q.   Have you ever seen any of those ads where they

2   sold -- they sold access to phone users by dialing a

3   10-10 code?

4      A.   Yes.

5      Q.   So, do you remember that -- I think it was

6   either Sprint or MCI had 10-10-280?

7      A.   I know I've seen the ads.  I don't remember

8   which one had what.

9      Q.   Do you remember the ad from AT&T which was

10   10-10-ATandT?

11      A.   No.

12      Q.   Do you know how is $11,534.67 charges were

13   generated?

14      A.   Not exactly.  I don't know which method they

15   used.  I did some research and found that the call had

16   been originated not in California, but in Kansas, and,

17   you know, it had gone to a number in the Philippines.

18   But I don't know which mechanism.

19      Q.   So, you're not aware that it was accessed

20   through using the calling access code 10-10-288?

21      A.   I don't have firsthand knowledge.

22      Q.   Did anybody ever tell you that?

23      A.   Not that I recall.

24      Q.   How did you learn that the other charges

25   from the other long-distance service providers were the

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

1    Q.    All right.    Anybody else?

2    A.    We had a conference -- telephone conference

3    call with some gentleman with Crystal, Jessica.    It was

4    a gentleman, but I don't recall his name or what

5    department within AT&T he was from.

6    Q.    All right.    In any of those communications,

7    did anybody at AT&T tell you that they were going to

8    waive the $11,534.67?

9    A.    Crystal and Jessica never said that because

10    they explicitly told me they couldn't be involved in the

11    dispute of that amount, given that that account, dealing

12    for (sic) -- within their system, whatever that meant,

13    and that we had to deal directly with the -- with AT&T

14    Corporate in -- and the Fraud Resolution Group regarding

15    this.

16          Daniela never said she would waive the charges.

17          She just asked us to fill out a form.    And she

18    said it would go into investigation, and a resolution

19    would be made.

20    Q.    Did Mr. Lewis ever tell you that he was told

21    by anybody at AT&T that AT&T would waive the $11,534.67?

22    A.    He was told by the lady technician from the

23    AT&T Technical Team in New Jersey that he talked to.

24    Q.    He was told what by who?

25    A.    That this was a common occurrence, and that

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

1    the process was to dispute the charges, and they will be

2    waived.

3         Q.    Did they ever get waived?

4         A.    Not the 11,000.  They are still an open

5    balance.

6         Q.    Okay.  Did he ever indicate to you who he

7    spoke with?

8         A.    He doesn't have a name for the person.  All

9    he recalls -- he told me it was a woman from the AT&T

10   Technical Team in New Jersey.

11        Q.    Did he ever tell you that he received within

12   ten days of that conversation any written evidence that

13   the charges in the amount of $11,534.67 would be waived?

14        A.    No.

15        Q.    Okay.  Did you ever figure out how your system

16   was compromised?

17        A.    No.  Me personally, no.

18        Q.    Do you know if anybody at Dataway determined

19   how the Dataway system had been compromised?

20        A.    Not to my knowledge.

21        Q.    And the system that was in place in July of

22   2006, that was a system that was owned and operated by

23   Dataway?

24        A.    Yes.

25        Q.    I mean, you didn't lease your telephone system

DEPOSITION OF FRANCISCO J. MOLIERI - VOLUME I

# EXHIBIT C

11/06/2007 11:03 FAX                                                          ☒007
Nov. 10. 2006 11:17AM                                          No. 0350  P. 5



| 051 788 3374 001 | 8/25/06 | 9/25/06 | at&t | Page 3 |

| ITEM | EXPLANATION | CHARGES |
|---|---|---|

SURCHARGES BILLED TO: 0517883374001
LONG DISTANCE
1   UNIVERSAL CONNECTIVITY CHARGE        987.76
2   ADMINISTRATIVE EXPENSE FEE           82.78
3   PROPERTY TAX ALLOTMENT               140.17
4   FEDERAL REGULATORY FEE               111.95
TOTAL LONG DISTANCE SURCHARGES:                   $1,322.66
TOTAL BILLED TO: 0517883374001                    $1,322.66

TOTAL SURCHARGES:                                 $1,322.66

| ITEM | EXPLANATION | CHARGES |
|---|---|---|

CHARGES BILLED TO: 0517883374001
LONG DISTANCE
5   UTILITY USERS TAX                    804.75
TOTAL LONG DISTANCE TAXES:                        $804.75
TOTAL BILLED TO: 0517883374001                    $804.75

TOTAL TAXES:                                      $804.75

LONG DISTANCE CALLS
LONG DISTANCE CHARGES BILLED TO: 051 788 3374 001
LONG DISTANCE CALLS BILLED TO: 415 802-8700
6.  JUL 24   4:53A  PHILIPPINE PH    06324392509   419   DDC   STAN   2,415.06
7.  JUL 24   4:59A  PHILIPPINE PH    06324317817   411   DDC   STAN   2,371.04
8.  JUL 24   5:05A  PHILIPPINE PH    06324472954     1   DDC   STAN       9.91
9.  JUL 24   5:05A  PHILIPPINE PH    06324472954   402   DDC   STAN   2,322.91
10. JUL 24   5:08A  PHILIPPINE PH    06324510199   395   DDC   STAN   2,288.78
TOTAL CHARGES                                                        $9,407.26

TOTAL AT&T CALL CHARGES                                              $9,407.26

AT&T2



**Fraud Resolution Group**
*Daniela Carnoell*

30 Knightsbridge Rd, Room 33D42
Piscataway, NJ 08854
v: 732-652-1765
f: 732-652-1768/1769

October 12, 2006

Via US Mail

Francisco Molieri
Dataway Inc
180 Redwood St, Ste 300
San Francisco, CA 94102

Re:~FTS Case #: 1773958
    Account #:  0517883374001

Dear Francisco Molieri,

On behalf of AT&T, we would like to acknowledge receipt of your toll fraud dispute and outline the procedure for formalizing your claim. We understand the seriousness of this type of occurrence and are committed to resolving this matter promptly and amicably.

This investigation is only intended to document and substantiate your claim. In order to facilitate claim processing and proceed with our investigation, please document the details of your claim in the blanks below.

