**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| 2000 Biennial Regulatory Review | ) |
| | ) |
| Policy and Rules Concerning the International, | ) |
| Interexchange Marketplace | ) |
| | ) |

IB Docket No. 00-202

**REPORT AND ORDER**

Adopted: **March 16, 2001**                    Released:  **March 20, 2001**

By the Commission:    **Commissioner Ness issuing a  statement;**
**Furchtgott-Roth concurring and issuing a statement.**

## TABLE OF CONTENTS

Paragraph

I. ................................................................................... INTRODUCTION AND BACKGROUND          3

II. ......................................................................................REGULATORY FORBEARANCE          8

    A.   Analysis of Statutory Requirements.................................................................................8
        1.   Are Tariff Filing Requirements Necessary to Ensure that the Charges, Practices, Classifications or Regulations for the International Interexchange Services of Non-dominant Interexchange Carriers Are Just and Reasonable, and Are Not Unjustly or Unreasonably Discriminatory?...................................................................................9
            a.   Background .................................................................................10
            b.   Discussion ...................................................................................10
        2.   Are Tariff Filing Requirements for the International Interexchange Services of Non-dominant Interexchange Carriers Necessary for the Protection of Consumers? ...............................................................13
            a.   Background .................................................................................13
            b.   Discussion ...................................................................................14
        3.   Is Forbearance from Applying Section 203 Tariff Filing Requirements to the International Interexchange Services Offered by Non-Dominant Interexchange Carriers Consistent with the Public Interest? ...............................16
            a.   Background .................................................................................16
            b.   Discussion ...................................................................................17

EXHIBIT F

B.    Maintenance and Disclosure of Price and Service Information.........................................22
      1.        Background ...............................................................................................22
      2.        Discussion .................................................................................................23
      1.        Background ...............................................................................................26
      2.        Discussion .................................................................................................27

D.    Complete Detariffing of International CMRS Services ....................................................27
      1.        Background ...............................................................................................27
      2.        Discussion .................................................................................................28

E.    Filing of Carrier-to-Carrier Contracts .............................................................................31
      1.        Background ...............................................................................................31
      2.        Discussion .................................................................................................32

III. ...................................................................................................... TRansition Issues          36

A.    Background ......................................................................................................................36

B.    Discussion ........................................................................................................................36

IV. ................................................................................................ ADMINISTRATIVE MATTERS     39

A.    Final Regulatory Flexibility Certification ........................................................................39

V. .......................................................................................................... ORDERING CLAUSES       43

PART 0 – COMMISSION ORGANIZATION .........................................................................45

Separate Statement of...............................................................................................................56

Commissioner Susan Ness ........................................................................................................56


APPENDIX A:    **List of Parties**
APPENDIX B:    **Final Rules**

EXHIBIT ⌐

## I.    INTRODUCTION AND BACKGROUND

1.    On October 18, 2000, the Commission released a Notice of Proposed Rulemaking (*NPRM*) initiating a review of its regulation of international interexchange services. The Commission initiated this proceeding in response to the dramatic changes that have occurred in the international interexchange marketplace as a result of the Commission's deregulatory and procompetitive policies, the World Trade Organization (WTO) Basic Telecom Agreement, increased privatization and liberalization of foreign markets, falling accounting rates, and greater competition in the U.S. market.[1]  Specifically, the Commission made several tentative conclusions relating to the detariffing of international interexchange services in the *NPRM* pursuant to its power to forbear from applying provisions of the Communications Act of 1934 or of the Commission's regulations.[2]  In this Report and Order, we examine the Commission's proposals raised in the *NPRM* and, after consideration of parties' comments, adopt the conclusions discussed herein.

2.    Moreover, as part of the statutory obligation to review its regulations in every even-numbered year under Section 11 of the Act,[3] the Commission proposed in the *NPRM* to examine whether tariffs are no longer necessary in the public interest "as a result of meaningful economic competition between providers of such service."[4]  As part of the 2000 biennial regulatory review, the Commission reviewed all of its rules relating to international telecommunications services to identify those rules that could be revised or eliminated. In conjunction with this review, the Commission staff also met with interested parties to discuss which rules could be modified or eliminated in light of competition in international telecommunications services, and which rules should be clarified to make it easier for practitioners and other members of the public to understand and follow those rules. Based on this review, the Commission has identified a number of rules that it proposes to amend in this proceeding and in two related proceedings.[5]

3.    As we noted in the *NPRM,* the Commission has made numerous efforts to eliminate the tariff requirements in Section 203 of the Act for interexchange services.[6]  In the *Domestic Detariffing Order,*

---

[1]    *In the Matter of 2000 Biennial Regulatory Review; Policy and Rules Concerning the International, Interexchange Marketplace*, IB Docket No. 00-202, Notice of Proposed Rulemaking, 15 FCC Rcd 20008 (2000) (*NPRM*).

[2]    The Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.*  The Telecommunications Act of 1996 (the 1996 Act) amends the Communications Act of 1934. Hereinafter, all citations to the Communications Act will be to the relevant section of the United States Code unless otherwise noted. The Communications Act of 1934, as amended, will be referred to herein as the Communications Act or the Act.

[3]    47 U.S.C. § 161.

[4]    47 U.S.C. § 161(a)(2).

[5]    *See In the Matter of 2000 Biennial Regulatory Review: Amendment of Parts 43 and 63 of the Commission's Rules,* IB Docket No. 00-231, 15 FCC Rcd 24264 (2000) and *Review of Commission Consideration of Applications under the Cable Landing License Act*, IB Docket No. 00-106, Notice of Proposed Rulemaking, 15 FCC Rcd 20789 (2000).

[6]    Section 203 requires every common carrier, except connecting carriers, to file with the Commission tariffs for itself and connecting carriers for the provision of interstate and foreign wire or radio communications.  47 U.S.C. § 203. *See In the Matter of Policy and Rules Concerning the Interstate, Interexchange* (continued....)

EXHIBIT F

the Commission took action to detariff completely domestic long distance services pursuant to its forbearance authority under Section 10 of the Communications Act of 1934.[7]  In April 2000, the U.S. Court of Appeals for the District of Columbia upheld the Commission's authority under the statute to require complete detariffing[8] of domestic interstate, interexchange services.[9]

4.   Though tariffs have traditionally been used to prevent discrimination among consumers, the Commission concluded in the domestic proceeding that the decision to forbear from requiring tariffs does not depart from the Commission's historic commitment to protect consumers against anticompetitive practices.[10]  Indeed, the Commission found that tariffs impede carriers' flexibility to react to competition and may actually harm consumers because of the effect of the "filed-rate" doctrine.[11]  While concluding

(Continued from previous page) ——————————————

> *Marketplace; Implementation of Section 254(g) of the Communications Act of 1934, as amended*, CC Docket No. 96-61, Notice of Proposed Rulemaking, 11 FCC Rcd 7141 (1996) (*Domestic Detariffing NPRM*); Report and Order, 11 FCC Rcd 9564 (1996); Second Report and Order, 11 FCC Rcd 20,730 (1996) (*Domestic Detariffing Order*); *stay granted, MCI Telecommunications Corp. v. FCC*, No. 96-1459 (D.C. Cir. Feb. 13, 1997); Order on Reconsideration, 12 FCC Rcd 15,014 (1997) (*Domestic Detariffing Order on Reconsideration*); Second Order on Reconsideration and Erratum, 14 FCC Rcd 6004 (1999) (*Domestic Detariffing Second Order on Reconsideration*); *stay lifted and aff'd, MCI WorldCom, Inc., et al. v. FCC*, 209 F.3d 760 (D.C. Cir. April 28, 2000), Memorandum Report and Order, DA 00-2586 (CCB, rel. Nov. 17, 2000) (*Domestic Transition Order*).

[7]   *See* 47 U.S.C. §§ 160, 160(d) (prohibiting the use of forbearance, except as provided in Section 251(f), with respect to the requirements of Sections 251(c) or 271 until the Commission determines that the requirements have been fully implemented).  Section 10(a) of the Act reads as follows:

> [T]he Commission shall forbear from applying any regulation or any provision of this Act to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that –
>
> > (1)  enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable, and are not unjustly or unreasonably discriminatory;
> >
> > (2)  enforcement of such regulation or provision is not necessary for the protection of consumers; and
> >
> > (3)  forbearance from applying such provision or regulation is consistent with the public interest.
>
> 47 U.S.C. §160.

[8]   *NPRM,* 15 FCC Rcd at 20021, paras. 19-21.  We note that "complete" or mandatory detariffing refers to a policy of prohibiting nondominant interexchange carriers from filing tariffs pursuant to Section 203 of the Act.  "Permissive" or voluntary detariffing refers to a policy of permitting, but not requiring, nondominant interexchange carriers to file tariffs for services.

[9]   *MCI WorldCom, Inc. et al. v. FCC*, 209 F.3d 760 (D.C. Cir. April 28, 2000).

[10]   *Domestic Detariffing Order*, 11 FCC Rcd at 20,733, para. 5.

[11]   *See infra* note 57.

EXHIBIT F

in the domestic proceeding that tariffs were no longer necessary for domestic interexchange services, the Commission reaffirmed its intent to enforce vigorously the statutory and regulatory safeguards against carriers that take unfair advantage of American consumers. Moreover, the Commission noted that detariffing would allow consumers to avail themselves of all remedies provided by state consumer protection and contract laws against abusive carrier practices.[12]

5.    In the domestic detariffing proceeding, the Commission chose not to consider whether detariffing international interexchange services satisfies the requirements of Section 10.[13] In the *NPRM*, however, the Commission tentatively concluded that competitive conditions in the international interexchange marketplace today support the complete detariffing of non-dominant carriers' provision of international services, with limited exceptions for permissive detariffing of such services, in accordance with the criteria in Section 10.[14] The Commission also proposed requirements regarding public disclosure and maintenance of information that mirror those requirements adopted in conjunction with the detariffing of domestic services.[15]

6.    In this order, we affirm our finding made in the *NPRM* that there have been significant changes that have benefited consumers and competition in the past several years that support the detariffing of international interexchange services. In particular, the international interexchange marketplace has experienced increased privatization and liberalization, rapidly declining international settlement rates, and a greater number of providers of international interexchange services.[16] In 1997, most of the world's most advanced economies entered into the WTO Basic Telecom Agreement, committing to open their telecommunications markets to foreign investment. Since that time, the Commission has worked diligently to further competition in the international interexchange marketplace by encouraging competition from foreign companies in the U.S. market and by reforming and streamlining its rules and policies governing the provision of U.S. international services.[17] As a result of

---

[12]    *Domestic Detariffing Order*, 11 FCC Rcd at 20,733, para. 5.

[13]    *Domestic Detariffing NPRM*, 11 FCC Rcd at 7160, para. 33 (defering to this proceeding the question of whether the Commission should consider generally forbearing from requiring tariffs for international services provided by a non-dominant carrier, but seeking comment on whether to forbear from applying tariffs to the international portion of domestic and international bundled service offerings); *Domestic Detariffing Order*, 11 FCC Rcd at 20,781-83, paras. 94-98 (finding that there is insufficient evidence to determine if forbearance is required for the domestic and international bundled service offerings); *Domestic Detariffing Order on Reconsideration*, 12 FCC Rcd at 15,043-44, paras. 51-52 (affirming decision that there is insufficient evidence to make a determination).

[14]    *NPRM*, 15 FCC Rcd at 20015-20017, paras. 7-12.

[15]    *NPRM*, 15 FCC Rcd at 20023-20024, paras. 22-26.

[16]    *NPRM*, 15 FCC Rcd at 20015-20017, paras. 8-12.

[17]    The results of the WTO basic telecommunications services negotiations are incorporated into the General Agreement on Trade in Services (GATS) by the Fourth Protocol to the GATS, April 30, 1996, 36 I.L.M. 366 (1997). These results, as well as the basic obligations contained in the GATS, are referred to herein as the "WTO Basic Telecom Agreement." *See Rules and Policies on Foreign Participation in the U.S. Telecommunications Market*, IB Docket Nos. 97-142 and 95-22, Report and Order and Order on Reconsideration, 12 FCC Rcd 23,891 (1997) (*Foreign Participation Order*), Order on Reconsideration, FCC 00-339 (rel. September 19, 2000); *International Settlement Rates*, IB Docket No. 96-261, Report and Order, 12 FCC Rcd 19,806 (1997) (*Benchmarks Order*); Report and Order on Reconsideration and (continued....)

EXHIBIT F

these new policies, and in conjunction with market forces, there has been a substantial increase in the level of competition in the international interexchange marketplace, to the benefit of consumers.[18]

7.   In light of the increasingly competitive state of the international interexchange marketplace, we find that the deregulatory actions we take in this order to detariff international interexchange services will serve to promote further the pro-competitive goals of the 1996 Act and foster increased competition. We adopt the *NPRM*'s tentative conclusions that the statutory requirement that non-dominant common carriers file tariffs for their international interexchange services is no longer necessary for the majority of international services as a result of competition in the market for international interexchange services and that complete detariffing of these services satisfies the forbearance criteria in Section 10.[19]  As we noted in the *NPRM*, when referring to the non-dominant status of carriers, unless otherwise noted, we intend to invoke the reference to dominant classification due to reasons *other* than a foreign carrier affiliation.[20]

8.   In response to the *NPRM*, we received fifteen initial comments and five replies, along with several *ex parte* filings.[21]  Although most commenters supported the Commission's proposal to detariff as set forth in the *NPRM*,[22] several commenters raised policy issues that are discussed in greater detail below.  Specifically, in addition to our adoption of complete detariffing for non-dominant providers of international interexchange services, we adopt and discuss further herein the following conclusions and amendments to our rules:[23]

(a)  *Limited Exceptions for Permissive Detariffing*:  We conclude, as proposed in the *NPRM*, that limited exceptions for permissive detariffing for international interexchange direct-dial services to which end-users obtain access by dialing a carrier's access code; and for the first 45 days of service to new customers that contact the local exchange carrier (LEC) to choose their primary interexchange carrier are in the public interest.  In addition, we find that permissive detariffing is appropriate for the provision of international inbound collect calling services to the

(Continued from previous page) ――――――――――――――――――
Order Lifting Stay, 14 FCC Rcd 9256 (1999) (*Benchmarks Reconsideration Order*); *aff'd sub nom. Cable & Wireless P.L.C. v. FCC*, 166 F.3d 1224 (D.C. Cir. 1999); *1998 Biennial Regulatory Review, Reform of the International Settlements Policy and Associated Filing Requirements*, IB Docket Nos. 98-148 and 95-22, CC Docket No. 90-337 (Phase II), Report and Order and Order on Reconsideration, 14 FCC Rcd 7963 (1999) (*ISP Reform Order*).

[18]   *NPRM,* 15 FCC Rcd at 20012, para. 4.  *See infra* Part II.A.1.

[19]   *See* discussion *infra* Part II.A.

[20]   As we noted in the *NPRM*, the regulatory safeguards imposed on carriers that are regulated as dominant on particular routes because of an affiliation or alliance with a foreign carrier with market power are set forth in 47 C.F.R. § 63.10 and differ from the regulatory safeguards that the Commission has imposed on carriers that are dominant for reasons other than a foreign carrier affiliation, *eg.* price cap regulation. *NPRM,* 15 FCC Rcd at 20010, para. 2.

[21]   *See* Appendix A.

[22]   *See e.g., Ad Hoc Reply* at 1; *AT&T Wireless Comments* at 1 (for CMRS carriers); *BTNA Comments* at 1; *Cingular Wireless Comments* at 1; *CompTel Comments* at 1-2; *ComSat Comments* at 1; *Excel Comments* at 1; *GSA Comments* at 2; *SNET Reply* at 1; *Verizon Wireless* at 1 (for CMRS carriers); *Viatel Comments* at 1; *Joint Comments* at i, 3.

[23]   *See* Appendix B.

**EXHIBIT F**

U.S. Moreover, we are persuaded that carriers providing "on-demand" mobile satellite services may be unable to establish contractual relationships with customers, and, therefore, permissive detariffing of such services is also warranted. [24]

(b) *Public Disclosure Requirement*: We also adopt a public disclosure requirement that non-dominant interexchange carriers make information available to the public concerning current rates, terms, and conditions for all of their international interexchange services, in at least one location during regular business hours, and that such carriers that have Internet websites post this information on-line.

(c) *Maintenance of Price and Service Information*: We require non-dominant interexchange carriers to maintain price and service information regarding all of their international interexchange service offerings. This price and service information should include the information provided in the public disclosure requirement, as well as supporting documents for the rates, terms, and conditions of the offerings, all of which should be provided to the Commission within ten business days of receipt of a Commission request. We further require that non-dominant interexchange carriers retain price and service information for a period of at least two years and six months following the date the carrier ceases to provide international services on such rates, terms and conditions, in order to afford the Commission sufficient time to notify a carrier of the filing of a Section 208 complaint.[25]

(d) *Complete Detariffing of Services Provided by U.S. Carriers Affiliated with Foreign Carriers Possessing Market Power*: We adopt the Commission's tentative conclusion in the *NPRM* that the maintenance of information requirement, along with the Commission's enforcement powers and other safeguards, will help monitor and prevent potential anticompetitive behavior by U.S. carriers on routes on which they are affiliated with foreign carriers possessing market power on relevant routes. Therefore, we extend our policy of complete detariffing to the services provided by all non-dominant U.S. carriers,[26] including those regulated as dominant under 47 C.F.R. Section 63.10 for a specific route because of an affiliation with a foreign carrier possessing market power.[27]

(e) *Complete Detariffing of International Commercial Mobile Radio Services (CMRS)*: We revise the Commission's previous conclusion that permissive detariffing of CMRS providers for international services on unaffiliated routes is in the public interest. Instead, we determine that our forbearance analysis regarding the public interest need for complete detariffing of international interexchange services by non-dominant carriers is applicable to CMRS providers of international interexchange services. We therefore adopt a policy of complete detariffing for international interexchange services provided by CMRS providers for affiliated and unaffiliated

---

[24]     *See infra* Part II.A.3.

[25]     *See infra* Part II.B.  We apply the maintenance of information requirement to CMRS providers of international interexchange services for those routes on which they are affiliated with a foreign carrier that has market power.  However, we decline to extend the public disclosure requirements to those CMRS providers.  *See infra* Part II.D.