*Note: You may receive invoices from your Local Exchange Carrier that contain AT&T billing charges. The Local Exchange Carriers may bill you as our billing agent. When there is a disputed charge, such as toll fraud, the Local Exchange Carrier may remove these charges from the invoice and refer it back to AT&T to resolve. This process is for administrative purposes ONLY and should not be construed as our waiver of payment for these charges.*

Total dollar amount of the disputed calls, including taxes: ___$11,534.67___

Account number(s): ___051 988 3374 001___

Name of AT&T Account Executive (if applicable): ___N/A___

Telecommunications equipment involved (manufacturer of your telecommunications system / PBX, voice mail, etc.): _____

To the best of your knowledge, has the fraud stopped?: ___YES___

First date of fraudulent calls: ___07-24-2006___  Last date of fraudulent calls: ___07-24-2006___

Date system was installed: _____  Date system was secured: _____

A brief synopsis of how the fraud occurred (please attach additional sheets, if necessary):

___THIS ACCOUNT IS AN UNAUTHORIZED ACCOUNT___
___WE NEVER REQUESTED AT&T TO CREATE THIS ACCOUNT___
___NOR DID WE CONSENT IT BE CREATED.___

What security measures has your company taken to prevent this type of fraud from happening again?:
___HAVE REINFORCED SECURITY MEASURES & APPLIED MORE___
___STRINGENT PASSWORD POLICIES.___

Nov. 10. 2006 11:16AM                                          No. 0350   P. 3

Business Name (if different than above): _DATAWAY, INC._

Business Address: _180 REDWOOD STREET, SE 300 SF CA 94102_

Customer Signature: _Francisco Molieri_  Printed Name: _FRANCISCO MOLIERI_

Title: _COMPTROLLER_                Date: _11·10·2006_

Reach Number: _(416) 882-8711_   email address: _FMOLIERI@DATAWAY.COM_

This completed form ALONG WITH COPIES OF YOUR BILLS DETAILING THE CALLS
YOU BELIEVE WERE UNAUTHORIZED (YOU ONLY NEED TO PROVIDE THE PAGES
THAT DISPLAY THE DISPUTED CALLS AND THE SUMMARY OF CHARGES PAGE),
must be mailed or faxed on or before 10/26/2006 in order to avoid any collection activity on your
account. WITHOUT APPROPRIATE DOCUMENTATION, YOUR CLAIM MAY BE
DENIED. All other amounts not in dispute should be paid by their appropriate due date to the
address listed on your invoice. Please forward this documentation to the following address or the
fax number on page one:

       Daniela Carswell
       AT&T FRG
       30 Knightsbridge Rd, Room 33D42
       Piscataway, NJ 08854

If you have any questions regarding this matter, you can reach me at 732-652-1765.

Sincerely,

_Cynthia Re_
_for_
Daniela Carswell

Enclosure

_ORIGINAL BILL FOR DISPUTED ACCOUNT._
_STATEMENT TO DISPUTE ENTIRE ACCOUNT._

---

To learn more about NetPROTECT Services and how to protect your company from future toll fraud, contact
the Service Establishment Group at 1-800-NET-SAFE or visit our web site at
http://www.att.com/netprotect. Additionally, AT&T maintains a Toll Fraud Security Group around the clock
to help businesses that suspect unauthorized use of their telephone systems. If you believe your company is
experiencing toll fraud please contact Network Security at 1-800-821-8235.

**AT&T COMMUNICATIONS**
Adm. Rates and Tariffs
Bridgewater, NJ 08807
Issued: August 9, 2001

TARIFF F.C.C. NO. 30
1st Revised Page 5
Cancels Original Page 5
Effective: August 10, 2001

## AT&T BUSINESS TELECOMMUNICATIONS SERVICE

### TABLE OF CONTENTS

<u>Page</u>

### Section 3 - General Regulations (continued)

3.5.16. Fractional Charges and Credits ........................... 37
  3.6.1. General............................................. 39
    A. Interruptions to Established Calls. .............. 39
    B. Wrong Numbers..................................... 39
    C. When Credit Allowances Do Not Apply.............. 39
  3.6.2. Use of Another Means of Communication................ 39
3.7  CONNECTIONS.......................................... 40
3.7.1. General............................................. 40
3.7.2. Responsibilities of the Customer...................... 40
  A. Compatibility with BTS ............................ 40
  B. Interface Information.............................. 40
  C. Interference and Hazard........................... 40
  D. Changes to BTS.................................... 40
  E. Testing and Maintenance........................... 40
3.7.3. Responsibilities of the Company...................... 41
  A. General.......................................... 41
  B. Changes in Components, Operations, or Procedures.. 41
3.7.4. Connection to a Customer-provided Communications
    System or to Service(s) Provided by Others............ 41
  A. Answer Supervision................................ 41
  B. Minimum Protection Criteria....................... 41
  C. Customer-Provided Communications System Failures.. 41
  D. Use of Satellite Facilities....................... 41
3.7.5. Minimum Protection Criteria.......................... 42
  A. General.......................................... 42
  B. All Connections................................... 42
  C. Direct Electrical Connections..................... 43
  D. Acoustic or Inductive Connections................. 44
3.7.6. Recording of Two-Way Telephone Conversations.......... 44
  A. Recording Requirements............................ 44
  B. Exceptions....................................... 45
3.7.7. Connections to Other Services Provided by the Company. 45
3.8. RATE DETERMINATION......................................... 46
3.8.1. Distance Measurements................................ 46
3.8.2. Time-of-Day and Day-of-Week.......................... 47
3.8.3. Class of Service.................................... 47
  A. Dial Station..................................... 48

C

C

**AT&T COMMUNICATIONS**
Adm. Rates and Tariffs
Bridgewater, NJ 08807
Issued: August 9, 2001

TARIFF F.C.C. NO. 30
1st Revised Page 6
Cancels Original Page 6
Effective: August 10, 2001

## AT&T BUSINESS TELECOMMUNICATIONS SERVICE
### TABLE OF CONTENTS

<u>Page</u>

### Section 3 - General Regulations (continued)

3.8.4. Determining the Chargeable Time of a Call............. 49
3.8.5. Determining the Applicable Rate In Effect............. 50
3.8.6. Call Forwarding    51
3.8.7. International Terminations    51
3.9. VIOLATION OF REGULATIONS................................ 52
3.9.1. General........................................ 52
3.9.7. Access Arbitrage .................................. 53.1
3.10 DEFINITIONS.................................. 54