[26]     *See* discussion *supra,* para. 7.

[27]     *See infra* Part II.C.

EXHIBIT F

routes.[28]

(f)  *Filing of Carrier-to-Carrier Contracts*:  We amend Section 43.51 to clarify that it requires solely the filing of those carrier-to carrier contracts:  (1) involving international interexchange carriers classified as dominant for reasons other than a foreign affiliation under Section 63.10 of the Commission's rules, or (2) for services between an authorized carrier and a foreign carrier possessing market power.  Moreover, we eliminate the current requirement in Section 43.51(a)(3) that carriers file contracts related to rights granted by foreign governments.[29]

9.  In addition, we determine that a transition period may be necessary for non-dominant carriers providing international interexchange services to become compliant with the rules and policies we adopt in this order.  Therefore, we adopt a transition period of nine months from the effective date of this order to allow non-dominant carriers to cancel their tariffs for international interexchange services.  During the transition period, we will only permit non-dominant carriers to file new or revised tariffs for mass market international interexchange services.  We will not permit the filing of new or revised contract tariffs or other long-term arrangements for international interexchange services during the transition period. Moreover, we require carriers to be in full compliance with the public disclosure and maintenance of information requirements with respect to a service at the time the service is detariffed, and we require carriers to post information on their websites regarding new or revised detariffed offerings within twenty-four hours and update public information sites within five days of such offerings taking effect.  In this regard, we intend to mirror the requirements and procedures for complying with the public disclosure rules and canceling tariffs followed during the transition period for domestic detariffing.[30]

## II.    REGULATORY FORBEARANCE

### A.    Analysis of Statutory Requirements

10.  Section 10(a) of the Communications Act requires the Commission to forbear from applying, to a telecommunications carrier or telecommunications service, regulations or provisions of the Communications Act, if the Commission makes three specific determinations.[31]  In determining whether forbearance from enforcing a particular provision or regulation is in the public interest, the Commission is specifically required to consider whether forbearance will promote competitive market conditions,

---

[28]    *See infra* Part II.D.  The Commission has previously detariffed the domestic interexchange services of CMRS providers and chose to detariff permissively the international services of CMRS providers to unaffiliated points.  *See Implementation of Sections 3(n) and 332 of the Communications Act, Regulatory Treatment of Mobile Services*, Second Report and Order, 9 FCC Rcd 1411 (1994) (*CMRS Second Report and Order*).  *See Personal Communications Industry Association's Broadband Personal Communications Services Alliance's Petition for Forbearance for Broadband Personal Communications* Services, Memorandum Opinion and Order and Notice of Proposed Rulemaking, 13 FCC Rcd 16,857 (1998) (*CMRS Forbearance Order*).

[29]    *See infra* Part II.E.

[30]    *See infra* Part III.  *See Domestic Transition Order,* DA 00-2586 (CCB, rel. Nov. 17, 2000).

[31]    47 U.S.C. § 160(a).  *See supra* note 7.

EXHIBIT F

including the extent to which forbearance will enhance competition among providers of telecommunications services.[32] We find that the Communications Act requires us to forbear from applying Section 203 of the Act and to adopt a policy of complete detariffing for international interexchange services provided by non-dominant carriers, with limited exceptions for permissive detariffing.

11. Furthermore, with respect to the scope of application of the detariffing policies we adopt in this order, we note that the Commission proposed complete detariffing for all international interexchange services in the *NPRM*, with a few limited exceptions. We clarify that our use of the term "interexchange services" covers those telecommunications services provided between telephone exchanges, not including exchange access services.[33] Though the Commission primarily concentrated on the effects of detariffing on mass market and small business consumers in the domestic proceeding, the Commission also intended that its detariffing policies extend to contract tariffs and individually-negotiated arrangements to the extent these arrangements are considered common carriage.[34] For example, in the domestic proceeding, the Commission stated that the public disclosure requirement would promote the public interest by making it easier for all consumers, including resellers, to compare carriers' service offerings.[35] When the Commission reinstated the public disclosure requirement in 1999, it explained that for the public disclosure requirement to be meaningful, it must apply to all arrangements, including mass market and individually-negotiated service arrangements.[36] There was evidence presented in the domestic proceeding that smaller and medium-sized businesses were able to receive better rates by using the individually-negotiated contracts of larger businesses, and for this reason, the Commission disagreed with the argument that large business-user contracts should be exempt from the public disclosure requirements.[37] Because we believe that all customers will benefit from detariffing, we, therefore, decline to narrow the types of international interexchange services that our detariffing rules cover.[38]

1.    **Are Tariff Filing Requirements Necessary to Ensure that the Charges, Practices, Classifications or Regulations for the International Interexchange Services of Non-dominant Interexchange Carriers Are Just and Reasonable,**

---

[32]    47 U.S.C. § 160(b).

[33]    We note that CMRS providers do not use exchanges in the provision of wireless services. In any event, the use of the term "interexchange" is not necessary to the implementation of these rules to detariff all international CMRS.

[34]    The Section 203 tariffing requirement applies to "every common carrier, except connecting carriers." *See* 47 U.S.C. § 203.

[35]    *Domestic Detariffing Order*, 11 FCC Rcd at 20,776-77, para. 85.

[36]    *Domestic Detariffing Second Order on Reconsideration*, 14 FCC Rcd at 6014-15, note 60.

[37]    *Id. See also Domestic Transition Order* at para. 20 ("We reiterate the requirement explicitly stated in the [*Domestic Detariffing Second Order on Reconsideration*] that information on all services must be publicly disclosed, including information on services offered through individually negotiated contracts.").

[38]    *Level 3 Comments* at 2. Level 3 specifically requests that the Commission modify its proposed rules to ensure that the public disclosure and contract filing requirements would be inapplicable to international private line services or dedicated access services, as well as the voice services of large business and carrier end-users. We address this issue in Part II.B.

EXHIBIT F

### and Are Not Unjustly or Unreasonably Discriminatory?

a.  **Background**

12. In the *NPRM*, the Commission tentatively concluded that competitive conditions in the global telecommunications market have improved significantly enough in the recent past to reduce the likelihood of dramatic price increases or the wide-scale proliferation of unfavorable terms and conditions offered to consumers. The Commission therefore tentatively concluded that the tariff filing requirements contained in Section 203 are not necessary to ensure that the charges, practices, classifications or regulations for the international interexchange services of non-dominant interexchange carriers are just and reasonable, and are not unjustly or unreasonably discriminatory.[39]  Pursuant to the first requirement for forbearance in Section 10(a), the Commission also tentatively determined that, to the extent there are market segments where the benefits of increased competition have not reached consumers, the filing of tariffs would not address the underlying causes for these distortions and would not be necessary to ensure that rates are just and reasonable and are not unjustly or unreasonably discriminatory.

b.  **Discussion**

13. As we tentatively concluded in the *NPRM*, we find that the competitive state of the international interexchange marketplace no longer requires non-dominant carriers to file tariffs to ensure that charges, practices, classifications or regulations are just and reasonable and are not unjustly or unreasonably discriminatory, as required by the first criterion of Section 10(a). [40]  Several commenters support the Commission's tentative conclusion that there is sufficient competition in the market for international interexchange services to justify detariffing, and they further claim that the international market is now as competitive as the market for domestic service offerings.[41]

14. The Commission has previously identified two "structural problems" in the international services market that contributed to inflated consumer calling prices:  (1) inflated international accounting rates; and (2) the need for additional competition in the U.S. market.[42] As the Commission explained in the *NPRM*, recent Commission action, coupled with market forces unleashed by the WTO Basic Telecom Agreement, has addressed those structural problems. [43]

15. With respect to the Commission's concern about inflated international accounting rates, the

---

[39]     *NPRM,* 15 FCC Rcd at 20017, para. 11.

[40]     *See* 47 U.S.C. §§ 201-202. Section 201(b) requires that "[a]ll charges, practices, classifications, and regulations for and in connection with such communication services, shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is hereby declared to be unlawful." 47 U.S.C. § 201(b). Section 202 declares it "unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service . . . ." 47 U.S.C. § 202.

[41]     *Ad Hoc Reply* at 4; BTNA *Comments* at 3; *Cingular Wireless Comments* at 3,5; *Joint Comments* at 6.

[42]     *NPRM,* 15 FCC Rcd at 20015, para. 8. *See Motion of AT&T Corp. to be Declared Non-Dominant for International* Services, Order, 11 FCC Rcd 17,963 (1996) (*AT&T International Non-Dominance Order*). *Id.* at 17,994-95, paras. 82-85, and at 18,000, para. 101.

[43]     *NPRM,* 15 FCC Rcd at 20016, paras. 9-10.

EXHIBIT F

Commission has made significant progress toward lowering accounting rates through reform of its accounting rate and international settlement policies.[44] As the Commission discussed in the *NPRM*, the Commission has pursued a two-pronged approach to accounting rate reform by relaxing regulations governing accounting rate negotiations on routes where there is competition in the foreign market and by adopting "benchmark" settlement rates to help reduce rates on routes where foreign carriers are not subject to competitive pressures.[45] These accounting rate policies, in conjunction with market forces, have led to substantial decreases in settlement rates. The U.S. average accounting rate declined from 81¢ at year end 1995 to 38¢ at year end 2000, a decrease of 58%.[46]

16. The Commission has also addressed the need for further competition in the U.S. market. The Commission's *Foreign Participation Order*, adopted in response in part to the WTO Basic Telecom Agreement, established policies that permit entry into the U.S. market by foreign carriers. Since the *Foreign Participation Order*'s "open entry" policies for WTO Members became effective on February 9, 1998, the Commission has granted more than 1916 Section 214 authorizations to provide international telecommunications services. In addition, the Commission's accounting rate reform policies have encouraged greater competition among U.S. carriers.[47]

17. Allegiance Telecom argues that the market for international interexchange services is not sufficiently competitive to warrant detariffing, and that the Commission's reliance on the WTO Basic Telecom Agreement is an insufficient basis for concluding that the international market is, or will be, competitive enough to eliminate tariffs.[48] We reject this argument. Our evidence shows that, generally, competition in the market for international interexchange services has increased substantially and that this competition has resulted in significant benefits to consumers. As we explained above, our

---

[44]    The current international accounting rate system was developed as part of a regulatory tradition in which international telecommunications services were supplied through a bilateral correspondent relationship between national monopoly carriers. An accounting rate is the price a U.S. facilities-based carrier negotiates with a foreign carrier for handling one minute of international telephone service. Each carrier's portion of the accounting rate is referred to the settlement rate. In almost all cases, the settlement rate is equal to one-half of the negotiated accounting rate.

[45]    *NPRM*, 15 FCC Rcd at 20016, para. 9. The *Benchmarks Order* requires U.S. carriers to negotiate settlement rates that comply with the "benchmark" rates established by the Commission. The benchmark rates, and the transition schedule for achieving these rates, vary based upon a country's economic classification. In the *Benchmarks Order*, the Commission established benchmark settlement rates of $0.15 per minute for upper income countries; $0.19 for upper middle income and lower middle income countries; and $0.23 for lower income countries and countries with teledensity < 1. *Benchmarks Order*, 12 FCC Rcd at 19,815-16, para. 19. Since the *Benchmarks Order* took effect on January 1, 1998, over 99% of the settled minutes for countries in the upper income and upper-middle income categories and over 65% of the settled minutes in the lower middle income category are in compliance with the benchmark rates. *See also Regulation of International Accounting Rates*, CC Docket No. 90-337, Phase II, Fourth Report and Order, 11 FCC Rcd 20,063 (1996) (*Flexibility Order*); *ISP Reform Order*, 14 FCC Rcd 7963 (1999).

[46]    The U.S. average accounting rate is a figure composed of the rates between the United States and all international points where each country's rate is weighted by its minutes to and from the United States.

[47]    *ISP Reform Order*, 14 FCC Rcd at 7971-73, paras. 23-29.

[48]    *Allegiance Telecom Comments* at 4.

EXHIBIT F

accounting rate reform policies, market forces, and increased U.S. market entry have led to greater competition in the U.S. market and substantial reductions in consumer rates for international interexchange services.  Since the adoption of these policies and the WTO Agreement, the average rate for international telephone service in the United States has decreased $0.23 per minute from $0.74 per minute in 1996 to $0.51 per minute in 1999.[49]  Moreover, discount calling plan rates have decreased even more dramatically.[50]  Allegiance Telecom offers no specific evidence to support its claims that the international market is not competitive in general or that the increasing number of providers and evidence of lower consumer calling prices and accounting rates does not demonstrate an increased level of competition in the international marketplace.

18. We also find that, as consumers become more aware of the lower priced options for international services and choose appropriate plans, non-dominant interexchange carriers will lose their ability successfully to charge or impose unreasonable or unjust rates, terms and conditions for international services.  This is supported by the Commission's previous finding that, in general, consumers are highly sensitive to prices and are likely to switch carriers to take advantage of favorable price promotions.[51]  Moreover, to the extent carriers attempt to engage in unjustly or unreasonably discriminatory behavior, we have the ability to remedy potential violations of the provisions of Sections 201 and 202 of the Act through the exercise of our authority to investigate and adjudicate complaints and to examine relevant legal and policy issues under Section 208 of the Act.[52]

19. Nevertheless, despite increased competition among U.S. international carriers, there are some circumstances under which consumers have not benefited from lower rates.  First, rates remain high on routes on which competition has not taken hold in the foreign market.[53]  One key reason is that, on many such routes, excessive settlement costs are being passed through to U.S. consumers, even though there may be increased competition on the U.S. end.  Secondly, rates remain excessive for consumers who do not subscribe to carriers' discount calling plans or take advantage of competitive dial-around rates.  Higher prices in these circumstances may be attributable, in part, to consumer information problems, including consumers' difficulty in obtaining timely and reliable information about calling plans

---

[49]     FCC, Section 43.61 International Telecommunications Data, Table A1, 1996 and 1999.

[50]     For example, on the United States to United Kingdom route, discount residential rates for the peak period charged by the major carriers varied between $0.30 and $0.80 per minute in 1996; by 1999, these rates were as low as $0.10 per minute. On the United States to Japan route, discount rates varied between $0.45 and $1.30 per minute in 1996; by 1999, these rates were as low as $0.16 per minute. On the United States to India route, discount rates varied between $0.73 and $1.70 per minute in 1996; by 1999, these rates were as low as $0.55 per minute. Rates are based upon publicly available tariffs of AT&T, MCI WorldCom, and Sprint. Monthly recurring charges for calling plans for which these rates were available remained the same at $3.00 per month or dropped to $2.00 per month.

[51]     *See AT&T International Non-dominance Order*, 11 FCC Rcd at 17,980, para. 46.

[52]     47 U.S.C. § 208.  *Domestic Detariffing Order*, 11 FCC Rcd at 20,742-43, para. 21 (ability under Section 208 to investigate and adjudicate complaints is sufficient to address illegal carrier conduct); *Competitive Carrier Sixth Report and Order*, 99 FCC 2d at 1029, para. 12 (tariffs "are not essential" to the Commission's ability to ensure that carriers' rates comply with the Act because the Commission has "other means to ensure our enforcement of the mandates of the Act," – including the Commission's Section 208 complaint process); *CMRS Second Report and Order* at 1478-79.

[53]     *AT&T International Non-dominance Order*, 11 FCC Rcd at 17,980, para. 46.

**EXHIBIT F**

and other competitive alternatives, such as dial-around services. As the Commission explained in the *NPRM*, we do not believe that tariffs will address the underlying causes of high rates in either of these situations. In fact, the public disclosure requirement we adopt below will help alleviate the consumer information issue because, unlike tariff filings, it will result in the provision of rate and service information that is easily understood by or accessible to consumers and that permits them to compare and choose suitable calling plans.

20. In sum, we conclude that our international rules, policies, and enforcement authority, in conjunction with market forces and a more educated consumer, will generally ensure that the rates, practices, and classifications of non-dominant interexchange carriers for international interexchange services will be just and reasonable and not unjustly or unreasonably discriminatory. We therefore conclude that tariffs for international interexchange services provided by non-dominant carriers are no longer necessary to ensure that charges, practices, classifications or regulations are just and reasonable and are not unjustly or unreasonably discriminatory, as required by Section 10(a). In addition, pursuant to Section 11, we find that the requirement that non-dominant carriers file tariffs pursuant to Section 203 of the Act is no longer necessary in the public interest because of meaningful economic competition in the international interexchange marketplace.[54] Accordingly, as we discuss further below, we adopt a policy of complete detariffing for non-dominant interexchange carriers that will improve market efficiency by permitting carriers to respond to the dynamics of the marketplace and will further the goals of Sections 201 and 202 of the Act.

### 2. Are Tariff Filing Requirements for the International Interexchange Services of Non-dominant Interexchange Carriers Necessary for the Protection of Consumers?

#### a. Background

21. In the *NPRM*, the Commission tentatively concluded that requiring non-dominant interexchange carriers to file tariffs for international offerings is not necessary for the protection of consumers of international interexchange services in satisfaction of the second criterion of Section 10(a).[55] Instead, the Commission stated that tariff filing requirements, though initially required to prevent discrimination among consumers, may now actually harm consumers by undermining the development of competition and possibly leading to higher rates by impeding price reductions and marketing innovations.[56]

22. In particular, the Commission tentatively concluded in the *NPRM* that tariffs for international interexchange services might affect consumers adversely because of the application of the "filed-rate" doctrine.[57] As the Commission explained, Section 203(c) requires carriers to provide service at the rates,

---

[54]      47 U.S.C. § 161.

[55]      *NPRM*, 15 FCC Rcd at 20018-20020, paras. 14-16.

[56]      *NPRM*, 15 FCC Rcd at 20018, para. 14.

[57]      Pursuant to the "filed-rate" doctrine, where a filed tariff rate, term or condition differs from a rate, term, or condition set in a non-tariffed carrier-customer contract, the carrier is required to assess the tariff rate, term or condition. *See Armour Packing Co. v. United States*, 209 U.S. 56 (1908); *American Broadcasting Cos., Inc. v. FCC*, 643 F.2d 818 (D.C. Cir. 1980); *see also Aero Trucking, Inc. v. Regal Tube Co.*, 594 F.2d 619 (7th Cir. 1979); *Farley Terminal Co., Inc. v. Atchison, T. & S.F. Ry.*, 522 F.2d
(continued....)