### Section 4 - Initial Subscription to AT&T

4.1. GENERAL.................................................. 58
4.1.1. Dial Station.................................. 58
  A. State-to-State Dial Station Calls Billed
     To The Customer's Domestic Residential
     Telephone Account................................ 59
  A.1. Application Of Rates........................... 59
  (a). Distance Measurements........................ 59
  (b). Rate Periods................................. 59
  (c). Computing The Charge For A Call.............. 60
  (d). Rates Applicable for Persons with
       Hearing and/or Speech Disabilities.......... 60
  (e). Rates....................................... 61
  (f). Single Bill Fee............................. 61
  B. International Dial Station Calls................ 62
     General....................................... 62
  B.1. Regulations.................................. 62
  (a) Availability of Service...................... 62
  B.2. International Mobile Termination Charge....... 63
  B.3. Mainland - Canada Service..................... 64
  B.4. Mainland - Mexico Service..................... 65
  B.5. Mainland Service To Foreign Countries or
       Areas Other Than Canada or Mexico............ 66
  B.6. Hawaii Service to Foreign Countries or Areas.. 67
  B.7. Puerto Rico Service to Foreign Countries
       or Areas..................................... 68
  B.8. US Virgin Islands Service to Foreign Countries
       or Areas..................................... 69

C

**AT&T COMMUNICATIONS**
Adm. Rates and Tariffs
Bridgewater, NJ 08807
Issued: July 30, 2001

, ARIFF F.C.C. NO. 30
Original Page 7

Effective: July 31, 2001

# BUSINESS TELECOMMUNICATIONS SERVICE

## TABLE OF CONTENTS

Page

**Section 5 - Casual Calling Services**

5.1. General.................................................. 71
   5.1.1. Non-Subscriber 1010288 Service......................... 71
      A. Internet Service Connections..................... 71
      B. AT&T Satellite Service Calls..................... 72
5.2. Non-Subscriber 1010288 Service.............................. 72
   5.2.1. General............................................. 72
   5.2.2. Calls Not Subject To Non-Subscriber 1010288 Charges... 72
   5.2.3. Credits............................................. 72
   5.2.4. Availability........................................ 72
   5.2.5. Rates and Charges................................... 72

**Section 6 - Collect Calls Received From International Countries/Areas**

6.1. General.................................................. 74
   6.1.1. Regulations......................................... 74
      A. Collect Calls.................................... 74
      B. Availability of Service.......................... 75
6.2. Canada - Mainland Service................................... 76
6.3. Mexico - Mainland Service................................... 76
6.4. Mainland Service from Foreign Countries or Areas other
   than Canada or Mexico........................................ 77
6.5. Hawaii Service from Foreign Countries or Areas.............. 78
6.6. Puerto Rico Service from Foreign Countries or Areas........... 79
6.7. US Virgin Islands Service from Foreign
   Countries or Areas.......................................... 80
6.8. Mainland Service from Foreign Countries or Areas other
   than Canada or Mexico........................................ 81
   6.8.1. Rate Periods........................................ 81
   6.8.2. Collect Calls Accepted.............................. 87
6.9. Hawaii Service from Foreign Countries or Areas.............. 95
   6.9.1. Rate Periods........................................ 95
   6.9.2. Collect Calls Accepted.............................. 104
6.10. Puerto Rico Service from Foreign Countries or Areas........... 112
   6.10.1. Rate Periods....................................... 112
6.11. US Virgin Islands Service from Foreign
   Countries or Areas.......................................... 119
   6.11.1. Rate Periods....................................... 119
6.12. Puerto Rico and US Virgin Islands Service
   from Foreign Countries or Areas............................. 126
   6.12.1. Collect Calls Accepted............................. 126

**AT&T COMMUNICATIONS**
Adm. Rates and Tariffs
Bridgewater, NJ 08807
Issued: July 30, 2001

**TARIFF F.C.C. NO. 30**
Original Page 8

Effective: July 31, 2001

## BUSINESS TELECOMMUNICATIONS SERVICE

### TABLE OF CONTENTS

Page

**Section 7 – Global Satelite Service**
7.1. General........................................................ 134
7.1.1. Availability............................................. 134
7.1.2. Rates and Charges.................................. 134

**Section 8 - Rate Schedules and Tables**

8.1. General........................................................ 136
8.1.1. Rate Periods............................................. 136
8.2. Domestic Dial Station Rates...................................... 139
..... Non-Subscriber Service Charge.................................. 140
8.3. International Dial Station Rates .............................. 142
..... Mobile Termination Charges..................................... 144
..... International Non-Subscriber Service Charge.................... 148
8.4. Availability Customer Account Charge............................ 151
8.5. Local Exchange Company Billing Availablity.................... 151
8.6. Customer Account Charge.........................................153
8.7. Collect Usage Rates Overseas to Mainland....................... 155
8.8. Collect Usage Rates Overseas to Hawaii......................... 166
8.9. Operator Handled Collect Call Service Charge Canada........... 177
Operator Handled Collect Call Service Charge Mexico........... 178
8.10. AT&T Global Satelite Charges.................................. 179
8.11. BTN Requirement Billing Capability............................ 180

Printed in U.S.A.

AT&T14

**AT&T COMMUNICATIONS**
Adm. Rates and Tariffs
Bridgewater, NJ  08807
Issued:  July 30, 2001

TARIFF F.C.C. NO. 30
Original Page 9

Effective:  July 31, 2001

# BUSINESS TELECOMMUNICATIONS SERVICE

## SECTION 1

## GENERAL TARIFF INFORMATION

**AT&T COMMUNICATIONS**
Adm. Rates and Tariffs
Bridgewater, NJ 08807
Issued: July 30, 2001

TARIFF F.C.C. NO. 30
Original Page 10

Effective: July 31, 2001

## BUSINESS TELECOMMUNICATIONS SERVICE

### HOW TO USE THIS TARIFF

**General -** This tariff contains the regulations and rates applicable to Interstate and foreign Business Telecommunications Service.

BTS provides the capability for communications between two or more stations. Other BTS offerings, such as Custom Network Services, Conference Services, and AT&T MultiQuest Service are also available.