EXHIBIT F

terms, and conditions set forth in the tariffs on file with the Commission, until the carrier files a superseding tariff canceling, or changing the rates, terms, and conditions in the tariffed offering.[58] Regardless of whether a carrier has signed an underlying contract with a customer on different terms from those contained in the tariff, Section 203(c), in most circumstances, requires the carrier to provide the service on the terms set forth in the tariff.  Therefore, tariffs, even if filed on a voluntary or permissive basis, may preclude consumers from pursuing remedies under state consumer protection and contract laws that are generally available to consumers in unregulated, competitive environments. Accordingly, the Commission concluded that complete detariffing, *i.e.*, prohibiting the filing of tariffs, would avoid the uncertainty, confusion, and potential harm to consumers associated with the application of the "filed-rate" doctrine.[59]

23. Moreover, the Commission tentatively concluded in the *NPRM* that, in a detariffed marketplace, carriers' freedom to respond to price and service changes in an unregulated manner would add further protection for consumers against rates, terms and conditions that violate the Communications Act.[60] The Commission also tentatively concluded that its enforcement authority under Section 208 of the Act, in addition to competitive market forces, would ensure the protection of consumers in a detariffed marketplace.

### b.    Discussion

24. We agree with the Commission's tentative conclusion in the *NPRM* that the international interexchange tariffs of non-dominant providers are unnecessary to protect consumers.  Indeed, as the Commission discussed in the *NPRM*, the ability of a carrier to alter or abrogate a contract unilaterally under the "filed-rate" doctrine undermines consumers' legitimate expectations.[61]  Most mass market customers would reasonably assume that a carrier would not alter service offerings without notifying a customer; nevertheless, in the event of a dispute over a rate change, a customer would be bound to the rates, terms and conditions of the tariff filed with the Commission.  Therefore, tariffing requirements not only impair market efficiency, as we discuss further below, but in some cases could result in harm to consumers through the application of the "filed-rate" doctrine.

25. In its comments, Global Telecompetition Consultants, Inc. (GTC) construes the Commission's statements, both in the domestic proceeding and in the *NPRM,* that complete detariffing will eliminate the possible invocation of the "filed-rate" doctrine, as "doing away with the filed-rate doctrine."[62]  GTC argues that detariffing, whether domestic or international, is not equivalent to the abolition of the "filed-rate" doctrine, which is a judicially created doctrine that the Commission cannot

(Continued from previous page) ————————————————
> 1095 (9th Cir.), *cert. denied*, 423 U.S. 996 (1975).  Consequently, if a carrier unilaterally changes a rate by filing a tariff revision, the newly filed rate becomes the applicable rate unless the revised rate is found to be unjust, unreasonable, or unlawful under the Communications Act.  *See* 47 U.S.C. § 201(b); *see also Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116 (1990).

[58]    47 U.S.C. § 203(c).

[59]    *NPRM,* 15 FCC Rcd at 20019, paras. 15-16.

[60]    *Id.* at 20019, para. 16 (citing *Domestic Detariffing Order*, 11 FCC Rcd at 20,750, para. 37).

[61]    *Id.* at 20019, para. 15.

[62]    *GTC Comments* at 2.

EXHIBIT F

overturn.[63]  Therefore, GTC claims that the Commission exceeded its jurisdiction and acted arbitrarily and capriciously in its analysis of how complete detariffing would "eliminate the filed-rate doctrine."[64]

26.  We disagree with GTC's argument that, by ordering complete detariffing, the Commission has purported to "overturn" a judicial doctrine.  Rather than "doing away with" the filed-rate doctrine, the Commission in the domestic and international proceedings has sought to prevent the invocation of the "filed-rate" doctrine through the use of its forbearance authority granted in Section 10.  Congress expressly empowered the Commission to forbear in certain circumstances from the statutory provisions of the Act.[65]  The Commission's statutory authority in Section 10 to forbear from applying Section 203 of the Act and to prohibit the filing of tariffs has been upheld by the U.S. Court of Appeals for the D.C. Circuit.[66]  Moreover, commenters concur that, in light of the D.C. Circuit's ruling, the Commission has the authority to require international carriers to cancel their tariffs.[67]  As the Commission explained in the domestic proceeding, the "filed-rate" doctrine has been applied to the rates, terms, and conditions of services specified in tariffs that are "duly filed" with the Commission in accordance with Section 203 of the Act.[68]  Therefore, in the context of complete detariffing, if the Commission prohibits the filing of tariffs under Section 10, there are no tariffs "duly filed" with the Commission and carriers have no opportunity to invoke the "filed-rate" doctrine.  Because we reject GTC's interpretation of the Commission's action, we also dismiss GTC's argument that we have engaged in arbitrary and capricious decisionmaking in proposing to detariff international services.[69]

27.  GTC further claims that the Commission violated the Regulatory Flexibility Act by engaging in a perfunctory analysis of complete detariffing's effect on the "filed-rate" doctrine and how its "elimination of the doctrine" would affect small carriers in the *Domestic Detariffing Order*.[70]  As an initial matter, we note that GTC does not cite to any specific harms to small carriers from either domestic or international detariffing.  We also note that the Commission tentatively concluded in the Initial Regulatory Flexibility Analysis in the *NPRM* that its detariffing proposals were the least burdensome on small entities and that eliminating the tariff requirement would reduce administrative costs to small entities.  The Commission sought comment on those tentative conclusions.[71]  Though there are similar policy rationales for detariffing domestic and international interexchange services, we emphasize that we have developed an independent record for detariffing international interexchange services in this proceeding and have considered fully the impact of the policies we adopt in this order on all parties, including small businesses.  For example, as we discuss below, we conclude that complete detariffing

---

[63]    *Id.* at ii, 3-10.

[64]    *Id.* at 11.

[65]    *See supra* note 7.

[66]    *See supra* discussion, para. 3.

[67]    *CompTel Comments* at 2; *Joint Comments* at 5.

[68]    *Domestic Detariffing Second Order on Reconsideration*, 14 FCC Rcd at 6015, para. 17.

[69]    *GTC Comments* at 11.

[70]    *GTC Comments* at 15.

[71]    *NPRM*, 15 FCC Rcd at 20034, paras. 52-55.

EXHIBIT F

will promote flexibility and reduce the regulatory compliance burdens on all non-dominant providers of international interexchange services, including smaller carriers.[72]  We also note that carriers have flexibility in complying with the public disclosure requirement and that the costs to carriers of maintaining such sites and posting information are moderate.[73]

28.  In conclusion, we determine that complete detariffing will enhance competition, as we discuss further below, and protect consumers against rates, terms and conditions that violate the Communications Act.  Complete detariffing will allow carriers the flexibility necessary to respond to dynamic price and service changes in the marketplace and will best protect consumers from rates, terms, and conditions that violate Sections 201 and 202 of the Act.  In a deregulated environment, the Commission's enforcement authority, along with market forces, will serve to safeguard the rights of consumers.  Accordingly, we find that tariffs are unnecessary for the protection of consumers and that our elimination of the tariff requirement contained in Section 203 for non-dominant carriers providing international interexchange services satisfies the second prong of Section 10(a)'s statutory forbearance criteria.[74]

### 3.    Is Forbearance from Applying Section 203 Tariff Filing Requirements to the International Interexchange Services Offered by Non-Dominant Interexchange Carriers Consistent with the Public Interest?

#### a.    Background

29.  The Commission tentatively concluded in the *NPRM* that, with limited exceptions, prohibiting non-dominant interexchange carriers from filing tariffs for the provision of international interexchange services under a regime of complete detariffing is consistent with the public interest.[75]  As the Commission explained, Section 10(b) specifically requires the Commission to consider, in determining whether forbearance from enforcing a provision of the Communications Act or a regulation is in the public interest, whether forbearance will promote competitive market conditions, including the extent to which forbearance will enhance competition among providers of telecommunications services.[76]  The Commission tentatively concluded in the *NPRM* that, as a general matter, complete detariffing, as opposed to permissive detariffing, would best enhance competition among providers of such services, promote competitive market conditions, and achieve other objectives that are in the public interest, including eliminating the opportunity to invoke the "filed-rate" doctrine and establishing market conditions that more closely resemble an unregulated environment.[77]

30.  Nevertheless, the Commission proposed adopting permissive detariffing, as it did in the domestic detariffing proceeding, in two limited circumstances with respect to: (1) international

---

[72]    *See supra*, paras. 33-34.

[73]    *See supra*, para. 47.

[74]    47 U.S.C. § 160(a).

[75]    *NPRM,* 15 FCC Rcd at 20020, para. 17.

[76]    47 U.S.C. § 160(b).

[77]    *NPRM,* 15 FCC Rcd at 20020, para. 17 (citing *Domestic Detariffing Order,* 11 FCC Rcd at 20,773, para. 4, and at 20,760, para 52).

EXHIBIT F

interexchange direct-dial services to which end-users obtain access by dialing a carrier access code, *i.e.*, 10-10-XXX, ("dial-around 1+ services"), and (2) international interexchange services provided during the initial forty-five days of service or until there is a written contract between the carrier and the customer, in those limited circumstances in which a prospective customer contacts the LEC to select an interexchange carrier or to initiate a change of its primary interexchange carrier ("LEC-implemented new customer services").[78] The Commission's reasoning for these exceptions, based upon its conclusions in the domestic proceeding, was that, in a detariffed market, carriers and customers must be able to enter into legally binding contracts for services, and, regarding these two types of services, it may not be possible for carriers providing these types of services to give customers notice of the rates, terms and conditions of the service prior to the completion of a call.[79]

### b.    Discussion

31. We agree with the Commission's tentative conclusion in the *NPRM* that a deregulatory detariffing policy that does not require nor permit non-dominant carriers to file tariffs for international interexchange services, *i.e.*, complete or mandatory detariffing, will create the most pro-competitive conditions for the international interexchange marketplace.[80] A policy of complete detariffing will produce pro-consumer benefits by forcing carriers to be more responsive to customer demands and to offer a greater variety of innovative price and service packages. The elimination of non-dominant carrier tariff filings will also prevent potential situations in which carriers seek to avoid contract obligations or refuse to negotiate with customers based upon the "filed-rate" doctrine and the Commission's tariff filing and review processes.[81]

32. In contrast, allowing carriers to file international service tariffs by adopting a permissive or voluntary detariffing policy would impede vigorous competition in the market for interexchange services by: (1) removing incentives for competitive price discounting; (2) reducing or eliminating carriers' ability to rapidly and efficiently respond to changes in demand and cost; (3) imposing costs on carriers that attempt to make new offerings; and (4) preventing or discouraging consumers from seeking or

---

[78]     *Id.* at 20021, para. 20. "Dial-around 1+ services" are transactional services for which a consumer can "dial-around" its presubscribed long distance carrier by dialing a carrier access code, *i.e.*, 10-10-XXX, and access the network of another long distance carrier. "LEC-implemented new customer services" describe the services provided by a long distance carrier that a customer has selected by contacting its local exchange carrier rather than the long distance carrier directly. In both circumstances, a long distance carrier would likely be unable to contact the customer to provide notice of rate and service information prior to the completion of the call. *Domestic Detariffing Order on Reconsideration*, 12 FCC Rcd 15,014 at 15,026-41, paras. 18-44.

[79]     *NPRM*, 15 FCC Rcd at 20021-20022, paras. 20-21.

[80]     *Ad Hoc Reply* at 1; *AT&T Wireless Comments* at 1; *Cingular Wireless Comments* at 1; *CompTel Comments* at 1-2; *GSA Comments* at 3; *Verizon Wireless Comments* at 1; *Viatel Comments* at 1; *Joint Comments* at 3; *Joint Reply* at 2.

[81]     *NPRM*, 15 FCC Rcd at 20020, para. 18. *Domestic Detariffing Order*, 11 FCC Rcd at 20,761, para. 54 (noting the accounts of commenters claiming that carriers refuse to negotiate requested terms and conditions on the grounds that the requested terms and conditions are not contained in carriers' tariffs and that the Commission would reject any differing terms and conditions). *See also GSA Comments* at 3.

EXHIBIT F

obtaining service arrangements specifically tailored to their needs.[82] Thus, we adopt a policy of complete detariffing for international interexchange services provided by non-dominant carriers that will enable legal relationships between carriers and customers that mirror those in other unregulated competitive markets.

33. In the *NPRM*, we stated that complete detariffing would promote flexibility and reduce the regulatory compliance burdens on all non-dominant providers of international interexchange services, including smaller carriers.[83] We note, however, that two commenters disagree with this conclusion and argue that the administrative burdens associated with complete detariffing will be unacceptable. Specifically, Allegiance Telecom argues that there is no basis for the Commission to conclude that complete detariffing will promote market efficiency.[84] Instead, Allegiance Telecom asserts that transactional and administrative costs will increase with detariffing because carriers will have to engage in individual negotiations with customers and renegotiate to implement any changes, which will frustrate the ability of non-dominant carriers to respond rapidly to the marketplace.[85] Moreover, Allegiance argues that detariffing will not be competitively neutral because non-dominant carriers will not be able to avail themselves of the efficiencies that tariffs provide, while dominant carriers that must file tariffs will have a competitive advantage.[86] Additionally, GTC argues that the administrative and ministerial burden on carriers, especially smaller carriers, will be prohibitively expensive.[87]

34. We find unpersuasive the argument that complete detariffing will place undue burdens on non-dominant providers of international interexchange sevices or create a comparative advantage for dominant providers. The Commission has addressed this issue previously in the domestic proceeding and determined that complete detariffing will not pose more than minimal burdens on carriers, as carriers may issue short standard contracts for customers.[88] In addition, several commenters contend that detariffing will actually permit carriers to respond more quickly and efficiently to a customer's demand for services because a layer of complexity will be removed.[89] We also note that BTNA claims that by removing the requirement that carriers with foreign affiliates that possess market power file tariffs, the Commission will not be placing such carriers at a competitive disadvantage.[90] Therefore, in order to

---

[82]     NPRM, 15 FCC Rcd at 20020, para. 18 (citing *Competitive Carrier Sixth Report and Order,* 99 FCC 2d at 1030, para. 13; *Domestic Detariffing Order,* 11 FCC Rcd at 20,760-61, para. 53).

[83]     *NPRM,* 15 FCC Rcd at 20021, para. 19.

[84]     *Allegiance Telecom Comments* at 5.

[85]     *Id.*

[86]     *Id.* at 6.

[87]     *GTC Comments* at 2.

[88]     *NPRM,* 15 FCC Rcd at 20026, para. 30 (citing *Domestic Detariffing Order*, 11 FCC Rcd at 20,762-65, paras. 56-59). As AT&T Wireless notes with respect to CMRS services, detariffing will not hamper CMRS providers' ability to establish service arrangements with customers, as tariffs are not the only means of establishing terms and conditions. *AT&T Wireless Comments* at 2.

[89]     *Ad Hoc Reply* at 4; *BTNA Comments* at 4; *Joint Reply* at note 5.

[90]     *BTNA Comments* at 5.

EXHIBIT F

establish a more market-based, deregulatory environment we conclude that, with the few exceptions discussed below, it is in the public interest to prohibit non-dominant interexchange carriers from filing tariffs with respect to international interexchange services.

35. As we discussed in the *NPRM*, in a market environment without tariffs, carriers and customers must enter into legal contracts for services.[91]  The Commission proposed that, because of the difficulty of establishing a contractual relationship between carriers and customers, carriers should be permitted to file tariffs for their services with respect to: (1) international interexchange direct-dial services to which end-users obtain access by dialing a carrier access code, *i.e.,* 10-10-XXX, ("dial-around 1+ services"), and (2) international interexchange services provided during the initial forty-five days of service or until there is a written contract between the carrier and the customer, whichever occurs first, in those limited circumstances in which a prospective customer contacts the LEC to select an interexchange carrier or to initiate a change of its interexchange carrier ("LEC-implemented new customer services").[92]  We note that several parties have expressed support for these exceptions.[93]

36. Regarding casual calling services in general, the Commission previously determined in the domestic proceeding that notice is not a problem because most casual calling services already require intervention by an interexchange carrier that enables them to provide notice to customers prior to the completion of a call.[94]  However, with respect to a particular subset of casual calling services, dial-around 1+ services, notice remains unlikely.  The Commission explained in the *NPRM* that most interexchange carriers have not implemented universally the technology to allow them to distinguish a caller using "dial-around 1+ services" from "direct dial 1+ services."[95]  Therefore, the adoption of complete detariffing at this time for dial-around 1+ services would not be in the public interest until the cost burdens on non-dominant interexchange carriers to install the necessary signalling equipment to distinguish dial-around 1+ services and to provide recorded announcements regarding information about rates, terms, and conditions of dial-around 1+ services to customers are reduced; or alternative ways to notify customers become more widespread.[96]

37. We note that Teleglobe also raises the concern that carriers will be unable to establish contracts with customers for international inbound collect calling services to the U.S.[97]  We find that,

---

[91]     *NPRM,* 15 FCC Rcd at 20021, para. 20.

[92]     *NPRM,* 15 FCC Rcd at 20021-20022, paras. 20-21.

[93]     *GSA Comments* at 5; *GSA Reply* at 5; *Joint Comments* at 9-10; *SNET Reply* at 3-4.

[94]     Casual calling services, which include direct dial 1+ services, are those services that do not require the calling party to establish an account with an interexchange carrier or otherwise presubscribe to a service. *Domestic Detariffing Order on Reconsideration*, 12 FCC Rcd at 15,032-33, para. 30.

[95]     *NPRM,* 15 FCC Rcd at 20021, para. 20 (citing *Domestic Detariffing Order on Reconsideration*, 12 FCC Rcd at 15,034, para. 32).

[96]     *Id.* at 20021, para. 20 (citing *Domestic Detariffing Order on Reconsideration,* 12 FCC Rcd at 15,034-35, para. 33).  *Joint Comments* at 9-10.