**A. Tariff Structure -** This tariff is subdivided into fourteen major sections and rate tables which describe the terms, conditions, and rates under which BTS is offered. The rates for certain services are listed in rate tables. See individual service sections and the Rate Table Check Sheet for applicable rate tables. The tariff's major sections are:

Section 1. General Tariff Information - defines the scope of this tariff.

Section 2. Application - defines the scope of this tariff.

Section 3. General Regulations - the General Regulations applicable to BTS.

Section 4. Initial Subscription to AT&T as Primary Long Distance Carrier

Section 5. Casual Calling Services.

Section 6. Collect Calls Received from International Countries/Areas.

Section 7. On Demand Satellite

Section 8. Rate Schedules

### B. Tariff Format

**1. Page Numbering -** Page numbers appear in the upper-right corner of the page. Pages are numbered sequentially. When a new page is added between existing pages with whole numbers, a decimal is added. For example, a new page added between pages 34 and 35 would be 34.1.

**2. Page Revision Numbers -** Revision numbers also appear in the upper-right corner of the page. These numbers are used to determine the most current page version on file with the FCC. For example, the 4th revised page 34 cancels the 3rd revised page 34. Because of deferrals, notice periods, etc., the most current page revision number on file with the FCC is not always the tariff page in effect. Consult check sheets and supplements for the page currently in effect.

**AT&T COMMUNICATIONS**
Adm. Rates and Tariffs
Bridgewater, NJ 08807
Issued: July 30, 2001

TARIFF F.C.C. NO. 30
Original Page 11

Effective: July 31, 2001

## BUSINESS TELECOMMUNICATIONS SERVICE

## HOW TO USE THIS TARIFF

### B. Tariff Format (Cont.)

**3. Numbering Sequence** – There are nine levels of alpha-numeric coding.  Each level is subservient to its next higher level.  The following is an example of the numbering sequence used in this tariff.

```
2.
2.1.
2.1.1.
2.1.1.A.
2.1.1.A.1.
2.1.1.A.1.(a)
2.1.1.A.1.(a)I.
2.1.1.A.1.(a)I.(i)
2.1.1.A.1.(a)I.(i)(1)
```

**4. References To Other Tariffs** – Whenever reference is made to other tariffs, the reference is to the tariffs in force as of the effective date of the reference, and to amendments thereto and successive issues thereof.

### C. Check Sheets and Supplements

**Check Sheets** – When a tariff filing is made with the FCC, an updated check sheet accompanies the tariff filing.

The check sheet lists the pages contained in the tariff, with a cross reference to the current revision number on file with the FCC.  When new pages are added, the check sheet is changed to reflect the revision.  All revised pages contained in a given filing are designated by an asterisk (*) on the check sheet.  A supplement put into effect is also reflected on the check sheet.

The tariff user should refer to the latest check sheet to determine if a particular page is the most current page on file with the FCC.

**D. Supplements** – A supplement can be used to list a group of tariff pages or rate tables that are being deferred, suspended or advanced.  A supplement contains a brief explanation of the circumstances and a list of the pages involved.  It also informs the user of the disposition of these pages.  The supplements in effect are listed on the check sheet of the tariff.  When a supplement is no longer in effect, it is deleted from the subsequent check sheet.  A supplement can also be used to cancel a complete tariff.

**AT&T COMMUNICATIONS**
Adm. Rates and Tariffs
Bridgewater, NJ 08807
Issued:  July 30, 2001

TARIFF F.C.C. NO. 30
Original Page 12

Effective:  July 31, 2001

# LISTS OF CONCURRING, CONNECTING AND OTHER PARTICIPATING CARRIERS

## 1.1.2 Concurring Carriers -

Alascom, Inc.; Anchorage, AK
All America Cables and Radio, Incorporated; New York, NY
AT&T Communications of California, Inc.; San Francisco, CA
AT&T Communications of Delaware, Inc.; Philadelphia, PA
AT&T Communications of Illinois, Inc.; Springfield, IL
AT&T Communications of Indiana, Inc.; Indianapolis, IN
AT&T Communications of Maryland, Inc.; Oakton, VA
AT&T Communications of Michigan, Inc.; Lansing, MI
AT&T Communications of Nevada, Inc.; San Francisco, CA
AT&T Communications of New England, Inc.; Boston, MA
AT&T Communications of New Jersey, Inc.; Newark, NJ
AT&T Communications of New York, Inc.; New York, NY
AT&T Communications of Ohio, Inc.; Columbus, OH
AT&T Communications of Pennsylvania, Inc.; Philadelphia, PA
AT&T Communications of the Midwest, Inc.; Omaha, NE
AT&T Communications of the Mountain States, Inc.; Denver, CO
AT&T Communications of the Pacific Northwest, Inc.; San Francisco, CA
AT&T Communications of the South Central States, Inc.; Birmingham, AL
AT&T Communications of the Southern States, Inc.; Atlanta, GA
AT&T Communications of the Southwest, Inc.; Kansas City, MO
AT&T Communications of Virginia, Inc.; Oakton, VA
AT&T Communications of Washington D.C., Inc.; Oakton, VA
AT&T Communications of West Virginia, Inc.; Oakton, VA
AT&T Communications of Wisconsin, Inc.; Milwaukee, WI
AT&T Communications dba CONNECT 'N SAVE (described in Section
3.2.1.1.7.)
Cuban American Telephone and Telegraph Company; New York, NY
IDB Mobile Communications, Inc.; Rockville, MD*
ITT Communications, Inc. - Virgin Islands; New York, NY
Mobile Marine Radio; Mobile, AL
RCA Global Communications, Inc.; New York, NY

## 2. Connecting Carriers - None

## 3. Other Participating Carriers -

All local exchange carriers except those listed herein as Concurring
Carriers who have switched access tariffs on file under Part 69 of
the Federal Communications Commission's Rules and Regulations.

Communications Satellite Corporation; Washington, DC
RCA Global Communications, Inc.; New York, NY

**AT&T COMMUNICATIONS**
Adm. Rates and Tariffs
Bridgewater, NJ 08807
Issued: July 30, 2001

TARIFF F.C.C. NO. 30
Original Page 13

Effective: July 31, 2001

## 1.1.3 EXPLANATION OF SYMBOLS - Coding Of Tariff Revisions

Revisions to this tariff are coded through the use of symbols. These symbols appear in the right margin of the page. The symbols and their meanings are:

R - to signify reduction.
I - to signify increase.
C - to signify changed regulation.
T - to signify a change in text but no change in rate or regulation.
S - to signify reissued matter.
M - to signify matter relocated without change.
N - to signify new rate or regulation.
D - to signify discontinued rate or regulation.
Z - to signify a correction.