[97]     Letters from Brian Cute, Senior Regulatory Counsel, Teleglobe USA, to Magalie Salas, Secretary, FCC (filed Nov. 22, 2000 and Dec. 4, 2000)  (*Teleglobe Ex partes*).  *See also* letter from Carol Ann Bischoff, Executive Vice President and General Counsel, CompTel, to Magalie Salas, Secretary, FCC (filed March 2, 2001) (noting that, for some inbound collect international calling services, the operator on the foreign (continued....)

EXHIBIT F

Federal Communications Commission                                         FCC 01-93

under the current structure for handling international inbound collect calls, it may not be possible for providers of such services to provide legal notice of rates, terms, and conditions for the service to customers on the U.S. end prior to their accepting international inbound collect calls. Currently, it is common practice for U.S. providers of international inbound collect calls to enter into negotiated arrangements with foreign carriers to handle and bill such international inbound collect calls. According to Teleglobe, a U.S. carrier generally negotiates with a foreign carrier on a route to bill a certain proportion of minutes of international inbound collect calls carried to the U.S.[98] Yet, it is possible that the U.S. provider of an international inbound collect calling service on a particular route and the U.S. carrier that ultimately bills the U.S. customer for the call may not correspond. This may be the case because a foreign carrier may randomly choose which U.S. carrier will provide the international inbound collect call to the U.S., and the foreign carrier, which also meters the call, simply allocates billing records in accordance with the negotiated proportion of collect call traffic to each U.S. carrier at the end of a billing cycle, regardless of which U.S. carrier actually provided the service. The U.S. carrier that obtains the collect call record as part of its negotiated proportion of collect call minutes would then bill the U.S. customer at its tariffed rate for providing international inbound collect calls for the international route.[99] Because of the unique circumstances associated with the provision of international inbound collect calls, we find that permissive or voluntary detariffing is appropriate at this time for the provision of international inbound collect calls.

38. Additionally, ComSat Mobile Communications argues in its comments that the provision of "on-demand" Mobile Satellite Services ("on-demand" MSS), that are treated as CMRS services under Commission regulations should be subject to permissive detariffing.[100] ComSat explains that, though providers are able to issue standard contracts in many cases involving the provision of MSS,[101] providers are unable to do so with respect to the provision of "on-demand" MSS because such services are not limited to using any particular earth station operator for placing mobile-originating calls. Customers of "on-demand" MSS can dial up any earth station within view of the satellite being used.[102] It is this "on-demand" capability, according to ComSat, that permits customers to choose a different service provider each time a call is made, giving customers the flexibility to take advantage of different rates and service plans.[103] In most of these circumstances, there are no pre-existing arrangements between customers and the the earth station operators, though there is a centralized accounting authority, or ISP, that ultimately bills

(Continued from previous page) ———————————————————

    end handling the call does not have complete information about the rates, terms and conditions to disclose to the called party in the United States).

[98]    *Teleglobe ex parte* (filed Dec. 4, 2000).

[99]    For example, it is possible that a Bolivian foreign carrier randomly selected U.S. carrier "X" to carry an international inbound collect call from Bolivia to the U.S. customer, but U.S. carrier "Y" received the billing record of that call from the foreign carrier at the end of the billing cycle as part of its negotiated proportion of minutes of collect call traffic. Therefore, U.S. carrier "Y" would then bill the U.S. customer for the collect call pursuant to its FCC tariff for international inbound collect calls on the U.S.-Bolivia route.

[100]    *See* discussion of detariffing for other CMRS services *supra*, Part II.D.

[101]    *ComSat Comments* at 2.

[102]    *Id.* at 2-3.

[103]    *Id.* at 3.

EXHIBIT F

the customer.[104] Therefore, ComSat argues that there is generally no opportunity for providers of "on-demand" MSS to enter into any contractual arrangement with a customer, and tariffs are the only legally enforceable mechanism to ensure that a service provider will receive payment for its services.[105] Thus, ComSat requests that the Commission refrain from imposing complete detariffing and follow the same permissive detariffing model adopted for the provision of "dial-around" services for "on-demand" MSS.[106]

39. We agree that the Commission should not impose its complete detariffing regime in instances where entering into contracts with individual customers is not possible or where the burdens of requiring carriers to provide notice would be unreasonable.[107] Because providers of "on-demand" MSS generally cannot provide notice regarding rates and terms to customers prior to use of the service because of the unique features of "on-demand" MSS, we find that it is appropriate to adopt permissive detariffing for those "on-demand" MSS services for which customers have not entered into pre-existing ISP service contracts with a particular provider. Therefore, we will adopt this further exception to our policy of complete detariffing for the non-dominant provision of international interexchange services and make the accompanying revisions to our rules.

40. As we tentatively concluded in the *NPRM*, we also find that permissive detariffing is in the public interest for the initial forty-five days of non-dominant interexchange carriers' provision of international interexchange services to new residential and business customers, or until a written contract is consummated, whichever is earlier. When new customers choose or change an interexchange carrier by only contacting their local exchange carrier, the interexchange carrier has no direct contact with the customer, and, until the local exchange carrier informs the interexchange carrier of the new customer, the interexchange carrier may not be able to ensure that a contractual relationship is established with that customer. Because consumers choose their interexchange carrier for both domestic and international services, the conclusions in the domestic proceeding regarding LEC-implemented new customer services apply equally for both domestic and international interexchange services. We adopt our tentative conclusion in the *NPRM* that a period of forty-five days is reasonable to assume that an interexchange carrier can establish a carrier-customer contract for international interexchange services.[108]

41. In sum, because we find that complete detariffing will enhance competition and will be in the public interest as required by the third prong of the statutory forbearance criteria in Section 10,[109] we adopt a policy of complete detariffing for international interexchange services provided by non-dominant carriers. Additionally, we conclude that allowing, on a permissive basis, non-dominant interexchange carriers to file tariffs for dial-around 1+ services and LEC-implemented new customer services for a

---

[104]    *Id.* The notable exception is when a customer has signed an "ISP service contract" with a particular provider. *ComSat Comments* at note 5.

[105]    *Id.* at 3.

[106]    *ComSat Comments* at 4-5.

[107]    *Id.* at 1.

[108]    *NPRM*, 15 FCC Rcd at 20021, para. 21 (citing *Domestic Detariffing Order on Reconsideration*, 12 FCC Rcd at 15,037-38, para. 39).

[109]    47 U.S.C. §§ 160(a), 160(b).

EXHIBIT F

period of forty-five days or until there is a written contract between the carrier and customer, whichever is earlier, is in the public interest. We also find that permissive detariffing is appropriate for the provision of international inbound collect calls at this time. Moreover, we adopt a policy of permissive detariffing for the non-dominant provision of "on-demand" MSS where a customer has not entered into a pre-existing ISP service contract for a particular provider. Accordingly, we amend Section 61.19 of the Commission's rules to reflect these revisions.[110]

### B.    Maintenance and Disclosure of Price and Service Information

#### 1.    Background

42. The Commission tentatively concluded in the *NPRM* that, although customers will receive rate information through the billing process, and carriers will likely, as part of their contractual relationship with customers, provide notice of rate and other changes in an accessible format in order to remain competitive among consumers, consumers may continue to have difficulty obtaining complete information concerning all of the international interexchange service offerings available.[111] The Commission explained that consumers will need information concerning carriers' rates, terms and conditions in order to bring complaints to ensure carrier compliance with the requirements of the Act and in order for consumers to determine the most appropriate rate plans that may meet their individual calling patterns.

43. The Commission also acknowledged that tariffs are neither the only, nor the best means of disseminating information to consumers about international interexchange services. Mass market customers infrequently consult tariff filings, and when they do, they find them difficult to understand.[112] Accordingly, the Commission proposed extending to non-dominant providers of detariffed international interexchange services the public disclosure requirements it adopted in the domestic proceeding, including the requirement that carriers make rate and service information available to the public in at least one location during regular business hours and the requirement that carriers maintaining Internet websites post this information on-line in a timely and easily accessible manner with regular updates.[113] Moreover, the Commission proposed that carriers inform the public that this information is available when responding to consumer inquiries or complaints and specify the manner in which consumers may obtain the information. In addition, the Commission proposed that carriers indicate on the title or first page of their cancelled tariffs the address of their website and of the public information site where the rates, terms, and conditions for their international interexchange services can physically be found.[114]

44. The Commission also tentatively concluded that providers of international interexchange services, including certain CMRS providers, must maintain price and service information. CMRS providers would only be required to maintain price and service information for those routes on which the

---

[110]    *See* Appendix B.

[111]    *NPRM,* 15 FCC Rcd at 20023, para. 23.

[112]    *Id.* at 20023, para. 22 (citing *Domestic Detariffing Order,* 11 FCC Rcd at 20,745-46, para. 25).

[113]    *Id.* at 20024, para. 25 (citing *Domestic Detariffing Second Order on Reconsideration,* 14 FCC Rcd at 6015-16, para. 18).

[114]    *Id.* at 20024, para. 25 (citing *Domestic Detariffing Order,* 11 FCC Rcd at 20,776-77, paras. 84-86).

EXHIBIT F

CMRS provider is affiliated with a foreign carrier that possesses market power and collects settlement payments from U.S. carriers.[115]  The Commission reasoned that this maintenance of information requirement for non-dominant carriers would enable the Commission to monitor compliance with the Act and its rules in a deregulatory environment.[116]

## 2.    Discussion

45.  We find that the adoption of the public disclosure and maintenance of information requirements the Commission proposed in the *NPRM* will benefit consumers and further the public interest.  Public disclosure and maintenance of information about international interexchange services will promote carrier compliance with the requirements of the Act and permit consumers to have the information necessary to make efficient choices regarding their optimal service plans.[117]

46.  Nevertheless, several parties to the proceeding opposed the Commission's proposal to extend the public disclosure and maintenance of information requirements adopted in the domestic proceeding to non-dominant providers of international interexchange services.  These commenters argue that the public disclosure and record keeping requirements are burdensome and out-of-place in the current deregulatory environment and conflict with the Commission's stated goal of treating telecom carriers more like entities in other, less-regulated industries.[118]  Instead, they advocate that the best approach for the Commission would be to permit carriers to develop for themselves appropriate and efficient ways to maintain data and to inform customers about services.[119]

47.  We reject the argument that the public disclosure and maintenance of information requirements are overly burdensome and contrary to our deregulatory goals.  The requirements will not impede our continuing efforts to establish a deregulated market.  At the same time, they will permit the Commission to retain the "one positive aspect of tariffing," -- making sure that consumers have the information necessary to make informed decisions about their telecommunications services -- without the accompanying negative attributes.[120]  As the Commission reasoned in the domestic proceeding, the website requirement is not unduly burdensome because, on balance, the growth in usage of the Internet has greatly increased the benefits to consumers of an on-line information requirement, while the costs to carriers of maintaining such sites and posting information are moderate.[121]  Moreover, carriers have

---

[115]    *Id.* at 20026, para. 31.

[116]    *Id.* at 20026, para. 31.

[117]    *BTNA Comments* at 4; *TMISC Comments* at 4; *GSA Comments* at 6; *GSA Reply* at 7.

[118]    *Joint Comments* at note 4; *Joint Reply* at note 2.

[119]    Joint Comments at note 4.  However, we note that the joint commenters acknowledge that the maintenance of information requirement is an additional mechanism for the Commission to monitor compliance with its rules and justifies mandatory detariffing for international services on routes where a U.S. carrier is affiliated with a foreign carrier with market power. *Joint Comments* at 8; *Joint Reply* at note 5.

[120]    *Domestic Detariffing Second Order on Reconsideration*, 14 FCC Rcd at 6016, para. 19.

[121]    *Id.* at 6015-16, para. 18.

EXHIBIT F

flexibility in complying with the public disclosure requirement. We do not mandate that information about rates, terms and conditions be provided in any particular format or any particular location. We generally expect that competition among carriers will provide carriers the incentives to post information online in a more user-friendly format.[122] Nevertheless, carriers must ensure that such information is available to the public in at least one location during regular business hours, and those carriers that have Internet websites must post this information on-line in a timely and easily accessible manner with regular updates.[123]

48. We agree with TMISC that the specific timeframes for filing and updating information for detariffed services that the Common Carrier Bureau adopted in the *Domestic Transition Order* will assist in achieving the consumer benefits of public disclosure and provide carriers adminstrative ease in complying with the requirements of both domestic and international detariffing.[124] Therefore, we similarly adopt the requirement that carriers, both during and after the transition period, update their internet websites within twenty-four hours and update public information sites within five days of the effective date of a change in the rates, terms, or conditions of a detariffed service.[125] Also, we adopt the proposal that carriers inform the public that this information is available when responding to consumer inquiries or complaints and specify the manner in which consumers may obtain the information. In addition, carriers must indicate on the title or first page of their cancelled tariffs, the address of their website and of the public information site where the rates, terms, and conditions for their international interexchange services can be found.[126]

49. We note that Level 3 opposes the application of the public disclosure and contract filing requirements to international private line services and dedicated access services, as well as to the voice services of large business and carrier end-users.[127] Level 3 argues that it is mass market consumer end-users of international interexchange voice services, rather than large business or carrier end-users, who will benefit from the public disclosure of a carrier's service and that it is highly unlikely that mass market customers will acquire international private lines.[128] Both Level 3 and Ad Hoc argue that business customers who purchase international private lines and dedicated access services have substantial knowledge of the telecom market and would gain little or no benefit from the public availability of a carrier's "generic" rates and services.[129] Therefore, Level 3 requests that the Commission rely solely upon the marketplace to address the information requirements of sophisticated customers.[130] Level 3 also

---

[122]   *BTNA Comments* at 4-5.

[123]   *NPRM*, 15 FCC Rcd at 20024, para. 25 (citing *Domestic Detariffing Second Recon Order*, 14 FCC Rcd at 6015-16, para. 18).

[124]   *TMISC Comments* at 7.

[125]   *Transition Order* at para. 17.

[126]   *NPRM*, 15 FCC Rcd at 20024, para. 25.

[127]   *Level 3 Comments* at 3. *See infra* Part II.E. for a discussion of the contract filing requirements.

[128]   *Level 3 Comments* at 4.

[129]   *Id.* at 5; *Ad Hoc Reply* at 8.

[130]   *Level 3 Comments* at 5.

**EXHIBIT F**

raises concerns that it will be required to disclose online proprietary information.[131]

50. We find that there is no persuasive reason why international business customers or other carrier end-users may not also benefit from public disclosure even if the information appears "generic." As we discussed above, our detariffing policies are intended to apply to all interexchange services.[132] In the domestic proceeding, the Commission intended to provide the public disclosure benefits of detariffing and a less regulated market to all consumers. The Commission possessed evidence in the domestic proceeding that businesses, as well as mass market customers, benefit from public disclosure by being able to compare service offerings.[133] Availability of service information will help facilitate efficient telecommunications decisions for all segments of consumers.[134] Moreover, regarding Level 3's concerns about proprietary information, we do not expect carriers to provide more information publicly than would normally be contained in a tariff.[135] Therefore, proprietary information that a carrier would not disclose in a public tariff need not be disclosed on-line or elsewhere.

51. Ad Hoc raises concerns about the potential anticompetitive harm from requiring public disclosure of rate and service information. Ad Hoc argues, as it previously did in the domestic detariffing proceeding, that public disclosure could increase the ability of carriers to engage in parallel pricing or tacit price coordination.[136] However, as the Commission explained in the domestic proceeding and in the *NPRM*, the concerns about potential collusive behavior resulting from public disclosure, on balance, are outweighed by the benefits of public disclosure for numerous reasons.[137] As the Commission set forth in the *Domestic Detariffing Second Order on Reconsideration,* there is abundant evidence that disclosure and dissemination of service information is beneficial to competition. On the other hand, the evidence to the contrary that public disclosure is harmful is "sparse and indeterminate."[138] Moreover, in a marketplace with many competitors and low barriers to entry, engaging in anticompetitive or collusive behavior is unlikely. Furthermore, even if evidence of tacit price coordination existed, a public disclosure requirement would not greatly increase the risk of harm to competition. As the Commission has recognized, non-dominant interexchange carriers will continue to obtain information about their competitors' rates and service offerings regardless of whether the Commission requires public disclosure.[139] Therefore the absence of a public disclosure requirement would deny consumers the benefits of such a requirement without minimizing the possibility that

---

[131]    *Id.* at 7.

[132]    *See discussion supra* para. 11.

[133]    *Domestic Detariffing Second Order on Reconsideration*, 14 FCC Rcd at 6014-15, note 60.

[134]    We note that the GSA, the representative of Federal Executive Agencies as large customers of telecommunications services, supports the public disclosure requirements. *GSA Comments* at 6-7.

[135]    *Domestic Detariffing Order*, 11 FCC Rcd at 20,776, para. 84.

[136]    *Domestic Detariffing Order on Reconsideration*, 12 FCC Rcd at 15,050-54, paras. 66-73; Ad Hoc Reply at 7.

[137]    *NPRM,* 15 FCC Rcd at 20023, para. 24.

[138]    *Domestic Detariffing Second Order on Reconsideration*, 14 FCC Rcd at 6013-15, para. 16.

[139]    *Domestic Detariffing Order on Reconsideration,* 12 FCC Rcd at 15,052, para. 69.

EXHIBIT F

collusion could occur. Ad Hoc has not presented any new evidence in this proceeding that persuades us to alter this conclusion. We conclude, consistent with our findings in the domestic proceeding, that the best balance is struck in favor of consumer concerns and adopt the requirement that information about rates, terms, and conditions be made available to the public.[140]

52. Finally, we adopt the requirement that non-dominant carriers maintain price and service information regarding all of their international interexchange offerings and be able to submit this information within ten business days to the Commission upon request, consistent with the requirement that the Commission applied to non-dominant providers of domestic, interstate, interexchange services.[141] This maintenance of information requirement will assist the Commission in monitoring compliance with the Act and the Commission's rules and will help address potential violations that may require enforcement action. We anticipate that the information maintained will include the information disclosed to the public, in addition to supporting information regarding the rates, terms, and conditions of the carriers' international interexchange offerings. With respect to the type of underlying documentation carriers must maintain pursuant to this requirement, we intend for carriers to continue to keep the supporting information regarding services that is currently required under Part 61 of the Commission's rules for carriers submitting tariffs.[142] Furthermore, we require non-dominant interexchange carriers to retain the foregoing information for a period of at least two years and six months following the date that a carrier ceases to provide services on such rates, terms, and conditions, in order to afford the Commission enough time to notify a carrier of the filing of a complaint, which generally must be commenced within two years from the time the cause of action accrues.[143]

## C.    Application of Proposed Policies to U.S.-Authorized Affiliated Carriers Classified as Dominant for Specific International Routes.