Other marginal codes are used to direct the tariff reader to a footnote for specific information. Codes used for this purpose are lower case letters of the alphabet, e.g., x, y and z. These codes may appear beside the page revision number in the page header or in the right margin opposite specific text.

## 1.1.4 EXPLANATION OF ABBREVIATIONS

| | | | |
|---|---|---|---|
| ACAP | - AT&T Commercial Affiliation Program | DPR | - Dual Party Relay |
| Addn'l | - additional | ea. | - each |
| Adm. | - Administrator | FCC (F.C.C.) | - Federal Communications Commission |
| AGTCS | - Audiographics Tele-conference Service | FL | - Florida |
| | | GA | - Georgia |
| AK | - Alaska | HI | - Hawaii |
| AL | - Alabama | HICAP | - High Capacity |
| ANI | - Automatic Number Identification | Hz | - hertz |
| | | IA | - Iowa |
| AR | - Arkansas | ID | - Idaho |
| Assn. | - Association | IL | - Illinois |
| AT&T | - American Telephone and Telegraph Company | IN | - Indiana |
| | | Inc. | - Incorporated |
| AZ | - Arizona | Ind. | - Independent |
| CA | - California | kbps | - kilobits per second |
| CCCS | - College Connect Calling Service | kHz | - kilohertz |
| | | KS | - Kansas |
| CCITT | - International Telegraph and Telephone Consultative Committee | KY | - Kentucky |
| | | LA | - Louisiana |
| | | LATA | - Local Access and Transport |
| CIID | - Card Issuer Identifier | BTS | - Long Distance Message Telecommunications Service |
| CO | - Colorado | | |
| Co. | - Company | | |
| Coop. | - Cooperative | | |
| Corp. | - Corporation | MA | - Massachusetts |
| CT | - Connecticut | MD | - Maryland |
| dB | - decibel | | |
| DE | - Delaware | | |
| Dept. | - Department | | |

**AT&T COMMUNICATIONS**
Adm. Rates and Tariffs
Bridgewater, NJ 08807
Issued: July 30, 2001

TARIFF F.C.C. NO. 30
Original Page 14

Effective: July 31, 2001

## 1.1.4 EXPLANATION OF ABBREVIATIONS (continued)

ME   – Maine
MHz – megahertz
MI   – Michigan
MN   – Minnesota
MO   – Missouri
MS   – Mississippi
MT   – Montana
MTS  – Message Telecommuni-
       cations Service
NC   – North Carolina
ND   – North Dakota
NE   – Nebraska
NH   – New Hampshire
NJ   – New Jersey
NM   – New Mexico
No.  – Number
NPA  – Numbering Plan Area
NV   – Nevada
NY   – New York
O.L. – "Other Line"
OH   – Ohio
OK   – Oklahoma
OR   – Oregon
PA   – Pennsylvania
PBX  – Private Branch
       Exchange
PIN  – Personal Identification
       Number
PV   – Puerto Rico/U.S. Virgin
       Islands (also PR/VI)
RI   – Rhode Island
RTCS – Rate Table Check Sheet

SC   – South Carolina
TDD  – Telecommunications
       Device for the Deaf
TN   – Tennessee
TX   – Texas
U.S. – United States
UT   – Utah
V&H  – Vertical and Horizontal
VA   – Virginia
VNS  – Virtual Network Service
VT   – Vermont
WA   – Washington
WATS – Wide Area
       Telecommunications
WI   – Wisconsin
WV   – West Virginia
WY   – Wyoming

**Abbreviations and Definitions** – In the front of this tariff is a list of the abbreviations used (see Explanation of Abbreviations, page 12). In addition, the General Regulations section contains a Definitions subsection which defines terms which have a specific meaning within the context of this tariff (see Definitions, page 44).

Printed in U.S.A.

**AT&T COMMUNICATIONS**
Adm. Rates and Tariffs
Bridgewater, NJ 08807
Issued: July 30, 2001

**TARIFF F.C.C. NO. 30**
Original Page 15

Effective: July 31, 2001

**1.1.5 TRADEMARKS AND SERVICE MARKS -** The following marks, to the extent, if any, used throughout this tariff, are trademarks and service marks of the American Telephone and Telegraph Company.

|  Trademarks | Service Marks |
|---|---|
| None | ALLIANCE® |
| | ASSURITY |
| | AT&T Clear Advantage |
| | AT&T CustomNet |
| | AT&T DIRECTory LINK |
| | AT&T EasyReach® |
| | AT&T INTERNATIONAL REDIAL |
| | AT&T MultiQuest® |
| | AT&T OPTIMUM |
| | AT&T PRO® |
| | AT&T SMALL BUSINESS |
| | COLLEGE CONNECT |
| | MEGACOM® |
| | OneNet® |
| | NetPROTECT |
| | REACH OUT® |
| | USADirect® |
| | UNIPLAN® |
| | WorldSource |
| | AT&T WorldPlus® |

**Location of Material -** To locate material in this tariff, refer to the Master Table of Contents on Page 2 for the page number of the Section desired. For a more precise listing, refer to the detailed Table of Contents which starts on Page 3.

**Computation of Charges -** The charge for an BTS call is based on such factors as: (1) the distance between the rate centers of the originating (calling) and terminating (called) stations; (2) the time of day and the day of the week when the call takes place; (3) the duration of the call; (4) the class of service; and (5) Other Line charges or service charges, when applicable. The specific factors which apply to a given BTS call are listed in the rate section applicable to the service.

Printed in U.S.A.

**AT&T COMMUNICATION**
Adm. Rates and Tariffs
Bridgewater, NJ 08807
Issued: July 30, 2001

TARIFF F.C.C. NO. 30

Effective: July 31, 2001

BUSINESS TELECOMMUNICATIONS SERVICE

SECTION 2

APPLICATION OF TARIFF

**AT&T COMMUNICATIONS**
Adm. Rates and Tariffs
Bridgewater, NJ 08807
Issued: July 30, 2001

ARIFF F.C.C. NO. 30
Original Page 17

Effective: July 31, 2001

## BUSINESS TELECOMMUNICATIONS SERVICE
### SECTION 2 - APPLICATION OF TARIFF

### 2.1. APPLICATION

#### 2.1.1. General

A. This tariff contains the regulations and rates applicable to interstate and foreign (international) Business Telecommunications Service as described on the Title Page.