### 1.    Background

53. The Commission requested comment in the *NPRM* on whether it should retain tariffs for U.S. non-dominant facilities-based carriers on routes where they have an affiliation with a foreign carrier possessing market power. The Commission questioned whether tariffs for such routes are required in order to monitor potential price squeeze behavior by such U.S. carriers.[144] Pursuant to the Commission's *Benchmarks Order*, there is a rebuttable presumption that an authorized carrier has engaged in price squeeze behavior if any of the authorized carrier's tariffed collection rates on an affiliated route are less than its average variable costs on that route, which the Commission defined, for purposes of applying the

---

[140]    *Domestic Detariffing Second Order on Reconsideration*, 14 FCC Rcd at 6015-16, para. 18.

[141]    *NPRM*, 15 FCC Rcd at 20024, para. 26. *Domestic Detariffing Order*, 11 FCC Rcd at 20,777-78, para. 87. We note that we do not propose to require that carriers make such supporting documentation available to the public.

[142]    *Cingular Wireless Comments* at note 23 (requesting clarification on what the Commission intended in the *NPRM* as constituting supporting information).

[143]    *NPRM*, 15 FCC Rcd at 20024, para. 26.

[144]    NPRM, 15 FCC Rcd at ___, para. ___.

**EXHIBIT** F

condition, as a carrier's net settlement rate plus any originating access charges.[145]

### 2.    Discussion

54. We find that it is in the public interest to extend our forbearance analysis and detariffing policies to include services provided by U.S. non-dominant carriers on routes on which they are affiliated with foreign carriers that possess market power. The Commission and interested parties will have the rate information they need to evaluate whether a carrier presumptively has engaged in price squeeze behavior on an affiliated route because carriers will be required under the rules we adopt in this order to make available to the public information about their rates.[146] In addition, the maintenance of information requirement will assist in addressing concerns regarding potential anticompetitive pricing strategies by U.S. carriers classified as dominant due to their foreign affiliations.

55. Accordingly, we conclude that the maintenance and disclosure of price and service information, along with the Commission's regulatory safeguards for certain affiliated routes,[147] are sufficient alternatives to the monitoring of tariffs for detecting price squeeze and other anticompetitive behavior by facilities-based carriers affiliated with foreign carriers that possess market power. We therefore find that it would not serve the public interest to deny the benefits of a more unregulated marketplace to carriers and consumers alike by requiring U.S. non-dominant carriers affiliated with a foreign carrier possessing market power to file tariffs. In addition, we note that several commenters support the Commission's tentative conclusion that differential treatment regarding the detariffing of non-dominant carriers having affiliations with foreign carriers possessing market power is unwarranted.[148] Therefore, we conclude that it is in the public interest that our forbearance analysis and adoption of complete detariffing apply to all non-dominant providers of international interexchange services, including affiliated facilities-based carriers on routes on which their foreign affiliates have market power.

### D.    Complete Detariffing of International CMRS Services

#### 1.    Background

56. The Commission has previously adopted complete detariffing for CMRS providers of

---

[145]    *Benchmarks Order,* 12 FCC Rcd at 19,908-09, para. 224. In addition to the rebuttable presumption, the *Benchmarks Order* applied to U.S. carriers' section 214 authorizations a condition that required that, before any U.S. carrier may provide facilities-based switched or private line service on a route where it is affiliated with a foreign carrier with market power, the foreign affiliate must offer all U.S. carriers on the route a rate for settling traffic that is at or below the relevant benchmark rate. In the Commission's 1999 *Benchmarks Reconsideration Order,* the Commission narrowed the application of this condition to U.S. carriers with foreign carrier affiliates that possess market power. *Benchmarks Reconsideration Order,* 14 FCC Rcd 9256 (1999). We note that the Commission has proposed to narrow further the condition by eliminating it for authorizations to provide facilities-based private line services. *In the Matter of 2000 Biennial Regulatory Review; Amendment of Parts 43 & 63 of the Commission's Rules,* IB Docket No. 00-231, Notice of Proposed Rulemaking, FCC 00-407 (rel. Nov. 30, 2000).

[146]    *See supra* Part II.B.

[147]    47 C.F.R. § 63.10(c).

[148]    *BTNA Comments* at 5; *CompTel Comments* at 3;

EXHIBIT F

domestic services pursuant to its authority in Section 332 of the Act.[149]  Nevertheless, as the Commission explained in the *NPRM*, the Commission chose to adopt a policy of permissive detariffing for international services to *unaffiliated* points and to maintain the statutory tariff requirement for international services to *affiliated* points for CMRS providers in its *CMRS Forbearance Order*.[150]  In the *CMRS Forbearance Order*, the Commission determined that the forbearance criteria of Section 10(a)(1) and (a)(2) were satisfied and supported detariffing on unaffiliated routes;[151] however, the Commission determined that permissive detariffing, rather than complete detariffing, would reduce transaction costs and administrative burdens on service providers.  Therefore, the Commission adopted permissive detariffing for unaffiliated routes as consistent with the public interest under Section 10(a)(3).[152]

57.  In the *NPRM*, the Commission proposed revisiting the conclusion that permissive detariffing of CMRS providers for international services on unaffiliated routes is in the public interest.  Instead, the Commission tentatively concluded that its analysis regarding the public interest need for complete detariffing of international interexchange services by non-dominant carriers in order to protect consumers and further competition applied equally to CMRS providers of international services.  The Commission also proposed to extend the policy of complete detariffing to CMRS providers on affiliated routes.  The Commission tentatively concluded that any concerns regarding price squeeze behavior by CMRS providers could be addressed by requiring these carriers to maintain price and service information for those routes on which they are affiliated with foreign carriers that possess market power.

### 2.    Discussion

58.  We determine that complete detariffing of international CMRS services, as the Commission has previously found appropriate with respect to domestic services provided by CMRS carriers, is warranted for all U.S.-international routes whether affiliated or not.  We find less relevant the Commission's previous concern that complete detariffing will increase the transactional and administrative burden on carriers by forcing them to contact and negotiate individual contracts with customers.  Instead, as we discussed above, we conclude that complete detariffing will not pose more than minimal burdens on carriers, as carriers may issue short standard contracts for customers.[153]  This is especially true, given that CMRS carriers generally already have contracts with their customers.  This conclusion warrants our revision of the Commission's prior decision to require permissive detariffing of international services by CMRS providers.  Verizon Wireless supports this view, arguing that complying with tariff requirements is actually more burdensome for carriers that primarily have contract relationships with customers and that generally do not possess the resources necessary to prepare and file tariffs routinely.[154]  Moreover, we find that the negative consequences for consumers of the "filed-rate"

---

[149]   *CMRS Second Report and Order*, 9 FCC Rcd 1411 (1994).  47 U.S.C. § 332.

[150]   *CMRS Forbearance Order*, 13 FCC Rcd at 16,884, para. 56.

[151]   *CMRS Forbearance Order*, 13 FCC Rcd at 16,885, paras. 57-58.

[152]   *Id.* at 16,885-86, para 59.

[153]   *NPRM,* 15 FCC Rcd at 20026, para. 30.  AT&T Wireless states that detariffing will not hamper CMRS providers' ability to establish service arrangements with customers, as tariffs are not the only means of establishing terms and conditions.  *AT&T Wireless Comments* at 2.

[154]   *Verizon Wireless Comments* at 3.

EXHIBIT F

doctrine similarly exist for consumers of international CMRS services.[155]  In addition, as previously explained, permissive detariffing for international interexchange services would not protect consumers from application of the filed rate doctrine.[156]  Therefore, we determine that it is in the public interest to prohibit CMRS providers from filing tariffs with respect to international interexchange services.

59.  With respect to affiliated routes, the Commission previously concluded in the *CMRS Forbearance Order* that it should not detariff CMRS providers serving international routes where the CMRS carrier is affiliated with a foreign carrier that terminates U.S. international traffic.[157]  The Commission's reasoning was based upon the need for tariff information to evaluate whether a carrier presumptively has engaged in price squeeze behavior on an affiliated route.  However, as we discussed above with respect to the detariffing of non-dominant interexchange carriers that are affiliated with foreign carriers with market power, applying the requirement for maintenance of price and service information to CMRS providers serving affiliated routes will provide the rate information necessary to enforce compliance with the condition.[158]

60.  Therefore, we adopt our proposal in the *NPRM* to extend the requirement that carriers maintain price and service information to CMRS providers of international interexchange services for those routes on which they are affiliated with foreign carriers that possess market power.  We clarify our intent in the *NPRM*, however, to limit the application of the maintenance of information requirement to services provided by a CMRS carrier on those affiliated routes where the affiliated foreign carrier has market power and collects settlement payments from U.S. carriers.  As the Commission explained in the *Benchmarks Order*, a price squeeze against competing U.S. carriers would only be possible on routes where an affiliated foreign carrier controls an essential input for providing service, *i.e.,* settlement payments.[159]  We further conclude that it is unnecessary to extend to CMRS providers the public disclosure requirements discussed in this order.  In this regard, we recognize that such requirements are currently not applicable to the provision of domestic services by CMRS providers.

61.  We note that Cingular Wireless LLC argues that there is no need to impose a maintenance of information requirement on CMRS providers offering service on affiliated routes solely through the resale of the international switched services of unaffiliated facilities-based carriers.[160]  Cingular states that the information requirement, like tariffing, is unwarranted for CMRS providers, given their comparatively small share of the U.S. international services market.[161]  Moreover, Cingular contends that it is not evident how any type of documentation a CMRS provider maintains to "support" the rates,

---

[155]    *See supra* Part II.A.2.

[156]    *See supra* Part II.A.3.

[157]    *CMRS Forbearance Order*, 13 FCC Rcd at 16,886-87, para. 60.

[158]    *See supra* Part II.C.  In addition, the Commission has recognized that carriers will continue to obtain information about their competitors' rates and service offerings regardless of whether the Commission requires public disclosure.  *See supra* para. 51.

[159]    *Benchmarks Order*, 12 FCC Rcd at 19,896, para. 192.

[160]    *Cingular Wireless Comments* at 1.

[161]    *Id.* at 6.

EXHIBIT F

terms, and conditions of its resold international services could further the Commission's objective of preventing and detecting a price squeeze on an affiliated route.[162] Cingular also suggests that there are ample alternative mechanisms to monitor anticompetitive behavior, including the Section 208 complaint process.[163]

62. Though we disagree that CMRS providers should not be subject to the maintenance of price and service information requirement as we discussed above,[164] we agree with Cingular's assertion that the maintenance of information requirement is unnecessary for CMRS providers offering services solely through the resale of the international switched services of unaffiliated facilities-based carriers. The Commission has previously determined that the competitive concerns associated with switched resale on affiliated routes are less significant than those associated with facilities-based entry.[165] Of specific relevance here are the Commission's findings in the *Foreign Participation Order* that: (1) switched resellers have substantially less incentive to engage in predatory price squeezes than facilities-based carriers because of their lack of control over facilities; and (2) it is easier to detect predatory price squeezes in the switched resale context than in the facilities-based context because wholesale rates are known or easily identifiable.[166] Therefore, the maintenance of information requirement on affiliated routes where a CMRS carrier provides services solely through the resale of switched services of unaffiliated providers would be unnecessary to prevent anticompetitive behavior and unduly burdensome. We recognize, however, that if a carrier currently providing service through the resale of an unaffiliated facilities-based provider possesses the appropriate authorization, the same carrier may begin to provide international service as a facilities-based carrier or through an affiliated facilities-based provider without further informing the Commission. As always, we expect carriers to comply with applicable Commission rules, including the maintenance of information requirement, if the nature of their provision of service changes. We accordingly make the necessary revisions to rules 20.15 and 42.11 to reflect the narrow application of the maintenance of information requirement to CMRS providers of international interexchange services.

63. In addition, we note that a further minor amendment to our rules is necessary. In Section 20.15 of the Commission's rules that addresses the tariffing requirements of CMRS providers, the language in paragraph (d) states that the Commission's definition of "affiliation" is contained in rule

---

[162]    *Id.* at 7.

[163]    *Cingular Wireless Comments* at 8.

[164]    *See infra* paras. 59, 60.

[165]    We note that if an authorized carrier provides services on a route on which it is affiliated with a foreign carrier possessing market power solely through the resale of the switched services of unaffiliated providers, the carrier is presumed non-dominant, and the Commission does not apply the dominant carrier safeguards in rule 63.10 to the carrier's provision of service on that route. 47 C.F.R. § 63.10(a)(4). *See also* Market Entry and Regulation of Foreign-Affiliated Entities, IB Docket No. 95-22, *Report and Order*, 11 FCC Rcd 3873 (1995), para. 143 (citing Regulation of International Common Carrier Services, *Report and Order*, 7 FCC Rcd 7331, 7335 (1992)).

[166]    *Rules and Policies on Foreign Participation in the U.S. Telecommunications Market*, IB Docket No. 97-142, Report and Order, 12 FCC Rcd 23891, 23979-83, *recon. denied in relevant part*, FCC 00-339 (rel. Sept. 19, 2000) at paras. 68-69.

EXHIBIT F

63.18(h)(1)(i), which no longer exists.[167]  The Commission's definition of "affiliation" is contained in rule 63.09(e).  We therefore make a minor amendment to revised rule 20.15 in order to reflect the correct definition of "affiliation."[168]

64.  In summary, we revise the Commission's previous policy of permissive detariffing for the international interexchange services of non-dominant CMRS providers for unaffiliated routes and tariffing for affiliated routes and, instead, adopt a policy of complete detariffing for the international interexchange services of non-dominant CMRS providers for both unaffiliated and affiliated routes.  We also adopt a requirement that a CMRS carrier, which does not provide services solely through the resale of the switched services of an unaffiliated U.S. facilities-based carrier, maintain price and service information for routes on which the CMRS carrier is affiliated with a foreign carrier possessing market power and collecting settlement payments from U.S. carriers.

### E.    Filing of Carrier-to-Carrier Contracts

#### 1.    Background

65.  In the *NPRM,* the Commission proposed modifying the contract filing requirements in Section 43.51 of the Commission's rules.  Section 43.51 requires certain common carriers providing domestic services and all common carriers providing international services to file with the Commission copies of carrier-to-carrier contracts for domestic and international services.[169]  Section 43.51, among other things, relates to the filing by a common carrier of contracts, agreements, concessions, licenses, authorizations or other arrangements to which it is a party.[170]  In that regard, Section 43.51 implements Section 211 of the Communications Act.[171]  Section 211(a) requires that every carrier file contracts with other carriers affecting traffic regulated under the Communications Act.[172]  Section 211(b), however, provides that the Commission "shall also have the authority to exempt any carrier from submitting copies of such minor contracts as the Commission may determine."[173]  As the Commission stated in the *NPRM,* it has found that Section 211(b) gives the Commission "the discretion to exempt carriers from filing contracts, including those referred to in Section 211(a), when we determine that those contracts are of minor significance to the regulatory scheme."[174]

---

[167]    47 C.F.R. § 63.09(e).

[168]    *See* Appendix B.

[169]    Section 43.51 also contains a reporting requirement that applies to any U.S. carrier that interconnects an international private line to the U.S. public switched network at the carrier's switch, 47 C.F.R. § 43.51(d), and the Commission's international settlements policy, 47 C.F.R. § 43.51(e).

[170]    *See* 47 C.F.R. § 43.51(a).

[171]    47 U.S.C. § 211.

[172]    47 U.S.C. § 211(a).

[173]    47 U.S.C. § 211(b).

[174]    *Amendment of Sections 43.51, 43.52, 43.53, 43.54 and 43.74 of the Commission's Rules to Eliminate Certain Reporting Requirements,* CC Docket No. 85-346, Report and Order, 1 FCC Rcd 933, 934, para. 10 (1986) (*Reporting Streamlining Order*).

EXHIBIT F

66. As the Commission explained in the *NPRM*, the Commission has previously found that foreign carriers that lack market power do not have the capability to harm competition in the U.S. market. Thus, for example, the Commission has determined that the International Settlements Policy should not apply to settlement arrangements between U.S. carriers and foreign carriers that lack market power. Similarly, with regard to the "No Special *Concessions*" rule, the Commission has found that exclusive arrangements between U.S. carriers and foreign carriers that lack market power would not likely result *in* harm to competition and consumers in the U.S. market.[175] Accordingly, the Commission concluded in its *ISP Reform Order* that it is no longer necessary, pursuant to rule 43.51, to require the filing of settlement rate arrangements with foreign carriers that lack market power in their foreign markets and amended the "No Special Concessions" rule to eliminate the requirement that U.S. carriers file copies of exclusive arrangements with foreign carriers lacking market power.[176] We also note that the Commission previously eliminated the rule 43.51 filing requirement for contracts between non-dominant carriers for U.S.-domestic services because such carriers, likewise, do not pose an anti-competitive threat because of their lack of control over bottleneck facilities and the fact that they face numerous competitors in the marketplace.[177]

67. Because the current language in Section 43.51 may not convey the Commission's policies clearly, the Commission proposed in the *NPRM* to modify Section 43.51 of the Commission's rules to simplify the language of the provision and to clarify that the rule only applies to U.S. carrier contracts for international common carrier service involving: (1) a foreign carrier that has market power in its foreign market, or (2) a U.S. carrier that has been classified as dominant on any route included in the contract, except for U.S. carriers classified as dominant on a particular route due only to a foreign carrier affiliation pursuant to Section 63.10.[178]

### 2.    Discussion

68. We adopt the Commission's tentative conclusion in the *NPRM* to clarify and modify Section 43.51 of the Commission's rules. The primary purpose for requiring the filing of contracts between carriers is to assist the Commission in monitoring whether carriers are following the Commission's rules

---

[175]    The "No Special Concessions" rule prohibits U.S. international carriers from agreeing to accept special concessions directly or indirectly from any foreign carrier with respect to any U.S. international route where the foreign carrier possesses sufficient market power on the foreign end of the route to affect competition adversely in the U.S. market. 47 C.F.R. § 63.14. The specific types of arrangements covered by the "No Special Concessions" rule are set forth in 47 C.F.R. § 63.14(b). *See also Foreign Participation Order*, 12 FCC Rcd at 23960-62, para. 163 (carriers must file contracts under Section 43.51).