**2.1.2. Jurisdiction** - Jurisdiction refers to the classification of an BTS call as interstate (subject to the jurisdiction of the Federal Communications Commission) or as intrastate (subject to the jurisdiction of a state regulatory body). Jurisdiction is a matter of law, not of Company discretion or policy, or Customer preference. The law describing what constitutes interstate jurisdiction is the Communications Act of 1934, as amended. The Title Page of this tariff describes the jurisdictional scope of this tariff.

**Carswell, Daniela, WWCS**

| | |
|---|---|
| From: | SMITH, CRYSTAL L (CRYSTAL L), SBC |
| Sent: | Friday, November 10, 2006 5:23 PM |
| To: | Carswell, Daniela, WWCS |
| Cc: | YEE, JESSICA M; Lake, James C, WWCS |
| Subject: | RE: Question - Dataway |

I appreciate your follow-up, and I know my Manager, Jessica Yee has worked to resolve this matter in my absence (due to a funeral day). Just as an FYI - to clarify my statement on "submitted a request to recourse the charges" - that is being processed on the "Legacy S" side. The customer incurred fraud charges on Legacy S and Legacy T.

We recognize the processing of the fraud investigations, and steps to resolution would be different on your end (legacy T). The customer's billing as it relates to fraud has been quite a challenge, and we appreciate all of your efforts on your end
We will continue to address the legacy S component.

Best regards.

Crystal Smith
at&t California
Account Manager
Direct 415 644 7236
Fax  866 422 4542
email: crystal.smith@att.com


-----Original Message-----
From: CARSWELL, DANIELA (TCORP)
Sent: Friday, November 10, 2006 4:18 AM
To: SMITH, CRYSTAL L (PB)
Cc: YEE, JESSICA M (PB); LAKE, JAMES CHARLES (TCORP)
Subject: RE: Question - Dataway


Crystal,

I'm not sure what you mean by saying you have submitted a request to recourse the charges since that these fraudulent calls were made thru the AT&T Network (Legacy T). This is why the account was created even though this is a "Legacy S" customer. This fraud dispute was assigned to me to work on it and, by our procedures, we sent a letter to Francisco Molieri requesting to fill out, sign and return back to us with the call details to investigate within 10 business days.

Mr. Molieri did not returned the information. Instead, on October 17, 2006 I received a faxed letter from him stating that is problem does not only consist of the unauthorized charges made, but also the creation of this corporate account without their knowledge, consent or authorization. Therefore, he is hesitant to complete the form we sent him since he believe that the form is to dispute unauthorized charges on a valid existing account and this, is not the case. He is reluctant to complete and sign any documents that may lead to indicate they acknowledge this account as valid and theirs, when it is not. He stated the best way to reach him was by e-mail at: fmolieri@dataway.com.

At that point, I sent him an e-mail with a summary of Tariff 30, section 5, "Casual Calling Services" explaining that AT&T Casual Calling Services permit callers who are not presubscribed to AT&T to access AT&T's switched network for completion of their state-to-state and international Dial Station calls by dialing carrier access code, 1010288. Again, I requested for the claim letter to be fill out, signed and returned in order to proceed with the investigation. I also stated that, if this claim letter was not received, his claim will be denied, the total disputed amount will be sustained and referred for collection activity. I'm about to do this since it has been over 10 business days from the time the letter was sent out to him requesting these information.

AT&T82

**Carswell, Daniela, WWCS**

| | |
|---|---|
| **From:** | Francisco Molieri [FMolieri@dataway.com] |
| **Sent:** | Friday, November 10, 2006 2:28 PM |
| **To:** | Carswell, Daniela, WWCS |
| **Cc:** | YEE, JESSICA M; 'crystal.smith@att.com'; Simon Lewis |
| **Subject:** | Acct 051 788 3374 001 Dispute |

**Importance:**     High

Daniela,

I just sent via fax documents you requested be completed and returned.
Also faxed copy of first statement we received from this account showing
unauthorized calls.   And a Statement of dispute regarding the creation of
this account.   It is our understanding that these documents will initiate
the Fraud investigation and that all suspend/disconnect/cancel activity
towards our local and toll services will be halted at once.

If you would please send us assurance there will not be any disruption to
our services will be appreciated.

I can be best reached by phone at 415/882.8711, or email at
fmolieri@dataway.com.

Regards,


Francisco Molieri

1

AT&T122

## CARSWELL, DANIELA, ATTCORP

| | |
|---|---|
| From: | Francisco Molieri [FMolieri@dataway.com] |
| Sent: | Tuesday, November 14, 2006 1:07 PM |
| To: | CARSWELL, DANIELA, ATTCORP; YEE, JESSICA M, ATTPB; crystal.smith@att.com |
| Cc: | Simon Lewis |
| Subject: | RE: Acct 051 788 3374 001 Dispute |

Importance:        High

Daniela, Jessica, Crystal,

Thank you all for your help.

I am going to be away from Nov. 16th to Nov. 28th and will not have access
to email.   If anything about this dispute requiring immediate attention
comes up, please contact Simon Lewis at slewis@dataway.com or (415)882-8700.
Otherwise I will be back at work on Nov. 29th.

Best regards,


Francisco Molieri


-----Original Message-----
From: Carswell, Daniela, WWCS [mailto:dcarswel@att.com]
Sent: Tuesday, November 14, 2006 4:37 AM
To: YEE, JESSICA M (JESSICA M), SBC; Francisco Molieri
Cc: crystal.smith@att.com; Simon Lewis
Subject: RE: Acct 051 788 3374 001 Dispute


Jessica,

Yes, I did received the information and I put an hold treatment on the
account.



Daniela Carswell
Sr. Associate Manager
AT&T Fraud/Shortfall Investigations
732-652-1765
dcarswel@att.com


-----Original Message-----
From: YEE, JESSICA M (JESSICA M), SBC
Sent: Monday, November 13, 2006 5:44 PM
To: Francisco Molieri; Carswell, Daniela, WWCS
Cc: crystal.smith@att.com; Simon Lewis
Subject: RE: Acct 051 788 3374 001 Dispute
Importance: High


Hi Daniela.