[176]    *ISP Reform Order*, 14 FCC Rcd at 7971-73, paras. 21-29 and at 7980-81, para. 49. *See also* 47 C.F.R. § 43.51(g).

[177]    *See Amendment of Sections 43.51, 43.52, 43.53, 43.54 and 43.74 of the Commission's Rules to Eliminate Certain Reporting Requirements*, CC Docket No. 85-346, Notice of Proposed Rule Making, 102 FCC 2d 531, para. 4 ("Due to non-dominant carriers' lack of market power, and the competitive forces which surround them, we conclude that any contract between non-dominant carriers can be reasonably interpreted as 'minor' and thus subject to our exemption power under Section 211(b)."). *See also Reporting Streamlining Order*, 1 FCC Rcd at 933-34, paras. 2-3.

[178]    47 C.F.R. §§ 63.10, 43.51.

**EXHIBIT F**

or are otherwise acting in an anti-competitive manner.[179]  With respect to contracts filed pursuant to Section 43.51, the Commission has primarily been concerned with arrangements involving foreign carriers that possess market power on the foreign end of a route because such foreign carriers may have the ability to harm competition in the U.S. market.  Specifically, the Commission is concerned that foreign carriers may be able to "whipsaw" U.S. carriers by unilaterally setting the prices, terms and conditions under which U.S. carriers are able to exchange traffic.[180]  The filing requirements in Section 43.51 enable the Commission to enforce the International Settlements Policy and maintain regulatory oversight of accounting rate agreements to prevent whipsawing.[181]  In addition, the Commission is concerned that a foreign carrier with market power could adversely affect competition in the U.S. market by entering into an exclusive contract with a U.S. carrier.  To address this concern, the Commission adopted the "No Special Concessions Rule," which prohibits U.S. carriers from agreeing to accept special concessions from foreign carriers with market power.[182]  The filing requirements in Section 43.51 enable the Commission to enforce the "No Special Concessions Rule."

    69.  The Commission has limited the "No Special Concessions Rule" and the ISP to settlement and other arrangements with foreign carriers that possess market power.  With respect to the ISP, the Commission has found that there is no threat of whipsawing from foreign carriers that lack market power because U.S. carriers can respond to any whipsawing behavior by terminating their traffic with another carrier on the route.[183]  With respect to the "No Special Concessions Rule," the Commission has found that exclusive contracts with a foreign carrier that lacks market power will not harm competition in the U.S. because competing foreign carriers should have sufficient capacity to accommodate the demands of other U.S. carriers.[184]

    70.  As discussed above,[185] the Commission similarly has found that carriers that lack market power in their provision of U.S.-domestic services will generally be unable to engage in anticompetitive

---

[179]    *See, e.g, Foreign Participation Order*, 12 FCC Rcd at 24007, para. 259 ("[O]ur contract filing requirement in Section 43.51 of the Commission's rules enables us to detect instances where carriers enter into arrangements that are inconsistent with our rules and policies.").

[180]    "Whipsawing" is a practice that occurs when a foreign carrier with monopoly power pits competing U.S. carriers against one another in settlement rate negotiations, exploiting the fact that U.S. carriers unwilling to pay settlement rates demanded by foreign carriers would lose business on those routes to higher-bidding U.S. competitors, as there are no alternative means of terminating international traffic.  The Commission has determined that this practice can be detrimental to U.S. consumers as it can drive up the cost to U.S. carriers of terminating international traffic in foreign markets and hence, the prices to U.S. consumers.  *ISP Reform Order*, 14 FCC Rcd at 79773-74, para. 31.

[181]    *See 1998 Biennial Regulatory Review: Reform of the International Settlements Policy and Associated Filing Requirements*, IB Docket Nos. 98-148 and 95-22, CC Docket No. 90-337 (Phase II), Notice of Proposed Rule Making, 13 FCC Rcd 15,320 at 15,328-29, para. 21 (*ISP Reform NPRM*).

[182]    47 C.F.R. § 63.14

[183]    *1998 Biennial Regulatory Review, Reform of the International Settlements Policy and Associated Filing Requirements*, Report and Order, 14 FCC Rcd 7963(1999) (*ISP Reform Order*).

[184]    *Foreign Participation Order*, 12 FCC Rcd at 23, 958, para. 157.

[185]    *See supra*, para. 66.

**EXHIBIT F**

behavior in that market because of their lack of control over bottleneck facilities and competitive pressures from other carriers. On the basis of that finding, the Commission has found that it is not necessary to require the filing of copies of contracts between non-dominant carriers for U.S.-domestic services. We adopt our tentative conclusion in the NPRM that this same analysis applies to contracts between non-dominant U.S. carriers involving common carrier service between the U.S. and foreign points. No commenter in this proceeding has identified any factors unique to the provision of international service that make the filing of these contracts necessary. Nor has any commenter identified any competitive harms that the filing of contracts between carriers that both lack market power would help prevent.

71. Section 43.51 as presently drafted does not reflect clearly current Commission policies or market realities. Therefore, we amend the rule to clarify that only contracts involving carriers with market power need to be filed with the Commission. We modify Section 43.51 to state clearly that the rule applies solely to U.S. carrier contracts for international common carrier service involving: (1) a foreign carrier that has market power in its foreign market, or (2) a U.S. carrier that has been classified as dominant for any service on any route included in the contract except for U.S. carriers classified as dominant due only to a foreign carrier affiliation. We note that, to the extent that a carrier acts in an anti-competitive manner or otherwise violates our rules or policies, the Commission can obtain contracts and seek remedies against such improper activity through the Section 208 complaint process initiated by either a competitor or the Commission.[186] Moreover, the Commission maintains authority under Section 211 to require the filing of copies of contracts when it is necessary for implementation and review of compliance with our rules and policies.[187]

72. In order to implement the requirement that U.S. carriers file contracts with foreign carriers that have market power in a foreign market, Section 43.51 of the Commission's rules will specify that U.S. carriers shall use the Commission's published list of foreign carriers that do not qualify for the presumption, set forth in section 63.10(a)(3) of the rules, that they lack market power in a foreign market.[188]

73. We reject Level 3's request that the Commission exclude contracts with end-user customers for international private lines and for dedicated access services from the filing requirement in Section 43.51 and that the Commission exclude such contracts from the public disclosure requirement to the extent public disclosure may be applicable.[189] As we explained above,[190] those carrier-to-carrier

---

[186]   47 U.S.C. § 208. *See Domestic Detariffing Order on Reconsideration*, 12 FCC Rcd at 15051, para. 68 ("[Commission] can remedy any carrier conduct that violates the requirement that carriers make individually-negotiated service arrangements available to similarly-situated customers through the section 208 complaint process. . .").

[187]   *Reporting Streamlining Order*, 1 FCC Rcd at 933, para. 3.

[188]   The Commission adopted procedures for compiling this list in its *ISP Reform Order*, 14 FCC Rcd at 7978 –81, paras. 42-49. The Commission adopted this list for purposes of identifying settlement arrangements that are not required to comply with the International Settlements Policy and the Commission's No Special Concession Rule.

[189]   *See supra* Part II.B for a discussion of the disclosure and maintenance of price and service information.

[190]   *See supra*, paras. 68-70.

EXHIBIT F

contracts that involve U.S. or foreign carriers possessing market power pose potential anticompetitive harm to U.S. carriers and consumers and, therefore, we continue to require the filing of those carrier-to-carrier contracts under Section 43.51. We emphasize, however, that the filing requirement, as amended in this *Order*, is limited to U.S. carrier contracts for international common carrier service involving a foreign carrier that has market power in its foreign market or a U.S. carrier that has been classified as dominant on any route included in the contract, except for U.S. carriers classified as dominant on a particular route due only to a foreign carrier affiliation.

74. In addition, the Commission requested comment in the *NPRM* on whether to amend Section 43.51(a) to remove the language regarding rights granted to a U.S. carrier by a foreign government.[191] Several commenters agree with the Commission's tentative conclusion that it is unnecessary to require carriers to file copies of agreements with foreign governments. As we noted above, we require the filing of copies of contracts in order to determine whether carriers with market power are acting in a manner that may adversely affect competition in the U.S. market. Generally, we do not have that concern with agreements between U.S. carriers and foreign governments. To the extent that a foreign government is acting as a foreign carrier by directly providing international telecommunications services, the contract filing requirements would be applicable to carrier-to-carrier contracts involving the foreign government. We therefore adopt our proposal to eliminate the language in Section 43.51(a) regarding rights granted to U.S. carriers by foreign governments and adopt the other changes to Section 43.51 to make the rule easier to follow. Furthermore, we adopt the proposed amendments to Section 63.21 of the Commission's rules, regarding the conditions applicable to international authorizations, to reflect these changes.[192]

75. Some commenters request that the Commission take this opportunity to revise Section 43.61 of the Commission's rules, which requires U.S. carriers to file reports on international traffic.[193] In particular, SNET and Verizon Wireless argue that the Commission should eliminate the requirements of the rule for all non-dominant and CMRS carriers, respectively.[194] As we stated in the *Biennial Review 2000 Staff Report*, we recognize that it may be appropriate for the Commission to re-examine the current requirements in Section 43.61 of the Commission's rules.[195] However, we do not believe that this proceeding regarding detariffing of international interexchange services is the appropriate forum to consider possible revisions to the international traffic reporting rule. Instead, we plan to address and take into consideration comments on these and other concerns related to the requirements contained in Section 43.61 in the context of the Commission's current biennial regulatory review. If, as a result of the biennial regulatory review, we determine that revisions to the Section 43.61 international traffic reporting requirements may be warranted, we will commence a proceeding. We will incorporate the comments filed here on the Section 43.61 requirements into any future proceeding dealing with those rules.

---

[191]   *See* 47 C.F.R. § 43.51(a)(3).

[192]   Revisions to Sections 43.51 and 63.21 of the Commission's rules are included in Appendix B.

[193]   47 C.F.R. § 43.61.

[194]   *SNET* Reply at 4-5; Verizon *Wireless Comments* at 4-6.

[195]   *Federal Communications Commission Biennial Regulatory Review 2000,* Staff Report, FCC 00-346 (rel. Sept. 19, 2000).

EXHIBIT F

## III.    TRANSITION ISSUES

### A.    Background

76.  In the *NPRM*, the Commission requested comment on potential transition issues.[196]  In the domestic detariffing proceeding, the Commission established a transition period of nine-months for non-dominant carriers to detariff their domestic interexchange services and delegated those matters related to the transition to the Common Carrier Bureau.[197]  However, the nine-month transition period was interrupted by the litigation surrounding the domestic proceeding.  Subsequent to the resolution of the litigation, the Common Carrier Bureau sought comment on issues regarding the transition to a detariffed marketplace and established January 31, 2001 as the new domestic detariffing deadline.[198]  The Common Carrier Bureau also clarified that, during the transition, carriers would be permitted to file new or revised tariffs for mass market consumer long distance services, but carriers could not file new or revised long distance contract tariff offerings and other long-term arrangements.[199]  The Common Carrier Bureau subsequently determined in its *Domestic Transition Order* that it would extend the deadline for the detariffing of domestic mass market consumer services to April 30, 2001 in order to permit the Commission to consider the merits of establishing a coordinated timetable for the detariffing of domestic and international consumer services.[200]    Subsequently, the Common Carrier Bureau extended further the deadline for the detariffing of domestic mass market consumer services to July 31, 2001.  The Common Carrier Bureau retained the detariffing deadline of January 31, 2001 for large business contract-type services because it deemed the likelihood of confusion with respect to business customers much less of a concern than the potential customer confusion associated with mass market detariffing.

### B.    Discussion

77.  Several carriers request that the Commission grant a transition period of nine months to permit carriers sufficient time in order to adjust to a completely detariffed regime; to have the maximum flexibility to cancel tariffs; and to have the option of engaging in international detariffing after they have completed domestic detariffing.[201]  We grant carriers' request for a nine-month transition period from the effective date of this order for the detariffing of international interexchange services.  Though we believe that there will be certain efficiencies in detariffing international interexchange services gained from the domestic experience, we find merit in carriers' arguments that international detariffing may prove to be more complex than domestic detariffing because of the large number of international calling plans that will require contracts with customers and will need to be posted online.  Therefore, we adopt a transition period of nine-months from the effective date of this order to allow non-dominant carriers to cancel their tariffs for international interexchange services and become compliant with the rules we adopt in this

---

[196]    *NPRM,* 15 FCC Rcd at 20013, para. 5.

[197]    *Domestic Detariffing Order on Reconsideration*, 12 FCC Rcd at 15,044, para. 52.

[198]    *Public Notice*, DA 00-1028 (2000).

[199]    *Id.*

[200]    *Domestic Transition Order* at para. 4.

[201]    *CompTel Comments* at 2; *Excel Comments* at 2; *Joint Comments* at 4, 14.

EXHIBIT F

order.[202]  In so doing, we will permit, during the transition period, non-dominant carriers to file new or revised tariffs for mass market international interexchange services only.  We will not allow the filing of new or revised contract tariffs or other long-term arrangements for international interexchange services during the transition period.

78.  Once a carrier has detariffed its international services, it must be in compliance with the relevant public information and disclosure requirements.[203]  We require that carriers post information on their websites regarding new or revised detariffed offerings within twenty-four hours and update their public information sites within five days of such offerings taking effect.[204]  These transition requirements are the same as those established for the detariffing of domestic services.

79.  During the transition period, we expect that carriers will communicate with their customers about the change in status from a tariffed to detariffed environment.  While we believe that consumers will be protected by state consumer and contract laws after detariffing takes effect, we encourage carriers to make basic information available in their communications with their customers to avoid customer confusion.  Useful information would include the price of the calling plan that the customer currently subscribes to, the duration of the plan, the means of accepting (or rejecting) the terms of the plan, the notification procedures the carriers intends to use regarding changes in the plan, the dispute resolution mechanism, if any, that the carrier or the customer may invoke, and any other information that the carrier deems relevant to ensure a smooth transition.

80.  Several commenters also request that the Commission coordinate the deadlines for domestic and international services in order to minimize customer confusion and to ensure a smooth transition to a detariffed regime for domestic and international interexchange services.[205]  According to Excel, differing deadlines for domestic and international detariffing pose two potential problems:  (1) customer confusion, and (2) increased implementation costs.[206]  Commenters argue that consumer uncertainty and confusion will result from having separate deadlines because such an approach is inconsistent with consumer expectations about long distance calling plans.[207]  Also, commenters assert that carriers will have to incur needless costs associated with detariffing multiple times if domestic and international detariffing are not simultaneous.[208]  Moreover, parties express concern that international detariffing will be more difficult than domestic detariffing to implement in light of the number of countries and specialized nature of international calling plans.[209]  According to Viatel, carriers will incur the specific

---

[202]     We expect carriers to follow the same procedures to cancel tariffs set forth in the public notice issued by the Common Carrier Bureau on May 9, 2000.  *See Public Notice*, DA 00-128 (rel. May 9, 2000).

[203]     *Domestic Transition Order* at para. 15.

[204]     *Id.* at para. 17.

[205]     *See e.g., Ad Hoc Reply* at 3; *BTNA Comments* at 6; *CompTel Comments* at 4; *Excel Comments* at 1; *Viatel Comments* at 2; *Joint Comments of WorldCom, AT&T, Concert, Qwest, and Sprint* at 4, 12.

[206]     *Excel Comments* at 2.

[207]     *CompTel Comments* at 4; Viatel *Comments* at 2.

[208]     *CompTel Comments* at 4; *Joint Comments* at 13.

[209]     *Joint Comments* at 13.

**EXHIBIT F**

detariffing costs of changing or eliminating existing tariffs; developing or making changes to existing websites or other sources of information to comply with the new requirements; producing mailings and materials to educate customers; implementing a distribution system for such materials; preparing personnel; and developing standard contracts.[210] In addition, Excel claims that, with different detariffing deadlines, carriers will eventually be forced to raise some or all retail rates to recover the costs of detariffing, thereby harming consumers.[211]

81. In an *ex parte* filing, AT&T reiterates its desire for the Commission to delay further the implementation date for the detariffing of domestic services to allow carriers to detariff domestic and international services on the same date. AT&T notes, however, that it will be prepared to detariff domestic and international services on the same date if the Commission extends the date for detariffing domestic services to July 31, 2001 and if the Commission has adopted an order on detariffing for international services by March 2001.[212] In response to AT&T's ex parte filing, the Common Carrier Bureau extended the deadline for the detariffing of domestic mass market consumer services to July 31, 2001.[213]

82. The Commission's domestic detariffing policies have been delayed substantially since first adopted in 1996. We are committed to ensuring that consumers experience the benefits of domestic detariffing without significant further delay unless there are compelling reasons to warrant another extension of the deadline. The Common Carrier Bureau has already extended the deadline for domestic detariffing to July 31, 2001 in order to provide carriers an opportunity to detariff international and domestic services at the same time. As AT&T notes, the further extension for detariffing of mass market domestic services granted by the Common Carrier Bureau will enable at least some carriers to detariff both domestic and international services at the same time.[214] We believe that the additional extension granted by the Common Carrier Bureau strikes the proper balance between providing an opportunity for carriers to detariff international and domestic services at the same time and addressing the Commission's concern that consumers receive the benefits of detariffing without undue delay. During the interim nine-month transition period for international detariffing, those carriers that are able to detariff their international services with their domestic services tariffs may, but will not be required to do so.

83. In summary, we find that it is in the public interest to grant a period of nine months from the effective date of this order for non-dominant carriers to detariff their international interexchange services, during which time carriers may continue to file new or revised mass market tariffs but may not file new or revised contract tariff offerings and long-term arrangements. We further delegate to the International Bureau the authority to address any other transition issues related to international detariffing that may arise when the rules we adopt in this order become effective.

---

[210]    *Viatel Comments* at 3.

[211]    *Excel Comments* at 3.