1

I got a call from Francisco requesting confirmation that you have received the fax he sent, and that his services are currently posted with a pending claim against the account. Could you send a reply to all to be sure that his is covered?

Much appreciation,

Jessica Yee
Regional Sales Manager
BCS - Select
AT&T California
phone: 415-644-7132
fax: 866-422-4542
jessicayee@att.com

The information contained in this message may be confidential, proprietary,and/or legally privileged information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any copying, dissemination or distribution of confidential, proprietary or privileged information is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone as well as delete the message and all attachments. Thank you!

-----Original Message-----
From: Francisco Mollieri [mailto:FMollieri@dataway.com]
Sent: Friday, November 10, 2006 11:28 AM
To: CARSWELL, DANIELA (TCORP)
Cc: YEE, JESSICA M (PB); 'crystal.smith@att.com'; Simon Lewis
Subject: Acct 051 788 3374 001 Dispute
Importance: High

Daniela,

I just sent via fax documents you requested be completed and returned. Also faxed copy of first statement we received from this account showing unauthorized calls. And a Statement of dispute regarding the creation of this account. It is our understanding that these documents will initiate the Fraud investigation and that all suspend/disconnect/cancel activity towards our local and toll services will be halted at once.

If you would please send us assurance there will not be any disruption to our services will be appreciated.

I can be best reached by phone at 415/882.8711, or email at fmollieri@dataway.com.

Regards,

AT&T124

Page 1

| Account Number | Bill Close Date | Payment Due |
|---|---|---|
| 051 788 3374 001 | 11/25/07 | 12/25/07 |

DATAWAY DESIGNS

AT&T Business Services

| Total Current Charges | | Account Status | |
|---|---|---|---|
| TOTAL OTHER CHARGES AND CREDITS | 11,534.67% | PREVIOUS BALANCE | 11,534.67 |
| TOTAL CURRENT CHARGES | $11,534.67% | TOTAL CURRENT CHARGES | $11,534.67% |
| | | TOTAL AMOUNT DUE | $.00 |

### IMPORTANT MESSAGES ABOUT YOUR ACCOUNT

**Account Status**

Attention Customer!  You are receiving this bill from AT&T because these calls were dialed on and completed over the AT&T network.  Your preferred long distance carrier has not been changed.  In the future, you will continue to receive a separate bill from AT&T for those calls that use the AT&T Network.

*Thank you for using AT&T where every customer counts*

### Summary of Payments, Adjustments, Other Charges and Credits

| ITEM | DATE | EXPLANATION | CHARGES/CREDITS |
|---|---|---|---|
| | | SUMMARY OF OTHER CHARGES & CREDITS | |
| 1 | 11/02 | CREDIT ADJUSTMENT | 11,534.67% |
| | | TOTAL OTHER CHARGES & CREDITS | $11,534.67% |

PLEASE MAKE CHECKS PAYABLE TO AT&T AND INCLUDE YOUR ACCOUNT NUMBER ON PAYMENT. MAKE SURE THAT THE AT&T P.O. BOX ADDRESS SHOWS THROUGH THE ENVELOPE WINDOW. AT&T WILL NO LONGER REPLY TO COMMENTS ON THIS DOCUMENT. SUBMIT ALL CORRESPONDENCE TO www.att.com/customercare

TO ENSURE PROPER CREDIT, PLEASE DETACH AND RETURN WITH REMITTANCE.

001375 1 AB   .317 F19
DATAWAY DESIGNS
180 REDWOOD ST
SAN FRANCISC, CA 94102-3280

 at&t

Account Number:  051 788-3374 001
Bill Close Date:  11/25/07
Payment Due:  12/25/07

Total Amount Due:          $0.00

☐ Check here for name/ address /telephone number corrections only. See reverse side.

AT&T
P O BOX 78225
PHOENIX, AZ  85062-8225

Amount Enclosed: $

0517883374001060000000000000000000000000000000001

SC#00-06

AT&T141

Nov. 10. 2006  11:16AM

 **DATAWAY**

180 Redwood Street → San Francisco → California → 94102 → Tel: 415-882-8700 → Fax: 415-882-8787

# Facsimile Transmittal

From: Francisco J. Molieri

fmolieri@dataway.com

Phone: 415/882-8711

Fax:  415/882-8787

Company:  Dataway

To:  AT&T – Fraud Res. Group
Attn:  Daniela Carswel

Number of pages (including cover): 6

Fax:  732/652.1769

Date:  11.10.2006

☐ Urgent → ☐ Please Review → ☐ Please Comment → ☐ Please Reply → ☐ Please Recycle

Regarding:       Account 051 788 3374 001

Daniela,

Per conversation with Jessica Yee, our AT&T California account manager, attached please find form you requested be completed/signed and returned to substantiate/document our claim.  Also attached is the first statement we received on this account that contains the only activity there has been.

And attached as well is a Statement of Dispute regarding this account since it was created without any authorization, knowledge or consent from Dataway, Inc.

Please let me know if there is anything else.

My direct tel. Number is 415/882.8711, and my email address:
fmolieri@dataway.com

Sincerely,

Francisco Molieri
Comptroller

```
 1/11/07 N1AXFAH              Thrifty Biller          140675    KCTHR05
 9:35:13 QPADEV0071      Notes by Account Number       SELECT    2W09R1
```

Notes For.......:   051 788 3374 001 Live Account
                    DATAWAY DESIGNS

| "X" | Date | Text Description |
|---|---|---|
| _ | 10/09/2006 | DTS-TRN# 1773958 . Redirect to fraud for further assistance. .Contact:877-325-0445 West, David |
| _ | 10/09/2006 | DTS - TRN# 1773958. An Acknowledgement Letter was Not Sent. West, David |
| _ | 10/09/2006 | DTS-TRN# 1773958 . Set to investigate status.Contact:877-325 -0445 West, David |
| _ | 10/09/2006 | RDS - TRN# !773958.  HTN ALERT..NO ACTION TAKEN BY FRAUD DES K..CSR WAS A VICTIM  OF VOICEMAIL FRAUD PER GFMS CASE 2006- 07-24/308..IF CSR       CALLS IN TO DISPUTE CHARGES, PLEASE R EFER TO BILLING TO      OPEN DTS CLAIM..TNS/FRAUD DESK 800-3 37-5373 PROMPT 1 West, David |
| _ | 10/05/2006 | MOE / SEE PREV NOTES REG VM FRAUD / ALREADY BEING HANDLED / KKULWICKI + |

```
F3   Exit    F8   Inquiry   F10   Change    F13   Toggle      PAGEDN
F12  Prev    F9   Add       F15   Start at  F24   More Keys   PAGEUP
"X" a Record then press a Function Key to process.
```