[212]    Letter from Michael F. Del Casino to Magalie Roman Salas, Secretary, FCC (filed Feb. 1, 2001) (*AT&T ex parte*).

[213]    *Public Notice*, DA 01-282 (2001).

[214]    AT&T *ex parte*.

EXHIBIT F

## IV.    ADMINISTRATIVE MATTERS

### A.    Final Regulatory Flexibility Certification

84.  The Regulatory Flexibility Act of 1980, as amended (RFA),[215] requires that a regulatory flexibility analysis be prepared for rulemaking proceedings, unless the agency certifies that "the rule will not have a significant economic impact on a substantial number of small entities."[216]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[217]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[218]  A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA).  An Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the NPRM.[219]  The Commission sought written public comment on the proposals in the NPRM, including comment on the IRFA. The one comment received on the IRFA is discussed below.

85.  There have been dramatic changes in the market for international interexchange services due to the increase in privatization and liberalization of foreign markets, the execution of the WTO Basic Telecom Agreement, the decrease in settlement rates, and the increase in competition in the U.S. international services market.  These changes have resulted in a substantial increase in the level of competition in the international interexchange services marketplace.  Therefore, we believe it is no longer necessary to require tariffs for international interexchange services under Section 203 of the Act, except for carriers classified as dominant for particular services on particular routes for reasons other than a foreign carrier affiliation under Section 63.10 of the rules.[220]  The Commission concludes that detariffing international interexchange services will serve to promote further the pro-competitive goals of the 1996 Telecommunications Act and foster increased competition.  The Order requires complete or mandatory detariffing, with limited exceptions, for the international interexchange services provided by non-dominant carriers. [221]  The rules and policies contained in the Order apply to all carriers providing

---

[215]     The RFA, see 5 U.S.C § 601 et. seq., has been amended by the Contract With America Advancement Act of 1996, Pub. L. No. 104-121, 110 Stat. 847 (1966) (CWAAA).  Title II of the CWAAA is the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA).

[216]     5 U.S.C. § 605(b).

[217]     5 U.S.C. § 601(6).

[218]     5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[219]     In NPRM, 15 FCC Rcd at 20031-20034, paras, 42-56.

[220]     Currently, the only entity that would be required to file contracts is Comsat.

[221]     See supra Part II A3.

EXHIBIT F

international common carrier service pursuant to Section 214 of the Act.[222]

86. We believe that this Order will reduce carriers' filing costs. Although eliminating the filing of tariffs with the Commission, the Order does require that non-dominant interexchange carriers make information available to the public concerning current rates, terms, and conditions for all international interexchange services, in at least one location during regular business hours. Carriers that have Internet websites also must post this information on-line. The Order also requires that non-dominant international carriers, with the exception of most commercial mobile service providers, maintain price and service information regarding all of their international service offerings. This price and service information should include the information covered by the public disclosure requirement as well as supporting documents for the rates, terms and conditions of the offerings. The Order does not standardize the maintenance of information and public disclosure requirements so that carriers may maintain and disclose their rate information in a manner that is consistent with those business practices. These public disclosure and maintenance requirements are nominal because the information is currently maintained by all carriers, including small entities, in the normal course of business; and therefore, do not impose a significant economic impact on these small entities.

87. In addition, the Order reduces the filing of carrier-to-carrier contracts contained in Section 43.51. The Order clarifies that Section 43.51 applies solely to U.S. carrier contracts for international common carrier service involving: (1) a foreign carrier that has market power in its foreign market, or (2) a U.S. carrier that has been classified as dominant, for any service, on any route included in the contract, except for U.S. carriers classified as dominant due only to a foreign carrier affiliation. The Order eliminates the current requirement in Section 43.51(a)(3) that carriers file contracts related to rights granted by foreign governments, and stipulates that the Commission may obtain contracts and seek remedies against improper activity through the Section 208 complaint process initiated by either a competitor or the Commission. These modifications to the rules eliminate filing requirements on small entities and therefore, do not pose a significant economic impact on such entities.

88. The Commission has identified instances when tariffs will be permitted. The Commission's rules will permit carriers, including small entities, to file tariffs for their services with respect to international interexchange direct-dial services initiated by dialing a carrier's access code; and international interexchange services provided during the initial forty-five days of service or until there is a written contract between the carrier and the customer, but in no event shall the carrier provide service to its customer pursuant to tariff for more than forty-five days. The Order also adopts permissive detariffing for those "on-demand" mobile satellite services (MSS) services for which customers have not entered into pre-existing service contracts designating a particular provider. Finally, the Order also adopts permissive detariffing for international inbound collect calls. Carriers that permissively file tariffs under the Commission's rules will not be required to file information in addition to what is currently required. Therefore, these rules do not increase burdens on small entities, nor do they create a significant economic impact.

89. Therefore, we certify that none of the requirements of the Order will have a significant economic impact on a substantial number of small entities.

---

[222]    We are not certain as to the number of small entities that will be affected by the proposals. Agency data indicates there has been a steady increase in the number of Section 214 applications filed with the Commission. The total number of licensees is difficult to determine, because many licenses are jointly held by several licensees. Based on agency data, we estimate that there could be 800 applicants that might be a small entity.

EXHIBIT F

90. Only one commenter, Global Telecompetition Consultants, Inc. (GTC), addresses the issue of the RFA. GTC argues that the Commission did not perform the proper analysis in the RFA contained in the prior domestic detariffing proceeding. GTC raises this issue in this international detariffing proceeding because the international detariffing NPRM relies on the principles adopted in the domestic detariffing proceeding.

91. GTC's arguments focus on the "filed-rate" doctrine.[223] GTC construes the Commission's statements, both in the domestic proceeding and in the international detariffing NPRM, that complete detariffing will eliminate the possible invocation of the "filed-rate" doctrine, as "doing away with" the filed rate doctrine. GTC argues that detariffing, whether domestic or international, is not equivalent to the abolition of the "filed-rate" doctrine, which is a judicially-created doctrine that the Commission cannot overturn. Thus, GTC claims that the Commission exceeded its jurisdiction and acted arbitrarily and capriciously in its analysis of how complete detariffing would eliminate the "filed-rate" doctrine. Further, GTC claims that the Commission violated the RFA by engaging in a perfunctionary analysis of complete detariffing's effect on the "filed-rate" doctrine and how its elimination of the doctrine would affect small carriers. GTC does not, however, cite to any specific harms caused small carriers from either domestic or international detariffing.

92. We disagree with GTC's argument that, by ordering complete detariffing, the Commission has purported to "overturn" a judicial doctrine. Rather than "doing away with" the filed-rate doctrine, the Commission in the domestic and international proceedings has simply exercised its forbearance authority granted in Section 10 of the Act. Congress expressly empowered the Commission to forbear in certain circumstances from the statutory provisions of the Act.[224] The Commission's statutory authority in Section 10 to forbear from applying Section 203 of the Act and to prohibit the filing of tariffs has been upheld by the U.S. Court of Appeals for the D.C. Circuit.[225] Moreover, commenters concur that, in light of the D.C. Circuit's ruling, the Commission has the authority to require international carriers to cancel their tariffs.[226] As the Commission explained in the domestic proceeding, the "filed-rate" doctrine has been applied to the rates, terms, and conditions of services specified in tariffs that are "duly filed" with the Commission in accordance with Section 203 of the Act.[227] Therefore, in the context of complete detariffing, if the Commission prohibits the filing of tariffs under Section 10, there are no tariffs "duly filed" with the Commission and carriers have no opportunity to invoke the "filed-rate" doctrine. Because we reject GTC's interpretation of the Commission's action, we also dismiss GTC's argument that we have engaged in arbitrary and capricious decisionmaking in proposing to detariff international services.[228]

---

[223]   Pursuant to the filed-rate doctrine, where a filed tariff rate, term or condition differs from a rate, term, or condition set in a non-tariffed carrier-customer contract, the carrier is required to assess the tariff rate, term or condition. Consequently, if a carrier unilaterally changes a rate by filing a tariff revision, the newly filed rate becomes the applicable rate unless the revised rate is found to be unjust, unreasonable, or unlawful under the Communications Act. *See supra* n. 57

[224]   *See supra* note 7.

[225]   *See supra* discussion, para. 3.

[226]   *CompTel Comments* at 2; *Joint Comments* at 5.

[227]   *Domestic Detariffing Second Order on Reconsideration*, 14 FCC Rcd at 6015, para. 17.

[228]   *GTC Comments* at 11.

EXHIBIT F

93. We further note that, although there are similar policy rationales for detariffing domestic and international interexchange services, the Commission developed an independent record for detariffing international interexchange services in this proceeding. Thus, the Commission does not rely on the analysis contained in the domestic detariffing proceeding, but rather analyzes the full impact of the policies contained in this Order on all parties including small businesses. As noted above, the Commission incorporated an IRFA in the NPRM in this proceeding.[229] The Commission tentatively concluded in the IRFA that its detariffing proposals were the least burdensome alternatives on small entities and that eliminating the tariff requirement would reduce administrative costs to all entities, including small entities. The Commission sought comment on those tentative conclusions.[230] In this Order, we affirm the tentative conclusions in the NPRM and determine that complete detariffing will permit all carriers, including small carriers, to have the flexibility necessary to respond to dynamic price and service changes in the marketplace and will best protect consumers from the rates, terms and conditions that violate the Communications Act.[231]

94. **Report to Congress**: The Commission will send a copy of the Order, including a copy of the Final Regulatory Flexibility Certification, in a report to Congress pursuant to the Small Business Regulatory Enforcement Fairness Act of 1996.[232] In addition, the Commission will send a copy of the Order, including a copy of the Final Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the SBA. A copy of the Order and Final Regulatory Flexibility Certification will also be published in the Federal Register.[233]

### B. Final Paperwork Reduction Act of 1995 Analysis

95. This Order contains either new or modified information collections subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. It will be submitted to the Office of Management and Budget (OMB) for review under the emergency processing provisions of the PRA. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public to comment on the information collection(s) contained in this Order as required by the PRA. Public and agency comments on the request for emergency approval of the information collection requirements are due 14 days after date of publication of this Order in the Federal Register. Public and agency comments on the request for regular approval of the information collection requirements are due 60 days after date of publication of this Order in the Federal Register. Comments should address: (a) whether the new or modified collection of information is necessary for the proper performance of the functions of the Commission, including whether the information shall have practical utility; (b) the accuracy of the Commission's burden estimates; (c) ways to enhance the quality, utility, and clarity of the information collected; and (d) ways to minimize the burden of the collection of information on the respondents, including the use of automated collection techniques or other forms of information technology.

---

[229]   *See supra, para.* 84.

[230]   *NPRM*, 15 FCC Rcd at 20034, paras. 52-55.

[231]   *See supra.* paras. 28, *see also* 47 U.S.C.§§ 201, 202.

[232]   *See* 5 U.S.C. § 801(a)(1)(A).

[233]   *See* 5 U.S.C. § 605(b).

96. All comments regarding the requests for approval of the information collection, both regular and emergency, should be submitted to Judy Boley, Federal Communications Commission, Room 1-C804, 445 12th Street, SW, Washington, DC 20554, or via the Internet to jboley@fcc.gov; phone 202-418-0214. In addition, comments on the emergency request for approval of the information collections should be submitted to Edward C. Springer, OMB Desk Officer, Room 10236 NEOB, 725 17th Street, NW, Washington, DC 20503 or via the Internet to edward.springer@omb.eop.gov.

## V.    ORDERING CLAUSES

97. Accordingly, IT IS ORDERED, that, pursuant to Sections 1- 4, 10, 11, 201-205, 211, 218, 220, 226, 303(g), 303(r) and 332 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 160, 161, 201-205, 211, 218, 220, 226, 303(g), 303(r) and 332 the REPORT AND ORDER is hereby ADOPTED.

98. IT IS FURTHER ORDERED that, the Commission's Consumer Information Bureau, Reference Information Center shall send a copy of *this* REPORT AND ORDER, including the Final Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the Small Business Administration.

99. IT IS FURTHER ORDERED that, the policies, rules and requirements established in this decision shall take effect thirty days after publication in the Federal Register or in accordance with the requirements of 5 U.S.C. § 801 (a)(3) and 44 U.S.C. § 3507.

FEDERAL COMMUNICATIONS COMMISSION

Magalie Roman Salas
Secretary

**APPENDIX A – LIST OF PARTIES**

**EXHIBIT F**

**Federal Communications Commission**                    **FCC 01-93**

Ad Hoc Telecommunications Users Committee
and the New York Clearing House Association, L.L.C. (*Ad Hoc*):  *Reply*
Allegiance Telecom, Inc. (*Allegiance Telecom*):  *Comments*
AT&T Wireless Services, Inc. (*AT&T Wireless*):  *Comments*
BT North America Inc. (*BTNA*):  *Comments*
Cingular Wireless LLC (*Cingular Wireless*):  *Comments*
The Competitive Telecommunications Association (*CompTel*):  *Comments*
COMSAT Mobile (*ComSat*):  *Comments*
Excel Communications, Inc. (*Excel*):  *Comments, Ex parte*
General Services Administration (*GSA*):  *Comments, Reply*
Global Telecompetition Consultants, Inc. (*GTC*):  *Comments*
Level 3 Communications, LLC (*Level 3*):  *Comments*
SNET America, Inc. and Southwestern Bell Communications Services, Inc. (*SNET*):  *Reply*
The Telecommunications Management Information Systems Coalition (*TMISC*):  *Comments*
Teleglobe USA Inc. (*Teleglobe*):  *Ex parte*
Verizon Wireless (*Verizon Wireless*):  *Comments*
Verizon (*Verizon*):  *Comments*
Viatel, Inc. (*Viatel*):  *Comments, Reply*
WorldCom, AT&T, Concert, Qwest, and Sprint (*Joint Commenters*):  *Comments, Reply, Ex Parte*

**EXHIBIT F**

## APPENDIX B – FINAL RULES

## AMENDMENTS TO THE CODE OF FEDERAL REGULATIONS

For the reasons discussed in the preamble, the Federal Communications Commission amends 47 C.F.R

parts 0, 20, 42, 43, 61, 63 and 64 as follows:

## PART 0 – COMMISSION ORGANIZATION

1.   The authority citation for part 0 continues to read as follows:

Authority: 47 U.S.C. 155.

2.   Section 0.457 is amended by revising paragraph (d)(1)(vi) to read as follows:

§ 0. 457 Records not routinely available for public inspection.

*****

    (d) ***

    (1) ***

(vi)  The rates, terms and conditions in any agreement between a U.S. carrier and a foreign carrier that govern the settlement of U.S. international traffic, including the method for allocating return traffic, if the U.S. international route is exempt from the international settlements policy under § 43.51(e)(3) of this Chapter.

*****

## PART 20 – COMMERCIAL MOBILE RADIO SERVICES

3.   The authority citation for part 20 continues to read as follows:

Authority: 47 U.S.C. 154, 160, 251-254, 303, and 332 unless otherwise noted.

4.   Section 20.15 is amended by revising paragraphs (c) and (d) to read as follows:

§ 20.15 Requirements under Title II of the Communications Act.

*****

    (c)  Commercial mobile radio service providers shall not file tariffs for international and interstate

service to their customers, interstate access service, or international and interstate operator service.

EXHIBIT F

Sections 1.771 through 1.773 and part 61 of this chapter are not applicable to international and interstate services provided by commercial mobile radio service providers. Commercial mobile radio service providers shall cancel tariffs for international and interstate service to their customers, interstate access service, and international and interstate operator service.

(d)  Except as specified as in paragraphs (d)(1)-(2), nothing in this section shall be construed to modify the Commission's rules and policies on the provision of international service under Part 63 of this Chapter.

(1) Notwithstanding the provisions of § 63.21(c) of this Chapter, a commercial mobile radio service provider is not required to comply with § 42.10 of this Chapter.

(2)  A commercial mobile radio service (CMRS) provider that is classified as dominant under § 63.10 of this Chapter due to an affiliation with a foreign carrier is required to comply with § 42.11 of this Chapter if the affiliated foreign carrier collects settlement payments from U.S. carriers for terminating U.S. international switched traffic at the foreign end of the route. Such a CMRS provider is not required to comply with §42.11, however, if it provides service on the affiliated route solely through the resale of an unaffiliated facilities-based provider's international switched services.

(3)  For purposes of paragraphs (d)(1)-(2) of this section, *affiliated* and *foreign carrier* are defined in § 63.09 of this Chapter.

*****

## PART 42 – PRESERVATION OF RECORDS OF COMMUNICATIONS COMMON CARRIERS

5.  The authority citation for part 42 continues to read as follows:

Authority:  Section 4(i), 48 Stat. 1066, as amended, 47 U.S.C. 154(i).  Interprets or applies sections 219 and 220, 48 Stat. 1077-78, 47 U.S.C. 219, 220.

6.  Section 42.10 is amended by revising paragraph (a) to read as follows:

§ 42.10 Public availability of information concerning interexchange services.

EXHIBIT F

(a)  A nondominant interexchange carrier (IXC) shall make available to any member of the public, in at least one location, during regular business hours, information concerning its current rates, terms and conditions for all of its international and interstate, domestic, interexchange services.  Such information shall be made available in an easy to understand format and in a timely manner.  Following an inquiry or complaint from the public concerning rates, terms and conditions for such services, a carrier shall specify that such information is available and the manner in which the public may obtain the information.

*****

§ 42.11 Retention of information concerning detariffed interexchange services.

(a)  A nondominant IXC shall maintain, for submission to the Commission and to state regulatory commissions upon request, price and service information regarding all of the carrier's international and interstate, domestic, interexchange service offerings.  A commercial mobile radio service (CMRS) provider shall maintain such price and service information only about its international common carrier service offerings and only for those routes on which the CMRS provider is classified as dominant under § 63.10 of this Chapter due to an affiliation with a foreign carrier that collects settlement payments from U.S. carriers for terminating U.S. international switched traffic at the foreign end of the route.  Such a CMRS provider is not required to maintain its price and service information, however, on any such affiliated route if it provides service on that route solely through the resale of an unaffiliated facilities-based provider's international switched services.  The price and service information maintained for purposes of this paragraph shall include documents supporting the rates, terms, and conditions of the carrier's international and interstate, domestic, interexchange offerings.  The information maintained pursuant to this section shall be maintained in a manner that allows the carrier to produce such records within ten business days.  For purposes of this paragraph, *affiliated* and *foreign carrier* are defined in § 63.09 of this Chapter.