4I■                          » NUM                    0   6.6

AT&T167

**Francisco Molieri**

| | |
|---|---|
| From: | SMITH, CRYSTAL L (PB) [cs1591@att.com] |
| Sent: | Wednesday, September 20, 2006 8:13 PM |
| To: | Francisco Molieri |
| Cc: | Simon Lewis; Sandy Hendrarti; YEE, JESSICA M (PB) |
| Subject: | RE: Follow up on Disputed Calls |

A pending claim (P-Claim) has been requested to be set up on your account. Once it is completed in our system, we will provide you with the update of the expiration. Usually, the claims are set for 30 day cycles with the option to extend based on the status of resolution.

We have communicated with the Fraud group (Investigative Management) regarding their research into your account. The case was forwarded to the Long Distance Fraud unit to address. Jessica and I are pursuing further clarification with the Long Distance Fraud Division to clarify the status. The Long Distance Fraud Division will deny or approve the claim.

The pending claim that is placed on your account should prevent your account from going into jeopardy during this process.

Crystal Smith
at&t California
Account Manager
Direct 415 644 7236
Fax  866 422 4542
email: crystal.smith@att.com


-----Original Message-----
From: Francisco Molieri [mailto:FMolieri@dataway.com]
Sent: Wednesday, September 20, 2006 5:56 PM
To: SMITH, CRYSTAL L (PB); YEE, JESSICA M (PB)
Cc: Simon Lewis; Sandy Hendrarti
Subject: Follow up on Disputed Calls
Importance: High


Crystal, Jessica,



1

## Francisco Molieri

| | |
|---|---|
| From: | Francisco Molieri |
| Sent: | Friday, November 10, 2006 11:44 AM |
| To: | 'YEE, JESSICA M (PB)'; crystal.smith@att.com |
| Cc: | Simon Lewis |
| Subject: | RE: Question |
| | |
| Importance: | High |

Jessica, Crystal,

I just faxed to your office copies of all documents send to Daniela at FRG this morning.

That is for your records.

Thanks for all your help.

Francisco
-----Original Message-----
From: YEE, JESSICA M (PB) [mailto:jy1651@att.com]
Sent: Friday, November 10, 2006 10:28 AM
To: Simon Lewis; Francisco Molieri; crystal.smith@att.com
Subject: RE: Question

Hi Simon,

I've just talked w/ Francisco.  I am working to ensure you will not have
service interruption.  A form is required to be completed by Dataway to
begin investigation on this acct - today.  He simply needs to input on
the form that this was not an authorized acct to ensure that it's
communicated that there is no tie to Dataway's authorization or
ownership of this service.  This form initiates the investigation, which
will hence place a pending claim on the amt due, until it's completed.
Daniela will send communication outlining the next steps, and can answer
any further concerns on this particular acct.  Once the form is
submitted, she will take care of placing a pending claim - taking care
of service jeopardy/disconnection/collections status.

Hope this helps.

Jessica Yee
Regional Sales Manager
BCS - Select
AT&T California
phone:  415-644-7132
fax:  866-422-4542
jessicayee@att.com

The information contained in this message may be confidential,
proprietary,and/or legally privileged information intended only for the
use of the individual or entity named above.  If the reader of this
message is not the intended recipient, you are hereby notified that any
copying, dissemination or distribution of confidential, proprietary or
privileged information is strictly prohibited.  If you have received
this communication in error, please immediately notify the sender by
telephone as well as delete the message and all attachments.  Thank you!

-----Original Message-----
From: Simon Lewis [mailto:Simon@Dataway.com]

1

DW 003

Francisco Molieri

**From:** YEE, JESSICA M (PB) [jy1651@att.com]
**Sent:** Tuesday, November 14, 2006 11:32 AM
**To:** Simon@Dataway.com; FMolieri@Dataway.com; CARSWELL, DANIELA (TCORP); crystal.smith@att.com
**Subject:** Re: Acct 051 788 3374 001 Dispute

Simon

At this time, we are looking to recourse your charges that were billed on your ATT bill. We cannot assume/adjust this charge, as was explained to you by our Fraud Org . As far as your fraud instance on your other ATT bill, that was caused by someone casual dialing 10288 PIC, which is our legacy ATT pic, they are currently investigating, and should have answers from Daniela in the coming weeks.

We're near completion on the recourse, and will let you know status as we hear.

Jessica Yee
Regional Sales Manager
AT&T
415-644-7132
Jessica.yee@att.com

----- Original Message -----
From: Simon Lewis <Simon@Dataway.com>
To: Francisco Molieri <FMolieri@Dataway.com>; CARSWELL, DANIELA (TCORP); YEE, JESSICA M (PB); 'crystal.smith@att.com' <crystal.smith@att.com>
Sent: Tue Nov 14 10:15:01 2006
Subject: RE: Acct 051 788 3374 001 Dispute

Folks, we're looking for is complete resolution of this issue. Clearly a fraud was perpetrated and we should not be liable for any costs, period. At what point will this process be completed so we can get back to our business and not have this distraction.

Francisco, am I correct that all other long distance charges relating to this fraud from other vendors have been reversed? In other words it's only AT&T that we're having problems with now?

Jessica, as our long distance has always been SBC and as SBC is now AT&T can you not put some pressure on your fraud department to resolve this dispute once and for all?

Thx - Simon

-----Original Message-----
From: Francisco Molieri
Sent: Tuesday, November 14, 2006 10:07 AM
To: 'Carswell, Daniela, WWCS'; YEE, JESSICA M (JESSICA M), SBC; crystal.smith@att.com
Cc: Simon Lewis
Subject: RE: Acct 051 788 3374 001 Dispute
Importance: High

Daniela, Jessica, Crystal,

Thank you all for your help.



Best regards,

1

DW 006