*****

EXHIBIT F

**PART 43 – REPORTS OF COMMUNICATION COMMON CARRIERS AND CERTAIN AFFILIATES**

8.  The authority citation for part 43 continues to read as follows:

Authority:  47 U.S.C. 154; Telecommunications Act of 1996, Pub.L. 104-104, sec. 402(b)(2)(B), (c), 110

Stat. 56 (1996) as amended unless otherwise noted.  47 U.S.C. 211, 219, 220 as amended.

9.  Section 43.51 is revised to read as follows:

§ 43.51 Contracts and concessions.

(a) (1) Any communication common carrier described in paragraph (b) of this section must file with

the Commission, within thirty (30) days of execution, a copy of each contract, agreement, concession,

license, authorization, operating agreement or other arrangement to which it is a party and amendments

thereto with respect to the following:

(i)  The exchange of services; and,

(ii)  The interchange or routing of traffic and matters concerning rates, accounting rates,

division of tolls, or the basis of settlement of traffic balances, except as provided in paragraph (c) of this

section.

(2)  If the contract, agreement, concession, license, authorization, operating agreement or other

arrangement and amendments thereto is made other than in writing, a certified statement covering all

details thereof must be filed by at least one of the parties to the agreement. Each other party to the

agreement which is also subject to these provisions may, in lieu of also filing a copy of the agreement,

file a certified statement referencing the filed document. The Commission may, at any time and upon

reasonable request, require any communication common carrier not subject to the provisions of this

section to submit the documents referenced in this section.

(b)  The following communication common carriers must comply with the requirements of

paragraph (a) of this section:

EXHIBIT F

(1) a carrier that is engaged in domestic communications and has not been classified as non-dominant pursuant to § 61.3 of this Chapter,

(2) a carrier, other than a provider of commercial mobile radio services, that is engaged in foreign communications and enters into a contract, agreement, concession, license, authorization, operating agreement or other arrangement and amendments thereto with a foreign carrier that does not qualify for the presumption, set forth in Note 3 to this section, that it lacks market power on the foreign end of one or more of the international routes included in the contract, or

(3) a carrier that has been classified as dominant for any service on any of the international routes included in the contract, except for a carrier classified as dominant on a particular route due only to a foreign carrier affiliation under § 63.10 of this Chapter.

(c) With respect to contracts coming within the scope of paragraph (a)(1)(ii) of this section between subject telephone carriers and connecting carriers, except those contracts related to communications with foreign or overseas points, such documents shall not be filed with the Commission; but each subject telephone carrier shall maintain a copy of such contracts to which it is a party in appropriate files at a central location upon its premises, copies of which shall be readily accessible to Commission staff and members of the public upon reasonable request therefor; and upon request by the Commission, a subject telephone carrier shall promptly forward individual contracts to the Commission.

(d) ***

(e) International settlements policy. (1) Except as provided in paragraph (e)(3) of this section, if a carrier files an operating or other agreement with a foreign carrier pursuant to paragraph (a) of this section to begin providing switched voice, telex, telegraph, or packet-switched service between the United States and a foreign point and the terms and conditions of such agreement relating to the exchange of services, interchange or routing of traffic and matters concerning rates, accounting rates, division of tolls, the allocation of return traffic, or the basis of settlement of traffic balances, are not

EXHIBIT F

identical to the equivalent terms and conditions in the operating agreement of another carrier providing the same or similar service between the United States and the same foreign point, the carrier must also file with the International Bureau a modification request under § 64.1001 of this Chapter. Unless a carrier is providing switched voice, telex, telegraph, or packet-switched service on a route that is exempt from the international settlements policy, the carrier shall not bargain for or agree to accept more than its proportionate share of return traffic.

(2) Except as provided in paragraph (e)(3) of this section, if a carrier files an amendment, pursuant to paragraph (a) of this section, to an existing operating or other agreement with a foreign carrier to provide switched voice, telex, telegraph, or packet-switched service between the United States and a foreign point, and other carriers provide the same or similar service to the same foreign point, and the amendment relates to the exchange of services, interchange or routing of traffic and matters concerning rates, accounting rates, division of tolls, the allocation of return traffic, or the basis of settlement of traffic balances, the carrier must also file with the International Bureau a modification request under § 64.1001 of this Chapter.

(3) A carrier that enters into an operating or other agreement with a foreign carrier for the provision of a common carrier service on an international route is not subject to the requirements of paragraphs (e)(1)-(2) of this section if the route appears on the Commission's list of international routes that the Commission has exempted from the international settlements policy.

Note 1 to § 43.51(e)(3): The Commission's list of international routes exempted from the international settlements policy is available from the International Bureau's World Wide Web site at http://www.fcc.gov/ib. A party that seeks to add a foreign market to the list of markets that are exempt from the international settlements policy must show that U.S. carriers are able to terminate at least 50 percent of U.S.-billed traffic in the foreign market at rates that are at least 25 percent below the benchmark settlement rate adopted for that country in IB Docket No. 96-261, Report and Order, 12 FCC

EXHIBIT F

Rcd 19,806, 62 FR 45758 (Aug. 29, 1997). A party that seeks to remove a foreign market from the list of markets that are exempt from the international settlements policy must show that U.S. carriers are unable to terminate at least 50 percent of U.S.-billed traffic in the foreign market at rates that are at least 25 percent below the benchmark settlement rate adopted for that country in IB Docket No. 96-261.

(f) Confidential treatment. (1) A carrier providing service on an international route that is exempt from the international settlements policy under paragraph (e)(3) of this section, but that is otherwise required by paragraphs (a) and (b) of this section to file a contract covering service on that route with the Commission, may request confidential treatment under § 0.457 of this Chapter for the rates, terms and conditions that govern the settlement of U.S. international traffic.

(2) Carriers requesting confidential treatment under this paragraph must include the information specified in § 64.1001(c) of this Chapter. Such filings shall be made with the Commission, with a copy to the Chief, International Bureau. The transmittal letter accompanying the confidential filing shall clearly identify the filing as responsive to § 43.51(f).

Note 1 to § 43.51: For purposes of this section, *affiliated* and *foreign carrier* are defined in § 63.09 of this Chapter.

Note 2 to § 43.51: To the extent that a foreign government provides telecommunications services directly through a governmental organization, body or agency, it shall be treated as a foreign carrier for the purposes of this section.

Note 3 to § 43.51: Carriers shall rely on the Commission's list of foreign carriers that do not qualify for the presumption that they lack market power in particular foreign points for purposes of determining

EXHIBIT F

which of their foreign carrier contracts are subject to the contract filing requirements set forth in this section. The Commission's list of foreign carriers that do not qualify for the presumption that they lack market power in particular foreign points is available from the International Bureau's World Wide Web site at http://www.fcc.gov/ib. The Commission will include on the list of foreign carriers that do not qualify for the presumption that they lack market power in particular foreign points any foreign carrier that has 50 percent or more market share in the international transport or local access markets of a foreign point. A party that seeks to remove such a carrier from the Commission's list bears the burden of submitting information to the Commission sufficient to demonstrate that the foreign carrier lacks 50 percent market share in the international transport and local access markets on the foreign end of the route or that it nevertheless lacks sufficient market power on the foreign end of the route to affect competition adversely in the U.S. market. A party that seeks to add a carrier to the Commission's list bears the burden of submitting information to the Commission sufficient to demonstrate that the foreign carrier has 50 percent or more market share in the international transport or local access markets on the foreign end of the route or that it nevertheless has sufficient market power to affect competition adversely in the U.S. market.

## PART 61 – TARIFFS

10. The authority citation for part 61 continues to read as follows:

Authority: Sections 1, 4(i), 4(j), 201-205, and 403 of the Communications Act of 1934, as amended 47 U.S.C. sections 151, 154(i), 154(j), 201-205, and 403 unless otherwise noted.

11. Section 61.3 is amended by revising paragraph (y) to read as follows:

§ 61.3 Definitions.


*****

(y)   Non-dominant carrier.   A carrier not found to be dominant.   The nondominant status of

EXHIBIT F

providers of international interexchange services for purposes of this subpart is not affected by a carrier's classification as dominant under § 63.10 of this Chapter.

*****

12.  Section 61.19 is revised to read as follows:

§ 61.19 Detariffing of international and interstate, domestic interexchange services.

(a)  Except as otherwise provided in paragraphs (b) through (e) of this section, or by Commission order, carriers that are nondominant in the provision of international and interstate, domestic interexchange services shall not file tariffs for such services.

(b)  Carriers that are nondominant in the provision of international and domestic, interstate, interexchange services are permitted to file tariffs for dial-around 1+ services.  For the purposes of this paragraph, dial-around 1+ calls are those calls made by accessing the interexchange carrier through the use of that carrier's carrier access code.

(c)  Carriers that are nondominant in the provision of international and domestic, interstate, interexchange services are permitted to file a tariff for such services applicable to those customers who contact the local exchange carrier to designate an interexchange carrier or to initiate a change with respect to their primary interexchange carrier.  Such tariff will enable the interexchange carrier to provide service to the customer until the interexchange carrier and the customer consummate a written agreement, but in no event shall the interexchange carrier provide service to its customer pursuant to such tariff for more than 45 days.

(d)  Carriers that are nondominant in the provision of international inbound collect calls to the United States are permitted to file a tariff for such services.

(e)  Carriers that are nondominant in the provision of "on-demand" Mobile Satellite Services are permitted to file a tariff for such services applicable to those customers that have not entered into pre-existing service contracts designating a specific provider for such services.

EXHIBIT F

13.  Section 61.28 is revised to read as follows:

§ 61.28 International dominant carrier tariff filing requirements.

(a)  Any carrier classified as dominant for the provision of particular international communications services on a particular route for any reason other than a foreign carrier affiliation under § 63.10 of this Chapter shall file tariffs for those services pursuant to the notice and cost support requirements for tariff filings of dominant domestic carriers, as set forth in subpart E of this part.

(b)  Other than the notice and cost support requirements set forth in paragraph (a) of this section, all tariff filing requirements applicable to all carriers classified as dominant for the provision of particular international communications services on a particular route for any reason other than a foreign carrier affiliation pursuant to § 63.10 of this Chapter are set forth in subpart C of this part.

14.  Section 61.74 is amended by removing paragraph (d) and redesignating paragraphs (e) and (f) as paragraphs (d) and (e).

**PART 63 – EXTENSION OF LINES, NEW LINES AND DISCONTINUANCE, REDUCTION, OUTAGE AND IMPAIRMENT OF SERVICE BY COMMON CARRIERS; AND GRANTS OF RECOGNIZED PRIVATE OPERATING AGENCY STATUS**

15.  The authority citation for part 63 continues to read as follows:

Authority:  Section 1, 4(i), 4(j), 10, 11, 201-205, 214, 218, 403 and 651 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 154(i), 154(j), 160, 201-205, 214, 218, 403, and 571, unless otherwise noted.

16.  Section 63.10 is amended by removing paragraph (c)(1) and redesignating paragraphs (c)(2) through (6) as paragraphs (c)(1) through (5).

17.  Section 63.14 is amended by revising paragraph (c) to read as follows:

§ 63.14  Prohibition on agreeing to accept  special concessions.

*****

(c)  This section shall not apply to the rates, terms and conditions in an agreement between a U.S.

54

carrier and a foreign carrier that govern the settlement of international traffic, including the method for allocating return traffic, if the international route is exempt from the international settlements policy under § 43.51(e)(3) of this Chapter.

*****

18.   Section 63.17 is amended by revising paragraph (b)(3) to read as follows:

§ 63.17 Special provisions for U.S. international common carriers.

*****

(b) ***

(3)  Authorized carriers filing tariffs pursuant to §§ 61.19 or 61.28 of this Chapter that route U.S.-billed traffic via switched hubbing shall tariff their service on a "through" basis between the United States and the ultimate point of origination or termination;

*****

19.  Section 63.21 is amended by revising paragraphs (b) and (c) to read as follows:

§ 63.21 Conditions applicable to all international Section 214 authorizations.

*****

(b)  Carriers must file copies of operating agreements entered into with their foreign correspondents as specified in § 43.51 of this Chapter and shall otherwise comply with the filing requirements contained in that section.

(c)  Carriers regulated as dominant for the provision of a particular international communications service on a particular route for any reason other than a foreign carrier affiliation under § 63.10 shall file tariffs pursuant to Section 203 of the Communications Act, 47 U.S.C. 203, and part 61 of this Chapter. Except as specified in § 20.15(d) of this Chapter with respect to commercial mobile radio service providers, carriers regulated as non-dominant, as defined in § 61.3 of this Chapter, and providing detariffed international services pursuant to § 61.19 of this Chapter must comply with all applicable public disclosure and maintenance of information requirements in §§ 42.10 and 42.11 of this Chapter.

**EXHIBIT F**

*\*\*\*\*\**

## PART 64 – MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

20.  The authority citation for part 64 continues to read as follows:

Authority:  47 U.S.C. 151, 154, 201, 202, 205, 218-220, and 332 unless otherwise noted.

21.  Section 64.1001 is amended by revising paragraph (b) to read as follows:

§ 64.1001 International settlements policy and modification requests.

*\*\*\*\*\**

(b)  If the international settlement arrangement in the operating agreement or amendment referred to in § 43.51(e)(1) or (e)(2) of this Chapter differs from the arrangement in effect in the operating agreement of another carrier providing service to or from the same foreign point, the carrier must file a modification request under this section unless the international route is exempt from the international settlements policy under § 43.51(e)(3) of this Chapter.

*\*\*\*\*\**

**SEPARATE STATEMENT OF**

**COMMISSIONER SUSAN NESS**

EXHIBIT F

*Re:*     *2000 Biennial Regulatory Review; Policy and Rules Concerning the International, Interexchange Marketplace (IB Docket No. 00-202)*

Today's decision to eliminate unnecessary tariff filing requirements underscores our commitment to deregulate whenever there is competition and consumers are protected.  Carriers providing international services – like those providing domestic long distance services -- will now establish contractual arrangements with their customers just as virtually every other business in this country.

I also support our decision to require that carriers make public information about the rates and terms of their offerings.  Competition has provided consumers with a dizzying array of services and calling plan options.  Consumers often find carriers' marketing and billing information confusing and difficult to understand.

Public disclosure of rates and terms will increase the availability of information so that consumers can choose the telecommunications services that best meet their individual needs.  Consumers will have a powerful tool to shop around and compare rates, thereby leading to more informed decisions, and fewer unpleasant surprises when the bill arrives.

Consumers today can log onto a website, input their calling patterns, and receive a comparison of the interstate rates they would pay under different plans.  The public disclosure requirement ensures that consumer organizations continue to have access to the information necessary to provide and expand such services to consumers.

Economists generally agree that consumer access to accurate information is vital for the efficient functioning of competitive markets.  I am pleased that this decision provides for such access.  As a result of today's action, I expect competition in the international services market to intensify and consumers to reap the benefits.

**CONCURRING STATEMENT OF**

**COMMISSIONER HAROLD FURCHTGOTT-ROTH**

EXHIBIT F

Re: Policy and Rules Concerning the International, Interexchange Marketplace, 2000 Biennial
Regulatory Review, IB Docket No. 00-202 , Report and Order (adopted March 16, 2001).

I fully support today's decision to detariff the vast majority of international telecommunications
services.    However, as I stated at the NPRM stage of this proceeding, I fear that today's Order
perpetuates some flawed tariff policies that harm consumers and hinder full and efficient development of
the marketplace.[234]

As a general matter, I continue to object to the imposition of ineffective and burdensome rules in
the international context based on the purported need for symmetry with the domestic detariffing item. I
believe the better approach would have been to eliminate these obligations internationally now and call
for comment on changing these requirements domestically. I am hopeful that the Commission will revisit
all of these obligations as soon as practicable.

Our current international tariffing policies simply do not square with market realities. First and
fundamentally, I do not believe tariffs are a useful regulatory tool in a competitive marketplace. Indeed,
our permissive detariffing approach to some offerings  only serves to block consumer claims under the
filed rate doctrine. Telecommunications consumers should be entitled to the full panoply of rights that
consumers in other competitive markets enjoy. In this regard, competitive markets are driven in part by
consumer price comparison. Thus carriers have every incentive to disclose (and indeed advertise) their
rates.[235]  Today's item assumes the opposite – by creating a government mandate for disclosure both on
the web and in one physical location in the country.[236]   Similarly today's order imposes an unnecessary
record keeping requirement on international carriers. Under today's order, carriers must maintain records
for all international service offerings for a period of at least two years and six months.[237]   The item
justifies this obligation based on the need to have readily available information in the event a complaint
is filed (for example under sections 201 and 202 of the Act). Yet CMRS carriers are subject to the same
complaints, and we have no parallel obligation on those providers.   Carriers are well aware of their
potential liability.  If they were to dispose of these records in an irresponsible fashion, I have no doubt of
the Commission's ability to take appropriate action in a complaint case. Thus there appears to be little
need to create another document retention obligation.

In general today's item is simply too eager to mandate, and too reluctant to examine the utility of
the underlying rules.  In a quickly evolving and competitive marketplace, consumers and carriers will be
better served by a regulator that intervenes only when necessary – and focuses its discrete resources on
tackling the true problems instead of creating mandates to solve imaginary ones.

---

[234] See Concurring Statement of Commissioner Harold W. Furchtgott-Roth, *In the Matter of 2000
Biennial Regulatory Review Policy and Rules Concerning the International, Interexchange Marketplace*,
IB Docket No. 00-202, Notice of Proposed Rulemaking, FCC 00-367 at 42 (rel. Oct. 18, 2000) (urging
complete detariffing of international carriers and reexamination of policy of permissive detariffing for
domestic carriers).

[235]  A quick examination of international carriers websites reveals that carriers prominently advertise rate
information even in today's tariffed environment.

[236]  See ¶ 47. The ineffectiveness of physical location requirement is self-evident. The idea that consumers will
trek to the physical office of a carrier in order to gather rate information is bizarre.

[237] See ¶ 52.

**EXHIBIT F**

EXHIBIT F